**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| NOBOTS LLC,<br>Plaintiff,<br>vs.<br>GOOGLE, LLC,<br>Defendant. | Case No. 1:22-cv-00585-ADA<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement in which Nobots LLC ("Nobots") makes the following allegations against Google, LLC ("Google"), who without authority makes, distributes, offers for sale, and/or sells in the United States products and/or operating system software for products that infringe the Asserted Patents.

**PARTIES**

1. Plaintiff Nobots LLC is a limited liability company organized and existing under the laws of the State of Washington with a place of business at 13946 147th Place SE, Renton, Washington 98059. Nobots is the owner of all rights, title, and interest in and to United States Patent No. 9,595,008 (the "'008 Patent") and United States Patent No. 11,810,014 (the "'014 Patent") (together, the "Asserted Patents").

2. Defendant Google, LLC is a limited liability company organized under the laws of Delaware. Google maintains regular and established places of business throughout this District, including at 100 Congress Avenue, Austin, Texas, 78701; 901 E. Fifth Street, Austin, Texas, 78701; 500 West Second Street, Austin, Texas, 78701; 601 West Second Street, Austin, Texas, 78701; and 110 East Houston Street, San Antonio, Texas, 78205. Google may be served with

process through its registered agent, the Corporation Service Company, at 211 East 7th Street, Suite 620, Austin, Texas, 78701. Google is registered to do business in the State of Texas and has been since at least November 17, 2006.

3. Google also owns personal property throughout this District, including at 807 Ruby Drive, Austin, Texas, 78753; 10200 MC Kalla Place, Austin, Texas, 78758; 500 Chicon Street B, Austin, Texas, 78702; 500 West Second Street, Austin, Texas, 78701; 201 Colorado Street, Austin, Texas, 78701; 4100 Smith School Road, Austin, Texas, 78744; 701 E Parmer Lane, Austin, Texas, 78753; 845 Interchange Boulevard, Austin, Texas, 78721; 500 West Second Street 1450, Austin, Texas, 78701; 9606 N. Mo-Pac Expressway 700, Austin, Texas, 78759; 304 E. 24th Street, Austin, Texas, 78705; 100 East Houston Street, San Antonio, Texas, 78205; 8862 Garnett, San Antonio, Texas, 74221; 5903 Distribution, San Antonio, Texas, 78218; 819 S Laredo, San Antonio, Texas, 78204; 2350 South Midkiff Road, Midland, Texas, 79701; 500 West Overland Avenue, El Paso, Texas, 79901; 501 West Overland Avenue, El Paso, Texas, 79901; 4140 Rio Bravo Street, El Paso, Texas, 79902.

4. Google does business in this District and across the State of Texas. It has over 1,700 full-time employees in Texas. On information and belief, the majority of those employees are located in this District. Google proudly touts that it provided $26.45 billion of economic activity for 162,400 Texas businesses, nonprofits, publishers, creators, and developers in 2020, and that 1.43 million Texas businesses connect directly with their customers using Google products, including those that infringe and unlawfully profit off the inventions claimed in the Asserted Patents. In 2021, Google announced its plans to invest $50 million in Texas that year in office space and data centers alone. Google also proudly touts that it has awarded over $10 million in grants to nonprofits and organizations based in Texas, has donated over $10 million in charitable

giving to Texas nonprofits, and has invested more than $1 billion in renewable energy in Texas. For these and other reasons, and to generate additional business in and tax incentives from the State of Texas, Google proudly calls this District, "Our home in the Lone Star State," for which "Google is proud to have roots in Texas, with our Austin office housing teams focused on Android, Google Cloud, finance, and more," including designing, implementing, and monetizing those instrumentalities, methods, and systems that infringe the Asserted Patents.[1]

5. In addition to its offices and employees in this District, Google also has places of business and employees and agents conducting its business throughout the State of Texas, including through methods, practices, and systems that unlawfully infringe and make money off the inventions claimed in the Asserted Patents, such as at its office in Dallas, its data center in Midlothian, and its office in Houston (built in 2021).

6. On information and belief, Google's in-house legal department also has a substantial presence in Austin, Texas. Google's Careers website includes job postings for both "Litigation Counsel, Patent Litigation" and "Litigation Paralegal" roles with the option to work in Austin.[2] Given the location of Google legal personnel in Austin, on information and belief, documents, materials, and potential witnesses relevant to this action are located in this District.

7. Google has placed or contributed to placing infringing products, such as Google reCAPTCHA, into the stream of commerce via established distribution channels knowing or understanding that such products would be sold and used in the United States, including in this District. Google also has derived substantial revenue from infringing acts in this District, including

---

[1] *See, e.g.*, *Google Helps Texas Businesses Move Toward Their Goals* Economic Impact Report Texas, available at https://economicimpact.google.com/state/tx/ (last visited Nov. 11, 2021).

[2] *See, e.g.*, *Litigation Counsel, Patent Litigation*, Google Careers, available at https://careers.google.com/jobs/results/129929351756948166-litigation-counsel-patent-litigation/?category=LEGAL&company=Google&company=YouTube&hl=en&jlo=en-US&location=Austin,%20TX,%20USA (last visited Oct. 3, 2021).

from development, distribution, and sale of the infringing instrumentalities, methods, and systems, such as reCAPTCHA and the Ad Traffic Quality system.

8. On information and belief, Google designs, manufactures, distributes, imports, offers for sale, and/or sells in the State of Texas and this District products and/or operating system software for products that infringe the Asserted Patents.

## JURISDICTION AND VENUE

9. This is an action for patent infringement arising under the patent laws of the United States. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10. This Court has personal jurisdiction over Google because it conducts business in and has committed acts of patent infringement in this District and throughout the State of Texas, and has established minimum contacts with this forum state such that the exercise of jurisdiction over Google would not offend the traditional notions of fair play and substantial justice.

11. Upon information and belief, Google transacts substantial business with entities and individuals in the State of Texas and this District by, among other things, designing, using, offering to sell, distributing, and selling products and/or operating system software for products that infringe the Asserted Patents, including the infringing reCAPTCHA and Ad Traffic Quality instrumentalities, methods, and systems that Google purposefully uses, sells, offers for sale, and directs into the State of Texas and this District as alleged herein, as well as by providing service and support to reCAPTCHA and Ad Traffic Quality customers in this District,[3] and/or inducing others to commit acts of patent infringement in this District.

12. Google places the accused instrumentalities, methods, and systems into the stream

[3] *See, e.g.*, *Honor Code Reporting Form*, Baylor Univ., available at https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

of commerce via authorized and established distribution channels with the knowledge and expectation that they will be used and sold in the State of Texas and this District, and does not otherwise permit the use, distribution, or sale of the accused instrumentalities, methods, and systems outside of these authorized and established distribution channels.

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because Google has committed acts of infringement in this District and has regular and established places of business in this District, including at 100 Congress Avenue, Austin, Texas, 78701; 901 E. Fifth Street, Austin, Texas, 78701; 500 West Second Street, Austin, Texas, 78701; 601 West Second Street, Austin, Texas, 78701; and 110 East Houston Street, San Antonio, Texas 78205. *See In re Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

14. Furthermore, Google designs, uses, distributes, sells, and/or offers for sale the accused reCAPTCHA instrumentalities, methods, and systems to consumers, businesses, education facilities, and government organizations located in this District, such as Baylor University, Board & Brush, Billy Bob's Burgers, LeafFilter, and Roots Waco, all located in Waco, Texas. For example, Baylor University's website reflects that it is protected by reCAPTCHA v2 Invisible,[4] an accused method of reCAPTCHA discussed in further detail in paragraph 41, *infra*. When consumers in this District, and across the State of Texas, access the websites and apps of such businesses in this District, as well as websites and apps owned and operated by Google, Google subjects these businesses and consumers in this District to Google's privacy policies and uses Google's infringing reCAPTCHA methods, systems, and products to collect personal information and data from the consumers in this District for Google's own use and profit.

15. Google also designs, uses, distributes, sells, and/or offers for sale the accused Ad

[4] *See id*.

Traffic Quality and similar software instrumentalities, methods, and systems to consumers, businesses, education facilities, and government organizations located in this District. For example, Baylor University indicates that it uses Google Tag Manager and Google Analytics for its advertisements, reflecting that the university's advertisements are protected by Google's Ad Traffic Quality system.[5] As an additional example, Blackhawk Digital Marketing, an Austin-based digital marketing agency, has a team dedicated to navigating Google Ads.[6] When individuals and businesses in this District, and across the State of Texas, access websites and apps governed by Google's Ad Traffic Quality system, their behavior is monitored by that system in this District for Google's own use and profit.

16. Upon information and belief, a substantial number of Google employees based in or who regularly conduct Google business from this District have knowledge, information, documents, and things relevant to this action and are potential witnesses to this action, including as to Google's infringing activities and Nobots's damages. For instance, Bhanchand Prasad, a reCAPTCHA Security Customer Engineer at Google Cloud, is located in Austin, Texas.[7] As another example, Marty Sedlacek, Head of Solutions Sales at Google Cloud, who is responsible for corporate strategy in support of all Google Cloud technologies, including Google reCAPTCHA, also is located in Austin, Texas.[8] As another example, Zach Jordan, Head of Sales,

---

[5] *See Digital Analytics and Advertising Practices for Baylor University*, Baylor University (Oct. 31, 2019) available at https://brand.web.baylor.edu/sites/g/files/ecbvkj261/files/2021-01/Digital%20Advertising%20Tracking%20Practices%20-%20updated%20Oct%2031%202019.pdf#:~:text=Introduction:%20Digital%20advertising%20tracking%20and%20metric%20collection,websites%20are%20conducted%20via%20a%20tag%20system (last visited Jan. 14, 2026).

[6] *Worry-free lead generation with a Google ads agency*, Blackhawk, available at https://blackhawkdm.com/ads/google-ads-agency/ (last visited Jan. 14, 2026).

[7] *See Bhanchand Prasad*, LinkedIn, https://www.linkedin.com/in/bhanchand-prasad (last visited Nov. 13, 2021).

[8] *See Marty Sedlacek*, LinkedIn, https://www.linkedin.com/in/marty-sedlacek-0b4393/ (last visited Nov. 13, 2021); *see also, e.g.*, Sedlacek, Marty [@martyjsedlacek], "See how Caribou

Digital Enterprise, at Google Cloud, who oversees Google Cloud sales to enterprise clients, also is located in Austin, Texas.[9] As another example, Jen Person, Senior Development Advocate for Google Cloud, who is responsible for driving customer success and educating developers about Google Cloud, including reCAPTCHA, also is located in Austin, Texas.[10]

**THE ASSERTED PATENTS**

17. This Complaint asserts causes of action for infringement of United States Patent No. 9,595,008 and United States Patent No. 11,810,014. The Asserted Patents are valid and enforceable United States Patents, the entire right, title, and interest to which Nobots owns by assignment.

18. The Asserted Patents improve upon and teach novel "CAPTCHA" (Completely Automated Public Turing test to tell Computers and Humans Apart) instrumentalities, methods, and systems for assessing a confidence level that an operator of a computing device interacting with a server is a human being rather than an autonomic computer application employing various algorithms and routines (a "bot") and protecting websites and applications from fraudulent activity, spam, and abuse without creating friction for human users.

19. On March 14, 2017, the U.S. Patent and Trademark Office duly and legally issued the '008 Patent, which is entitled "Systems, Methods, Apparatus for Evaluating Status of Computing Device User." A true and correct copy of the '008 Patent is attached as **Exhibit A**.

---

Coffee uses reCAPTCHA Enterprise to create safe and frictionless digital experiences @googlecloud." *Twitter*, Sept. 2, 2021, available at https://twitter.com/search?lang=en&q=(recaptcha%20OR%20security%20OR%20bot)%20(from%3Amartyjsedlacek)&src=typed_query (last visited Nov. 13, 2021)

[9] *See Zach Jordan*, LinkedIn, available at https://www.linkedin.com/in/zachjordan1/ (last visited Nov. 13, 2021).

[10] *See Jen Person*, Developer Advocates, available at https://cloud.google.com/developers/advocates/jen-person (last visited Nov. 13, 2021); *see also, e.g.*, Jen Person, *reCAPTCHA Enterprise, Network Connectivity Center, & More*, YouTube (Nov. 8, 2021), available at https://www.youtube.com/watch?v=pJNSsyojkys (last visited Nov. 13, 2021).

20. The ’008 Patent generally claims methods for assessing a confidence level that an operator of a client computing device interacting with a server is a human rather than a bot, by presenting issued data from the server to the client computing device and monitoring and comparing at least some of the data generated at the client computing device in response to the issued data.

21. To the extent applicable, Nobots has complied with 35 U.S.C. § 287(a) with respect to the ’008 Patent.

22. On November 7, 2023, the U.S. Patent and Trademark Office duly and legally issued the ’014 Patent, which is entitled “Systems, Methods and Apparatus for Evaluating Status of Computing Device User.” A true and correct copy of the ’014 Patent is attached as **Exhibit B**.

23. The ’014 Patent generally claims instrumentalities that perform a method for assessing the likely user status (“human” or “bot”) of a computing device interacting with a server, including by comparing acquired and/or available data relating to the operation of the computing device to model data relating to human users’ interactions and other data characteristics, thus yielding at least one probability value as to one of the status states.

24. To the extent applicable, Nobots has complied with 35 U.S.C. § 287(a) with respect to the ’014 Patent.

25. Nobots owns all rights, title, and interest in and to the Asserted Patents, including the sole right to sue for any infringement, and possesses all rights of recovery.

## FACTUAL ALLEGATIONS

26. Fraudulent web activities cost enterprises billions of dollars each year. Security teams need to keep bots out of their websites and applications while ensuring that their human customers can always get in. Additionally, a recurring issue for operators of web pages—and

particularly those that host paid advertisements—is that bots can transmit information to a server, just as humans can. Advertisers, webpage operators that host paid advertisements, and facilitators of the purchase and sale of ads on the internet all need ways to block bots from accessing webpages and advertisements, as well as to detect bots, so that publishers are paid the correct amount by the advertisers whose ads the publishers host—that is, for web advertisements based on views by humans but not views by bots. But to maximize views and clicks, they often need to do so *without* interfering with human users' access to and interaction with their ads.

27. To detect, block, and/or monitor these bots, builders of websites and apps have created a variety of instrumentalities, methods, and systems to determine if the user is a bot or a human. One is to create an explicit test that a bot cannot easily parse but that is passable by a human. Another method is to integrate into the client-server web or app architecture code that gathers and analyzes user data to distinguish humans from bots based on model data of human user characteristics and behavior. The latter method does not require an explicit prompt to the user, but it still results in a determination of whether that user is a human or a bot.

28. Carnegie Mellon University coined the term "CAPTCHA" (Completely Automated Public Turing test to tell Computers and Humans Apart) for these types of tests. Initial efforts required a user to simply enter an alphanumeric string into an input field. However, as character-recognition engines became more available, such tests became easily defeated.

29. In 2007, Timothy P. Heikell invented improved CAPTCHA instrumentalities, methods, and systems that use information such as, without limitation, biometric data, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third-party data regarding abusers, etc., and a confidence score analysis to prevent fraud and keep bots out of websites and apps while allowing desired users

to gain access to offered content, through methods which can easily be implemented, automatically, without requiring additional user input and thus without bothering, frustrating, or stopping safe or desired users.

30. These novel and now-popular instrumentalities, methods, and systems claimed in the Asserted Patents significantly improve upon prior CAPTCHA methods, satisfy long-felt needs of enterprises and consumers alike, and are now wildly commercially successful for Google, who reportedly employs them hundreds of millions of times every day.

31. For many years after 2007, however, the most popular websites in the world, including Google, Yahoo, YouTube, Microsoft's Live ID, MySpace, Facebook, Wikipedia, and Craigslist, continued to use prior art CAPTCHA methods. Initial efforts required a user to simply enter an alphanumeric string into an input field, requiring the user to type the letters, digits, or characters of a distorted image appearing on the screen. These prior art methods provided rudimentary security, were dependent on user input and proficiency, and could not be implemented in all settings or for all users. For example, users with certain disabilities, such as those who are visually impaired or have dyslexia, and users who are not native English speakers may have trouble parsing the distorted text employed by prior art CAPTCHA methods.

32. In 2009, Google acquired reCAPTCHA, a company that had provided CAPTCHAs to help protect more than 100,000 websites from spam and fraud.[11] Google reportedly acquired the reCAPTCHA technology for between $10 million and $100 million.[12]

---

[11] *Teaching Computers to Read: Google Acquires reCAPTCHA*, Google Blog (Sept. 16, 2009), available at https://googleblog.blogspot.com/2009/09/teaching-computers-to-read-google.html (last visited Nov. 13, 2021).

[12] Alison Griswold, *How Luis Von Ahn Turned countless Hours of Mindless Activity Into Something Valuable*, Business Insider (Mar. 13, 2014), available at https://www.businessinsider.com/luis-von-ahn-creator-of-duolingo-recaptcha-2014-3 (last visited Nov. 13, 2021).

33. For many years thereafter, the reCAPTCHA utility that Google used involved a challenge-response test to determine whether or not a user was a human. As depicted in Figure 1, one test presented distorted text that a user needed to enter to prove the user was human.

**Figure 1**




34. Such tests were successful for a period of time in preventing non-adaptive software from recognizing the imaged characters, but people intent on abusing websites soon designed ways to circumvent the CAPTCHA, such as through specially tuned character recognition programs. As bots and fraudsters became more sophisticated, the desire to defeat the bots and prevent fraud resulted in images that were so distorted that some human users could not decipher the images.

35. Another attempt at a solution, also depicted in Figure 1 above, was to add a link to a sound file that would speak the distorted characters to the user, but this attempt at a solution also failed when these sound files also needed to be drastically distorted to protect against being discerned by increasingly sophisticated bots employing speech pattern matching algorithms. This attempt at a solution also could not easily be implemented for all users or in all settings because, for example, not all users have functioning audio equipment and environments such as libraries, government utilities, and work settings may not permit or enable such auditory methods.

36. Despite their widespread use, these prior art methods proved ineffective and frustrating. Because computer artificial intelligence quickly improved in responding to the type of challenge-response test depicted in Figure 1, such techniques became ineffective at eliminating bots. And the desire to defeat these increasingly intelligent bots also resulted in images that were

so distorted that human users, especially those with visual or hearing deficiency or imparity, became unable to pass the tests. The end result was that the prior art CAPTCHA methods were neither keeping out bots and preventing fraud, nor permitting human users to get in and access the desired content, at least not without blocking or frustrating significant human users.

37. What was needed was a more robust form of security—one that was neither easily defeated by bots, nor would keep out or frustrate human users trying to access the enterprises' websites and applications. As claimed in the Asserted Patents, Mr. Heikell solved this long-felt need by inventing, way back in 2007, new and improved CAPTCHA instrumentalities, methods, and systems, which shifted the burden of proof for assessing the likely user status of a computing device from the user side to the server side of the equation, by analyzing biometric and other available data of the user in response to data issued by the server and yielding a probability value, or confidence score, that the user is a human being rather than a bot.

38. For example, in exemplary embodiments, this assessment comprises comparing acquired or available data relating to the operation of the computing device to suitable models embodying human user derived data, or model data, indicative of human interaction with a computing device. Operating in the background, and without the need for the user to decipher or pass any challenge-response tests, the methods monitor at least some data generated by the user trying to access the website or application (e.g., mouse movements, key stroke combinations, browser cookies, IP addresses, or functionally equivalent device identifiers), compare the data generated by the user to model data indicative of a human interaction, and generate a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of a bot.

39. Nobots's inventions are incredibly valuable and significantly improved upon the

prior art CAPTCHA instrumentalities, methods, and systems. Focusing on active data (such as, e.g., mouse, keyboard, or touch screen information) and/or passive data (such as, e.g., browser cookies or IP information) passed from the computing device, rather than on answers to prior art challenge-response tests, achieves the objective of keeping bots out and permitting access by human users, while enhancing and without frustrating the human user experience on the website or app. Because a given dataset for each human person is unique, and not easily replicated by bots, security and profitability are enhanced without increasing the likelihood that desired human users will "fail" the assessment as was common with the prior art challenge-response methods. The user experience also is enhanced because the assessment can occur and a confidence level can be generated without requiring any incremental inputs from the user. For example, both active data and passive data can be monitored and compared in the background without prompting the user for such data.

40. By yielding a probability value or confidence level that an operator of a client computing device is a human user rather than a bot, instead of the prior art method of yielding a binary conclusion of bot or not, exemplary embodiments of the CAPTCHA instrumentalities, methods, and systems claimed in the Asserted Patents also enable a program or administrator on the website- or app-side to permit or deny access and/or operation to the computing device along a sliding scale, rather than binary "in" or "out." In such an exemplary embodiment, if the recorded activity includes no human-like patterns, or lots of bot-like patterns (such as mouse movements in perfectly straight lines), there is a very high probability that the user is a bot. If the recorded activity includes substantial and robust human-like activity (such as jittery, crooked mouse movements), there is a very high probability that the user is a human. When the claimed instrumentalities, methods, and systems yield a confidence level between these two probability levels, the

administrator of the server is empowered to choose which confidence values, in which circumstances, must be generated in order for the operator of the client computing device to be permitted access to the subject website or app, or to be permitted to view a particular page or piece of content (such as an ad), or to take a specific action (such as placing an order). By avoiding the "there is only one right answer" phenomenon inherent in the prior art, such embodiments also simultaneously enhance security and profitability without unnecessarily impairing the user experience because the old one-sized-fits-all methods are replaced by a more dynamic regime in which each website (e.g., social media websites versus bank websites) and even pages within websites (e.g., home pages versus credit card checkout pages) can define (and change) the confidence value which must be generated to permit access, views, or actions.

41. The instrumentalities, methods, and systems taught by the Asserted Patents also are easily implemented, automatically, for all human users, in all settings, for use in websites and apps alike. The recited comparisons can take place locally on the computing device, remotely on the originating server, or on a server dedicated to performing such actions. Because the exemplary embodiments can be accomplished exclusively from the server side, it is not necessary to distribute or install in the conventional sense client-side software, and existing available browsers and operating systems provide the means necessary to carry out the invented methods. For example, neither active nor passive data is affected by visual or hearing deficiency or imparity, or even just by a lack of human user literacy or proficiency. Auditory and visual challenges can be significantly reduced or eliminated entirely.

42. In December 2014, more than seven years after Mr. Heikell invented these revolutionary CAPTCHA methods and filed for patent protection in the Asserted Patents, Google implemented and began using, distributing, offering for sale, and selling reCAPTCHA v2, which

practiced Mr. Heikell's inventions. Eliminating the need for a user to read and decipher distorted text, as required by reCAPTCHA and demonstrated in Figure 1 above, reCAPTCHA v2 instead required users to select a checkbox next to the words "I am not a robot," as depicted in Figure 2 below. When the checkbox was selected, a web request was made to Google, which then evaluated the likelihood that the user was a human or a bot based on a comparison of model data and the computing device's passive data and/or interactions with the web page. In certain cases, as depicted in Figure 3 below, Google's reCAPTCHA v2 required users to complete an additional or different test, in which the user was asked to, for example, select from a group of images a subset of those images with certain characteristics. This method of reCAPTCHA also includes the use of event listeners to monitor for active data. Although each of these methods started to rely on comparisons of monitored data and model data, as taught by the Asserted Patents, Google reCAPTCHA v2 remained dependent on the prior art challenge-response, user-focused regime.

**Figure 2**



**Figure 3**




43. On March 14, 2017, the United States Patent and Trademark Office issued the '008 Patent, entitled "Systems, Methods, Apparatus for Evaluating Status of Computing Device User." That same month, Google launched reCAPTCHA v2 Invisible or "Invisible reCAPTCHA." In Google's words, "To stay one step ahead of the bad guys, reCAPTCHA needed to keep evolving to ensure the most delightful user experience. And now we're taking it even further. Can you see it? Of course not. It's invisible. Powering these advances is a combination of machine learning and advanced risk analysis that adapt to new and emerging threats. So whether on desktop or mobile, reCAPTCHA still means no frustration. People get to where they're going faster and everyone stays happy, except bots."[13] The infringing methods employed by Google's Invisible reCAPTCHA were immediately and contemporaneously praised as "new" and "better" technology, allegedly

[13] *See reCAPTCHA: Tough on Bots, Easy on Humans*, Google Search Central (May 19, 2016), available at https://www.youtube.com/watch?v=GeibaHfYW9o&t=18s (last visited Nov. 14, 2021).

developed by Google—and not by Mr. Heikell nearly a decade earlier, as actually was the case.[14]

44. On October 29, 2018—more than eleven years after Mr. Heikell made his patented inventions and nineteen months after the '008 Patent issued—Google launched reCAPTCHA v3, which Google again heralded as "the new way to stop bots" because it works "without user interaction" and "returns a score so you can choose the most appropriate action for your website,"[15] even though these methods had been invented by Mr. Heikell way back in 2007. As Google put it at the time, "Now with reCAPTCHA v3, we are fundamentally changing how sites can test for human vs. bot activities by returning a score to tell you how suspicious an interaction is and eliminating the need to interrupt users with challenges at all. reCAPTCHA v3 runs adaptive risk analysis in the background to alert you of suspicious traffic while letting your human users enjoy a frictionless experience on your site."[16]

45. In 2018, Google released a Beta version of reCAPTCHA Enterprise. In October 2022, Google released the reCAPTCHA Enterprise Mobile Software Development Kit (SDK). Google has continued to release improved versions of reCAPTCHA Enterprise for the web and for apps since that launch, through the present, with recent mobile SDK updates occurring in

---

[14] *See, e.g.*, Ayesha Ahmad, *No More Blurry Images to Prove You're a Human – Google Introduced Invisible reCAPTCHA*, MustTech News (Mar. 21, 2017), available at https://www.musttechnews.com/google-introduces-invisible-recaptcha/ (last visited Nov. 14, 2021); Shona Ghosh, *Google Has Killed Off reCAPTCHA As You Know It*, Business Insider (Mar. 13, 2017), available at https://www.businessinsider.com/googles-recaptcha-is-now-invisible-2017-3 (last visited Nov. 14, 2021); Rob Verger, *Google Just Made the Internet A Tiny Bit Less Annoying*: *See ya, CAPTCHA!*, Popular Science (Mar. 11, 2017), available at https://www.popsci.com/google-invisible-recaptcha/#page-3 (last visited Nov. 14, 2021); Ron Amadeo, *Google's reCAPTCHA Turns 'Invisible,' Will Separate Bots From People Without Challenges*, Ars Technica (Mar. 9, 2017), available at https://arstechnica.com/gadgets/2017/03/googles-recaptcha-announces-invisible-background-captchas/ (last visited Nov. 14, 2021).

[15] *See* Wei Lu, *Introducing reCAPTCHA v3: the new way to stop bots*, Google Search Central Blog (Oct. 29, 2018), available at https://developers.google.com/search/blog/2018/10/introducing-recaptcha-v3-new-way-to (last visited Nov. 30, 2021).

[16] *Id.*

December 2025 and January 2026.[17]

46. Over a similar period of time, Google implemented a collection of software-based techniques known as "Ad Traffic Quality," designed to detect bots among users interacting with, or attempting to interact with, ads hosted on Google's own web properties and its partners' web properties. Early mentions of Google resources regarding "click fraud" appeared online in 2007.[18] A description of Google's "Ad Traffic Quality" team did not surface until 2008, after Mr. Heikell's invention claimed in the '008 Patent.[19] In 2009, the Ad Traffic Quality team began to implement "filters" for user clicks, queries, and conversions, in order to credit only those activities that were associated with valid traffic, e.g., human users. [20] In 2011, Google noted on its Ad Traffic Quality Resource Center that Google had a "global team" working to catch invalid traffic. "The vast majority of all invalid clicks on AdWords ads are caught by our online filters." And the filters—first invented by Mr. Heikell—were already proving lucrative for all involved: "[T]he aggregate value of the clicks that we've identified as suspicious or invalid and excluded from what we've charged advertisers is in the hundreds of millions of dollars."[21]

47. Google's Ad Traffic Quality method and system, or similar bot-detection and bot-filtration methods and software systems, requests, receives, and stores active data (e.g., mouse

---

[17] *reCAPTCHA release notes*, Google Cloud, available at https://docs.cloud.google.com/recaptcha/docs/release-notes#March_31_2019 (last visited Jan. 14, 2026).

[18] Small Business Software, available at https://www.small-business-software.net/sept-2007-blog.htm (last visited Jan. 9, 2026).

[19] *See, e.g.*, Miguel Helft, *The Human Hands Behind the Google Money Machine*, Sarasota Herald-Tribune (June 2, 2008), available at https://www.heraldtribune.com/story/news/2008/06/02/the-human-hands-behind-google/28632910007/ (last visited Jan. 9, 2026).

[20] Carmelo Kintana, et al., *The Goals and Challenges of Click Fraud Penetration Testing Systems*, ISSRE (2009), available at https://static.googleusercontent.com/media/research.google.com/en//pubs/archive/34836.pdf (last visited Jan. 9, 2026).

[21] *Ad Traffic Quality Resource Center*, Google Ads, available at https://web.archive.org/web/20111024000336/https://www.google.com/ads/adtrafficquality/ (last visited Jan. 9, 2026) (screenshot taken by Internet Archive's Wayback Machine, captured on Oct. 24, 2011).

movements, "clicks," touch screen data) and passive data (e.g., IP addresses, mobile device identifiers) from users interacting with webpages and apps that host Google-managed ads.

**Figure 4**



Google Ads Help

Describe your issue

Both Google and their partners deliver the advertisements to users; however, Google maintains control over and performs the processes related to measurement and advertiser reporting of click activity. When a user clicks on an advertisement, whether delivered by Google or a partner, via any one of the products administering the product, the click activity is tracked by Google Ads through the ads redirect servers.

Measurement of click activity is based on the Google Ads click measurement methodology, which utilizes a technology infrastructure to manage and monitor click events. A click is recorded (measured) when Google Ads has received an initiated click and sends the user an HTTP 302 redirect to the advertiser landing page or website (or other intermediate server such as an advertiser's agent). These measured click events are recorded to data logs within an event file system. The data log files are then accumulated, edited and compiled through fully automated processes to produce click measurement and advertiser reporting. The editing process includes the process of filtering erroneous or corrupt data, identified non-human traffic including robots and other automated processes, and other identified invalid click activity. The filtered clicks are considered invalid, which means they are not billable to the advertiser. Google prepares click reports for advertisers which can be directly accessed by the respective advertiser.

**Figure 5**

**Categories of general invalid traffic (GIVT)**

| | |
|---|---|
| **Data center** | Ad traffic originating from servers in data centers whose IPs are linked to invalid activity (typically non-human traffic). These are usually known data center IPs that are likely included in lists, some of which are maintained by industry bodies. |
| **Known crawler** | Ad traffic from a program or automated script that requests content and declares itself as non-human (through a variety of identification mechanisms). These crawlers are usually included in the IAB International Spiders and Bots List. |
| **Irregular pattern** | Ad traffic that includes one or more attributes (for example, a user cookie) associated with known irregular patterns, such as auto-refresh traffic or duplicate clicks. |

48. Google's Ad Traffic Quality method and system, or similar bot-detection and bot-filtration methods and software systems, analyzes this user data in conjunction with model data based on prior human interaction, to detect and sometimes filter out bots.

**Figure 6**

Google Ads Help    Describe your issue

Both specific identification (including obeying robot instruction files, filtration lists, and publisher test activity) and activity-based filtration methods (including analyzing multiple sequential activities, outlier activity, interaction attributes, and other suspicious activity) are utilized in filtration.

In addition, the following parameters apply to the filtration methodology:

- Third-party filtration is not used by Google.
- Robot instruction files (robots.txt) are employed.
- Sources used for identification of non-human activity: Google uses the IAB/ABCe International Spiders & Robots List as well additional filters based on past robotic activities. The IAB Robots List exclude file is used.
- Activity based filtration processes: Activity-based identification involves conducting certain types of pattern analyses, looking for activity behavior that is likely to identify non-human traffic. Google's Ad Traffic Quality team has systems in place to determine any suspicious activities and does such activity based filtering appropriately.

49. Google's Ad Traffic Quality method and system, or similar bot-detection and bot-filtration methods and software systems, uses that analysis to create an internal confidence or likelihood level regarding the status of the user of a computing device. The specifics of how this level is determined are not disclosed publicly by Google "[i]n order to [according to Google] protect invalid traffic filtration processes from becoming compromised or reverse-engineered."[22]

50. Based on that value, and the threshold set for a particular site, page, app, or action, Google can block a bot entirely (Figure 7), and/or flag a bot as potentially invalid for ad-billing purposes and continue to monitor the bot's activity closely (Figure 8).

**Figure 7**

## Known bot-traffic exclusion

In Google Analytics properties, traffic from known bots and spiders is automatically excluded. This ensures that your Analytics data, to the extent possible, does not include events from known bots. At this time, you cannot disable known bot traffic exclusion or see how much known bot traffic was excluded.

Known bot and spider traffic is identified using a combination of Google research and the International Spiders and Bots List, maintained by the Interactive Advertising Bureau. Visit the Interactive Advertising Bureau (IAB) website for more information.

[22] *Google Ad Manager Help: Invalid traffic detection and filtration methodology*, Google, available at https://support.google.com/admanager/answer/141811?sjid=8505171532405550315-NC#googleAdManagerIABFiltration (last visited Jan. 11, 2026).

**Figure 8**

### How Google prevents invalid activity

Our specialists carefully monitor clicks and impressions on Google ads to protect your interests as well as those of advertisers. To do this, we use both automated systems and human reviews, analyzing all ad clicks and impressions for any invalid traffic that may artificially drive up an advertiser's costs or a publisher's earnings.

Google's proprietary technology analyzes clicks and impressions to detect invalid traffic. Our system uses sophisticated filters to distinguish between activity generated through normal use by users and activity that may pose a risk to advertisers, and advertisers are not charged for this activity.

51. Multiple confidence levels, based on multiple requests for data and multiple thresholds for risk tolerance, can be created over the course of a single user interaction, or multiple user interactions, based on how the user performs on the assessments. Per the Ad Traffic Quality website: "Some invalid traffic takes more time to detect. If something makes it through our filters but still seems fishy, we'll monitor the traffic data until we can be sure. In some cases, it may take up to several weeks to recognize a suspicious pattern."[23] The production of multiple confidence levels can be demonstrated by performing repeated Google searches; this causes more and more ads to disappear over time, as searches are repeated. *See* Figures 31-34.

52. Google's Ad Traffic Quality method and system, or similar methods and software systems, operate across Google-owned and -operated platforms, websites, and apps, including the protection of Google Accounts (which are linked to the ads a user sees), and also governs the ad management for the millions of third-party websites and apps that use Google's services.

53. Google has built a colossal business on its reputation for trustworthy filtering mechanisms, which ensure fair billing for advertisers and publishers alike. In the 2010s, Google

[23] *Traffic Quality: How does Google prevent invalid activity?*, Google Ads, available at https://www.google.com/ads/adtrafficquality/how-we-prevent-it/ (last visited Jan. 14, 2026).

made tens of billions of dollars from advertising; for instance, in 2017, Google "le[d] the world in digital and mobile ad revenue," raking in $73.8 billion in net digital ad sales.[24]

54. On December 15, 2022, the United States Patent and Trademark Office published Patent Application US 2022/0398476 A1, which would later issue as the '014 Patent.

55. Since 2022, Google's revenues from advertising, made valuable and trusted by Mr. Heikell's patented technology, climbed ever higher. In 2023, Alphabet (Google's parent company) generated approximately $237 billion in advertising revenues.[25] In 2024, it generated more than $260 billion in advertising revenues.[26] In an SEC filing, under the heading "How We Make Money," Google specifically noted: "We focus on creating the best advertising experiences of our users and advertisers in many ways, including filtering out invalid traffic. . . ."[27]

56. At all times since the Asserted Patents issued, and through the present and continuing forward, Google has continuously implemented, used, distributed, offered for sale, and sold CAPTCHA instrumentalities, methods, and systems that infringe the Asserted Patents—including, without limitation, Google reCAPTCHA v2 Checkbox, Google reCAPTCHA v2 Invisible, Google reCAPTCHA v3, and Google reCAPTCHA Enterprise. Google also has continuously implemented, used, distributed, offered for sale, and sold Ad Traffic Quality instrumentalities, methods, and systems, and other similar bot-detection and bot-filtration

[24] Rani Molla, *Google leads the world in digital and mobile ad revenue*, Vox (July 24, 2017), available at https://www.vox.com/2017/7/24/16020330/google-digital-mobile-ad-revenue-world-leader-facebook-growth (last visited Jan. 9, 2026).

[25] Alphabet, Inc., *Form 10-K for the Fiscal Year Ended December 31, 2023*, United States Securities and Exchange Commission, https://www.sec.gov/Archives/edgar/data/1652044/000165204424000022/goog-20231231.htm (last visited Jan. 9, 2026).

[26] Alphabet, Inc., *Form 10-K for the Fiscal Year Ended December 31, 2024*, United States Securities and Exchange Commission, https://www.sec.gov/Archives/edgar/data/1652044/000165204425000014/goog-20241231.htm (last visited Jan. 9, 2026).

[27] *Id.*

instrumentalities, methods, and systems designed to protect Google-managed advertisements that infringe the Asserted Patents. Google has acted and continues to act unlawfully, without Nobots's consent or authorization, and without paying Nobots a reasonable royalty for Google's substantial use of Nobots's novel and valuable inventions.

**COUNT ONE**
**INFRINGEMENT OF U.S. PATENT NO. 9,595,008**

57. Nobots repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

58. Google has infringed and continues to infringe Claim 18 of the '008 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States, without authorization, utilities that practice Claim 18 of the '008 Patent. These include Google's reCAPTCHA methods and Ad Traffic Quality methods. Google is liable for its infringement of the '008 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c).

59. More specifically, Google designs, implements, imports, offers for sale, and/or sells CAPTCHA instrumentalities that are configured to perform, and uses them to perform, one or more methods that assess a confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application, or bot, based on a comparison of monitored user data and generates a value representing a confidence level that a human, and not a bot, is operating the client computing device. Google also designs, constructs, and uses bot-detection and -filtration methods, including the Ad Traffic Quality methods, that perform those same steps.

60. Claim 18 depends from Claim 1, which recites "[a] method for assessing a confidence level that an operator of a client computing device interacting with a server is a human

being rather than an autonomic computer application, the method comprising:

a) a single user of a client computing devices requesting data from a server;

b) the server presenting data issued by the server to the client computing device;

c) monitoring at least some data generated by the user at the client computing device in response to the issued data;

d) comparing the monitored data to model data relating to human interaction with or in response to the issued data;

e) generating a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of an autonomic user with or in response to the issued data."

Claim 18 further recites "[t]he method of claim 1 further comprising repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)."

61. The Patent Trial & Appeal Board has concluded that, to correct a conspicuous error, Claim 18 "should be regarded as having been 'updated'" so that it recites the following: "The method of claim 1 further comprising repeating [*b*])-[*d*]) and comparing the first instance of the value of [*e*]) to the second instance of the value of [*e*])." *Nobots v. Google*, No. IPR2022-00940 (P.T.A.B. Nov. 29, 2023). Google has not objected to that conclusion. *Id*. Nobots applies that construction here.

62. The accused reCAPTCHA methods, including at least reCAPTCHA v2, v3, and Enterprise, meet every element of this claim.[28] As described above, each of the three improved reCAPTCHA methods implemented by Google is a method for assessing a confidence level that a user of a client computing device interacting with a server is a human being rather than an

[28] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google's products infringe the '008 Patent.

autonomic computer application. Google itself explains that reCAPTCHA "protects your site from spam and abuse. It uses advanced risk analysis techniques to tell humans and bots apart."[29]

63. Each of the accused reCAPTCHA methods requires that one or more single users of a client computing device request data from a server. For example, reCAPTCHA involves a user submitting a form to a web site. To do this, the user's browser must make a request to the web site's server. The server then responds with HTML provided by Google that includes a script tag instructing the browser to make a request to google.com to download the reCAPTCHA JavaScript. This is illustrated in Figure 9 below.

**Figure 9**




64. Figure 10 below shows sample code on Google's reCAPTCHA website depicting this script:

[29] *See What is reCAPTCHA?*, reCAPTCHA, https://developers.google.com/recaptcha (last visited Nov. 5, 2021).

**Figure 10**

```
<html>
  <head>
    <title>reCAPTCHA demo: Simple page</title>
    <script src="https://www.google.com/recaptcha/api.js" async defer></script>
  </head>
  <body>
    <form action="?" method="POST">
      <div class="g-recaptcha" data-sitekey="your_site_key"></div>
      <br/>
      <input type="submit" value="Submit">
    </form>
  </body>
</html>
```

**Source**: *reCAPTCHA v.2*, reCAPTCHA, ttps://developers.google.com/recaptcha/docs/display (last visited Nov. 5, 2021).

65. Each of the accused reCAPTCHA methods also requires that the server respond by presenting data issued by the server to the client computing device. For example, when the sample code in Figure 10 from Google's reCAPTCHA website is executed, one or more Google servers responds by sending the browser JavaScript code to the client computing device. In particular, and as depicted in Figure 11 below, the server responds with a JavaScript file called api.js.

**Figure 11**




66. Subsequently, one or more Google servers present additional data, including a

JavaScript file such as "recaptcha_en.js."[30] This is depicted in Figure 12, below.

**Figure 12**




67. Each of the accused reCAPTCHA methods requires monitoring at least some data generated by the user at the client computing device in response to the issued data. For example, the JavaScript code Google transmits to the user adds what are known as "event listeners," code that is executed upon the occurrence of certain actions, such as the activation of an on-screen button, the movement of a mouse pointer, the scrolling of a web page, the placement of a cursor in or out of a form field, and the like.[31] Such "event listeners" allow Google to monitor and track keyboard, mouse, touch, scroll and, resize events and movements. Figure 13 below depicts the creation of event listeners upon the execution of "reCAPTCHA_en.js."

[30] The "en" in the file name defines the language that will be used when the widget is rendered and can change; for instance, were French to be used, then the "en" would be "fr" instead.
[31] *See, e.g.*, *JavaScript: Events and Listeners*, I'd Rather be Writing, https://idratherbewriting.com/events-and-listeners-javascript/ (last visited Nov. 5, 2021).

**Figure 13**




68. The operation of event listeners is further demonstrated by Figures 14 and 15 below, which show how the use of reCAPTCHA v2 Checkbox allows for mouse movements to be tracked.

**Figure 14**


V2Checkbox - reCaptcha
https://recaptchaversions.azurewebsites.net/V2Checkbox
reCaptcha
V2 Checkbox
V2 Invisible
V3
I'm not a robot
reCAPTCHA
Inspector
Console
Debugger
Application
Rules
Layout
Computed
Flexbox
Grid
Box Model
Box Model Properties

**Figure 15**




69. Google has also made various statements indicating that it engages in monitoring with "event listeners." For instance, Vinay Shet, the former Google Product Manager of reCAPTCHA, told Wired.com that "the tiny mouse movement a user's mouse makes as it hovers and approaches a checkbox can help reveal an automated bot."[32]

70. Each of the accused reCAPTCHA methods compares the monitored data to model data relating to human interaction with the issued data or in response to the issued data. For example, as depicted in Figure 16 below, a payload generated by the JavaScript event listeners is

[32] *See* Andy Greenberg, *Google Can Now Tell You're Not a Robot with Just One Click*, Wired (Dec. 3, 2014), https://wired.com/2014/12/google-one-click-recaptcha (last visited Jan. 14, 2026).

transmitted to Google, which applies the data in the payload to the reCAPTCHA algorithm that compares such data to model data relating to human interactions in order to determine whether the user is to be treated as a human or bot.

**Figure 16**




71. Figure 17 below shows that in the context of the reCAPTCHA v2 Checkbox version, the "recaptcha_en.js" code is utilized when the event handler calls Google's function.

**Figure 17**




72. For example, when the user clicks on the checkbox, a POST request with an obfuscated payload that contains the event listener data depicted above is transmitted to Google, which uses this data to determine whether it believes the user is a human. This process is depicted in Figure 18 below.

**Figure 18**




73. Further, the data is used by Google's risk-analysis engine to evaluate whether the user is a human or potentially a bot, including by comparing the monitored data to model data. If it is potentially a bot, Google may issue additional challenges, as depicted in Figure 19 below.

**Figure 19**

However, CAPTCHAs aren't going away just yet. In cases when the risk analysis engine can't confidently predict whether a user is a human or an abusive agent, it will prompt a CAPTCHA to elicit more cues, increasing the number of security checkpoints to confirm the user is valid.




**Source**: Vinay Shet, *Are You a Robot? Introducing "No CAPTCHA reCAPTCHA,"* Google Security Blog (Dec. 3, 2014), https://security.googleblog.com/2014/12/are-you-robot-introducing-no-captcha.html (last visited Jan. 14, 2026).

74. Google's comparison of monitored to model data is further demonstrated by Google's websites, screenshots of which are contained in Figures 20 and 21 below, and which reflect that Google uses prior interactions with a website as part of its analysis:

**Figure 20**

Placement on your website

reCAPTCHA v3 will never interrupt your users, so you can run it whenever you like without affecting conversion. reCAPTCHA works best when it has the most context about interactions with your site, which comes from seeing both legitimate and abusive behavior. For this reason, we recommend including reCAPTCHA verification on forms or actions as well as in the background of pages for analytics.

**Source**: *reCAPTCHA v3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

**Figure 21**

> The updated system uses advanced risk analysis techniques, actively considering the user's entire engagement with the CAPTCHA—before, during and after they interact with it. That means that today the distorted letters serve less as a test of humanity and more as a medium of engagement to elicit a broad range of cues that characterize humans and bots.
>
> As part of this, we've recently released an update that creates different classes of CAPTCHAs for different kinds of users. This multi-faceted approach allows us to determine whether a potential user is actually a human or not, and serve our legitimate users CAPTCHAs that most of them will find easy to solve. Bots, on the other hand, will see CAPTCHAs that are considerably more difficult and designed to stop them from getting through.

**Source**: Vinay Shet, *reCAPTCHA Just Got Easier (But only if You're Human)*, Google Security Blog (Oct. 25, 2013), https://security.googleblog.com/2013/10/recaptcha-just-got-easier-but-only-if.html (last visited Jan. 14, 2026).

75. Each of the accused reCAPTCHA methods generates a value representing a confidence level that the monitored data is the result of human interaction on the client computing device, rather than that of an autonomic user, with the issued data or in response to the issued data. For example, in the reCAPTCHA v2 methods, one or more Google servers input the monitored data into the reCAPTCHA algorithm (which Google terms its "risk analysis engine"). The algorithm then outputs a value between 0.0 and 1.0, with 0.0 indicating that Google believes the user is a bot and 1.0 indicating that Google believes the user is a human. Additional challenges may be issued if Google is not confident. Sample results are depicted in Figure 22 below.

**Figure 22**




**Source**: *Analytics*, reCAPTCHA, https://developers.google.com/recaptcha/docs/analytics (last visited Dec. 6, 2021).

76. In the reCAPTCHA v3 version, a value between 0.0 and 1.0 also is returned, with a 0.0 signifying that Google is confident that the user is a bot and a 1.0 signifying that Google is confident that the user is a human, as explained in Figure 23 below. In the event that Google is not confident, additional challenges – such as two-factor authentication or email verification – may be issued. Sample results are depicted in Figure 24 below.

**Figure 23**

## Interpreting the score

reCAPTCHA v3 returns a score (1.0 is very likely a good interaction, 0.0 is very likely a bot). Based on the score, you can take variable action in the context of your site. Every site is different, but below are some examples of how sites use the score. As in the examples below, take action behind the scenes instead of blocking traffic to better protect your site.

| Use case | Recommendation |
|---|---|
| homepage | See a cohesive view of your traffic on the admin console while filtering scrapers. |
| login | With low scores, require 2-factor-authentication or email verification to prevent credential stuffing attacks. |
| social | Limit unanswered friend requests from abusive users and send risky comments to moderation. |
| e-commerce | Put your real sales ahead of bots and identify risky transactions. |

reCAPTCHA learns by seeing real traffic on your site. For this reason, scores in a staging environment or soon after implementing may differ from production. As reCAPTCHA v3 doesn't ever interrupt the user flow, you can first run reCAPTCHA without taking action and then decide on thresholds by looking at your traffic in the admin console. By default, you can use a threshold of 0.5.

**Source**: *reCAPTCHA v3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

**Figure 24**




**Source**: *Analytics*, reCAPTCHA, https://developers.google.com/recaptcha/docs/analytics (last visited Dec. 6, 2021).

77. Further, each of the accused reCAPTCHA methods also comprises repeating the analysis and value generation above and then comparing the first instance of the confidence value to the second instance of the confidence value. Google's reCAPTCHA software generates multiple confidence values across a single user's interaction with a website and compares those values with each other. This enables Google to track, for instance, consistent bot-like behavior or, alternatively, a trend away from human behavior, leading to improved bot detection and filtration.

78. For example, when users are deemed suspicious enough to warrant an additional challenge, as described above, Google's reCAPTCHA software repeats the analysis of steps b)

through d) of Claim 1 of the ’008 Patent. Google’s reCAPTCHA software then compares the first and second values generated through those repeated analyses. This allows for evaluation of relative user performance over time, for instance, noticing if a user is exhibiting consistent bot-like traits or else trending over time away from human behavioral patterns. This type of comparison can improve the software’s accuracy in assessing the overall likelihood that the user is a bot.

79. Google makes, distributes, uses, imports, offers for sale, and/or sells instrumentalities, methods, and systems, such as reCAPTCHA v2 Checkbox, reCAPTCHA v2 Invisible, reCAPTCHA v3, and reCAPTCHA Enterprise, that infringe at least Claim 18 of the ’008 Patent when used.

80. Google has sold, and continues to sell and offer for sale, these instrumentalities, methods, and systems in the United States, through Google websites (https://cloud.google.com/recaptcha-enterprise), including to companies throughout the State of Texas and this District.[33]

81. Google committed and is committing the foregoing infringing activities without license from Nobots. Google’s acts of infringement have damaged Nobots, as owner and assignee of the ’008 Patent. Nobots is entitled to recover from Google the damages Nobots has sustained as a result of Google’s wrongful acts in an amount subject to proof at trial. Google’s infringement of Nobots’s rights under the ’008 Patent is ongoing and will continue to damage Nobots.

82. Beginning no later than the filing of this Complaint, Google has had actual knowledge of the ’008 Patent. Google’s continued infringement following the filing of this Complaint, despite its knowledge of the ’008 Patent and Nobots’s infringement allegations, is

---

[33] *See, e.g.*, *Honor Code Reporting Form*, Baylor Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

intentional and deliberate and willful.

83. In addition, Google indirectly infringed, and continues to indirectly infringe, the ’008 Patent by actively inducing its infringement in violation 35 U.S.C. § 271(b).

84. In addition to Google, entities, consumers, and businesses who use Google’s reCAPTCHA instrumentalities directly infringe the ’008 Patent by using the accused Google reCAPTCHA methods.

85. Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the reCAPTCHA methods with knowledge and the specific intent that its efforts will result in the direct infringement of the ’008 Patent by these third parties.

86. Such active steps include, for example, advertising and marketing the infringing utilities to entities, consumers, and businesses[34] and selling such utilities to consumers knowing that they would be used in the United States.

87. Google user guides for the accused reCAPTCHA methods likewise facilitate infringement, instructing consumers about, among other things, how to “start using reCAPTCHA.”[35] By instructing third parties how to use the accused utilities for infringing

---

[34] *See, e.g.*, *Top 10 Use Cases for reCAPTCHA Enterprise to Defend Against OWASP Web-Automated Attacks*, Google Cloud, available at https://services.google.com/fh/files/misc/owasp_handbook_again.pdf; *reCAPTCHA Enterprise*, Google Cloud, available at https://cloud.google.com/recaptcha-enterprise (last visited Nov. 7, 2021); *What Is reCAPTCHA?*, reCAPTCHA, available at https://developers.google.com/recaptcha (last visited Nov. 7, 2021).

[35] *Developer’s Guide*, reCAPTCHA, available at https://developers.google.com/recaptcha/intro (last visited Nov. 7, 2021).

purposes, such as to limit website access using the infringing methods, Google knowingly induces these third parties to commit infringing acts.

**Figure 25**




**Source**: *reCAPTCHA v3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

88. In addition, Google has indirectly infringed and continues to indirectly infringe the ’008 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, infringing methods with knowledge that they are especially designed or adapted to operate in a manner that infringes the ’008 Patent and despite the fact that the infringing technology is not a staple article of commerce suitable for substantial non-infringing use. Google knowingly incorporates methodology for assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than a bot into the accused Google reCAPTCHA methods such that they operate in an infringing manner. By incorporating such methodology into its reCAPTCHA methods, Google contributes to infringing use as consumers grant or deny access to their servers using the

confidence levels generated by the accused utilities, which lack substantially noninfringing uses because the accused reCAPTCHA methods are designed and constructed to operate in a manner that infringes the ’008 Patent.

89. In addition, each of the accused Ad Traffic Quality methods, or similar bot-detection and bot-filtration methods implemented by Google, meets every element of this claim.[36] As described above, each of these is a method for assessing a confidence level that a user of a client computing device interacting with a server is a human being rather than an autonomic computer application. As Google puts it, Google uses automated methods of analyzing “all ad clicks and impressions for any invalid traffic that may artificially drive up an advertiser’s costs or a publisher’s earnings.” This includes impressions and clicks generated by “automated robots and traffic sources.” “[Google’s] system allows [Google] to filter out most invalid clicks and impressions, and advertisers are not charged for this activity.”[37]

90. Google’s Ad Traffic Quality methods, or similar bot-detection and bot-filtration methods, protects Google-managed ads. Google’s Ad Traffic Quality methods, or similar software methods, operate across Google-owned and -operated platforms, including the protection of Google Accounts (which are linked to the ads a user sees), and also govern the ad management for the millions of third-party websites that use Google’s services.

91. Each of the accused Ad Traffic Quality methods comprises a user of a client computing device requesting data from a server. These mechanisms are triggered “[w]hen a user’s

[36] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google’s products and services infringe the ’008 Patent.

[37] *Google Ad Manager Help: Prevent invalid clicks and impressions*, Google, available at https://support.google.com/admanager/answer/1298900 (last visited Jan. 11, 2026).

browser or robot makes a request of a server for content."[38] An equivalent trigger occurs, for instance, when a user requests a section, element, or feature of an app.

92. Along with the device's request for data, the device sends data to Google's servers. This can happen at the outset of an interaction, or it can happen in the middle of a user's interaction with a given website, for instance, when a user clicks on an ad. That is a request for data (the ad content, or the ad's link to an external website). In return, Google Ads will "send[] the user an HTTP 302 redirect to the advertiser landing page or website."[39] An equivalent call-and-response interaction occurs when a user is interacting with a mobile app.

93. Each of the accused Ad Traffic Quality methods comprises a server presenting data issued by the server to the client computing device. Google's Ad Traffic Quality software causes the Google server that received the user's request for data to respond to that request. For instance, at the outset of an interaction, one or more Google servers will respond by sending JavaScript code to the client computing device. The JavaScript files have a URL beginning with *https://www.google.com/xjs/_/js/* followed by a path to the JavaScript resource. Additionally, Google's Ad Traffic Quality system will cause Google servers to present a bundle of data that includes Set-Cookie headers and other identifiers like the Google-Analytics-specific "_ga" cookie, which cause the client computing device to include passive data in subsequent requests to Google servers.

---

[38] *Google Ad Manager Help: Invalid traffic detection and filtration methodology*, Google, available at https://support.google.com/admanager/answer/141811?sjid=8505171532405550315-NC#googleAdManagerIABFiltration (last visited Jan. 11, 2026).

[39] *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 14, 2026).

**Figure 26**

Some cookies and similar technologies help sites and apps understand how their visitors engage with their services. For example, Google Analytics uses a set of cookies to collect information on behalf of businesses which use the Google Analytics service and report site usage statistics to them without personally identifying individual visitors. '_ga', the main cookie used by Google Analytics, enables the service to distinguish one visitor from another and lasts for 2 years. Any site that implements Google Analytics, including Google services, uses the '_ga' cookie. Each '_ga' cookie is unique to the specific property, so it cannot be used to track a given user or browser across unrelated websites.

**Source**: *Google Privacy & Terms: How Google Uses Cookies*, Google, available at https://policies.google.com/technologies/cookies?hl=en-US (last visited Jan. 14, 2026).

As another example, noted above, Google Ads will also present to the client computing device HTTP redirects when a user requests (that is, clicks on) ad content.

94. Each of the accused Ad Traffic Quality methods comprises the monitoring of at least some data generated by the user at the client computing device, in response to the issued data. For instance, Google can monitor a user's interaction with a website (e.g., the user's mouse movements) through the JavaScript code sent by its Ad Traffic Quality software, as depicted in Figure 27.

**Figure 27**




**Source**: Google Search Engine Results Page (screenshot on file, captured April 24, 2025, 7:09 PM DST).

Similarly and as an additional example, Google monitors users' "click events" and compiles them for analysis in its bot-detection and -filtration systems, including the Ad Traffic Quality system.

**Figure 28**

Google Ads Help    Describe your issue

Both Google and their partners deliver the advertisements to users; however, Google maintains control over and performs the processes related to measurement and advertiser reporting of click activity. When a user clicks on an advertisement, whether delivered by Google or a partner, via any one of the products administering the product, the click activity is tracked by Google Ads through the ads redirect servers.

Measurement of click activity is based on the Google Ads click measurement methodology, which utilizes a technology infrastructure to manage and monitor click events. A click is recorded (measured) when Google Ads has received an initiated click and sends the user an HTTP 302 redirect to the advertiser landing page or website (or other intermediate server such as an advertiser's agent). These measured click events are recorded to data logs within an event file system. The data log files are then accumulated, edited and compiled through fully automated processes to produce click measurement and advertiser reporting. The editing process includes the process of filtering erroneous or corrupt data, identified non-human traffic including robots and other automated processes, and other identified invalid click activity. The filtered clicks are considered invalid, which means they are not billable to the advertiser. Google prepares click reports for advertisers which can be directly accessed by the respective advertiser.

**Source**: *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 14, 2026).

As a further example, Google servers collect information about a use "when a Google service on your device contacts our servers – for example, when you install an app from the Play

Store."[40] This information includes unique device identifiers, "the interaction of your apps, browsers, and devices with our services," and "information about how you're using your Android device."

Google's monitoring of data generated in response to Google servers' issued data is performed in service of Google's Ad Traffic Quality system and similar software systems, as noted in Figure 28.

---

[40] *Google Privacy Policy*, Google, available at https://policies.google.com/privacy (last visited Jan. 14, 2026).

**Figure 29**

> ## How Google prevents invalid activity
>
> Our specialists carefully monitor clicks and impressions on Google ads to protect your interests as well as those of advertisers. To do this, we use both automated systems and human reviews, analyzing all ad clicks and impressions for any invalid traffic that may artificially drive up an advertiser's costs or a publisher's earnings.
>
> Google's proprietary technology analyzes clicks and impressions to detect invalid traffic. Our system uses sophisticated filters to distinguish between activity generated through normal use by users and activity that may pose a risk to advertisers, and advertisers are not charged for this activity.

**Source**: *Google Ad Manager Help: Prevent invalid clicks and impressions*, Google, available at https://support.google.com/admanager/answer/1298900 (last visited Jan. 11, 2026).

95. Each of the accused Ad Traffic Quality methods comprises a comparison of the monitored data to model data relating to human interaction with or in response to the issued data. As described in Figure 29, Google's Ad Traffic Quality methods include the creation of "traffic-based models," trained using "machine learning." These traffic-based models draw on model data sources that may include trillions of records and include a "minimum" of seven days of traffic as input data.

**Figure 30**

Google Ads Help    Describe your issue

**Machine Learning**

Google uses supervised machine learning techniques[1] through methods such as Classification (e.g., Neural Network approach), in which the model will predict invalid traffic (IVT) by making a yes/no decision about whether an event is invalid, and Logistic Regression, in which the model scores various activities and then an IVT decision is made based on score thresholds. Supervised machine learning models may also use tree methods and graph methods.

Data sources used for machine learning include logs of queries and interactions ("ads logs"), non-logs data that can be joined with ads logs, and a variety of other supplementary proprietary signals. Google relies on hundreds of data sources of varying sizes: the total number of records per data source ranges from thousands to trillions, depending on the data source. Traffic-based models are required to be evaluated with a minimum 7 days of traffic as input data.

**Source**: *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 14, 2026).

96. Each of the accused Ad Traffic Quality methods comprises generating a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of an autonomic user. Google's Ad Traffic Quality system's machine learning techniques result in "scores" of various activities, which represent confidence levels.

**Figure 31**

> Google Ads Help
>
> Describe your issue
>
> **Machine Learning**
>
> Google uses supervised machine learning techniques[1] through methods such as Classification (e.g., Neural Network approach), in which the model will predict invalid traffic (IVT) by making a yes/no decision about whether an event is invalid, and Logistic Regression, in which the model scores various activities and then an IVT decision is made based on score thresholds. Supervised machine learning models may also use tree methods and graph methods.
>
> Data sources used for machine learning include logs of queries and interactions ("ads logs"), non-logs data that can be joined with ads logs, and a variety of other supplementary proprietary signals. Google relies on hundreds of data sources of varying sizes: the total number of records per data source ranges from thousands to trillions, depending on the data source. Traffic-based models are required to be evaluated with a minimum 7 days of traffic as input data.

**Source**: *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 14, 2026). As shown above in Figure 30, those "scores" are used to make decisions about how to treat the user, based on "score thresholds." Such decisions may include "flagging" a user as "invalid" and thus not billing an advertiser for views or clicks associated with that user.[41]

97. Each of the accused Ad Traffic Quality methods comprises the repetition of the above steps and the comparison of the first instance of the "score" with a second instance of the

"score." Google's Ad Traffic Quality methods, or similar bot-detection and -filtration methods, monitor and analyze multiple data points of user behavior across a single user interaction and/or multiple user interactions. For instance, Google's Ad Traffic Quality software causes Google servers to use long-lasting cookies, allowing Google to monitor users for extended periods of time.[42] Extended monitoring allows Google to detect "irregular patterns" in user behavior. [43] These data are repeatedly and successively analyzed, yielding different "scores" (or confidence values) over time. These scores are compared with each other to discern trends in the data—for instance, consistent bot-like behavior, or a trend away from human-like behavior—thereby improving the bot-detection and -filtration method. This phenomenon can be observed by the successive disappearance of ads over time, as a user simulates bot-like behavior, by running the same search repeatedly on Google Search. For example, if multiple low-confidence scores are received, Google's Ad Traffic Quality instrumentality is configured to, and used to, compare them and note consistent bot-like behavior. As the comparison yields stronger and stronger evidence of bot-like behavior, Google's Ad Traffic Quality instrumentality is configured such that it can, and is used to, remove more and more ads from the display.

---

[41] *Google Ad Manager Help: Prevent invalid clicks and impressions*, Google, available at https://support.google.com/admanager/answer/1298900 (last visited Jan. 11, 2026).
[42] *Google Privacy & Terms: How Google Uses Cookies*, Google, available at https://policies.google.com/technologies/cookies?hl=en-US (last visited Jan. 14, 2026).
[43] *Filtering invalid traffic to ensure quality*, Display & Video 360 Help, available at https://support.google.com/displayvideo/answer/6076504 (last visited Jan. 14, 2026).

**Figure 32**

In the first screenshot, there are six Sponsored Products and three Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 33**

In the second, there are six Sponsored Products and only one Sponsored Result:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 34**

In the third, there are six Sponsored Products and no Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 35**

In the fourth, there are no Sponsored Products and no Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

98. As a further example, Google collects data on users when signing them into Google Accounts. A user's Google Account is linked to the advertisements shown to that user by Google.[44] Google's Ad Traffic Quality system, or a similar software system, governs the protection of

[44] *See My Ad Center Help: Control what data Google uses to show you ads*, Google, available at https://support.google.com/My-Ad-Center-Help/answer/12156161?hl=en (last visited January 11, 2026).

Google Accounts. Google collects data to determine whether the user attempting to access the account is legitimate. If the initial data collection yields a confidence value suggesting that the user attempting to sign in might be a bot (and therefore not the legitimate user of the account), Google sends an "extra security question" or "challenge" to the user. Alternatively, if the login is suspicious, Google may send an email or other notification, or else deploy two-factor authentication.

**Figure 36**

# About admin alerts for suspicious login activity

*If you're using a personal Google Account, you can investigate suspicious activity on your account.*

As a Google Workspace administrator, you can use email alerts to notify you if there's suspicious sign-in activity for your users. For example, Google might notice a sign-in attempt that doesn't match a user's normal behavior. Usually, before Google sends you an alert, Google presents the user with an extra security question or challenge. If the user fails or abandons the challenge, the Google sends you the alert. The alert warns you that someone has the suspended user's password. For more information, go to Administrator email alerts.

## Examples of suspicious logins

- A user doesn't follow their usual sign-in pattern, such as a signing in from an unusual location.
- There was a successful sign-in from a suspended user's account.

**Note:** You might also get an alert if a suspicious event occurs when a user is using Mail Fetcher to import mail from another Gmail account, because the messages are being fetched through Google servers.

**Source**: *Google Workspace Admin Help: About admin alerts for suspicious login activity*, Google, available at https://support.google.com/a/answer/7102416?hl=en (last visited Jan. 11, 2026).

**Figure 37**


We monitor every login attempt to your account for suspicious activity. When there is a sign-in attempt from a device you've never used, or a location you don't commonly access your account from, we'll require additional information before granting access to your account. For example, if you sign in from a new laptop and you have a phone associated with you account, you will see a prompt—we're calling these dynamic verification challenges—like this:


**Source**: *Google Security Blog: New research: Understanding the root cause of account takeover*, Google, (Nov. 9, 2017), available at https://security.googleblog.com/2017/11/new-research-understanding-root-cause.html (last visited Jan. 11, 2026).

99. Google makes, distributes, uses, imports, offers for sale, and/or sells utilities and products, such as Ad Traffic Quality methods, that infringe at least Claim 18 of the '008 Patent.

100. Google has sold, and continues to sell and offer for sale, these utilities in the United States, including to companies throughout the State of Texas and this District.[45]

[45] *See, e.g., Honor Code Reporting Form*, Baylor Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021)

101. Google committed and is committing the foregoing infringing activities without license from Nobots. Google's acts of infringement have damaged Nobots, as owner and assignee of the '008 Patent. Nobots is entitled to recover from Google the damages it has sustained as a result of Google's wrongful acts in an amount subject to proof at trial. Google's infringement of Nobots's rights under the '008 Patent is ongoing and will continue to damage Nobots.

102. Beginning no later than the filing of this Complaint, Google has had actual knowledge of the '008 Patent. Google's continued infringement following the filing of this Complaint, despite its knowledge of the '008 Patent and Nobots's infringement allegations, is intentional and deliberate and willful.

103. In addition, Google indirectly infringed, and continues to indirectly infringe, the '008 Patent by actively inducing its infringement in violation 35 U.S.C. § 271(b).

104. In addition to Google, entities, consumers, and businesses who use Google's advertising-related services, all of which are governed by the Ad Traffic Quality system, directly infringe the '008 Patent by using the accused Ad Traffic Quality methods.

105. Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the Ad Traffic Quality methods with knowledge and the specific intent that its efforts will result in the direct infringement of the '008 Patent by these third parties.

106. Such active steps include, for example, advertising and marketing the infringing

(reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

utilities to entities, consumers, and businesses and selling such utilities to consumers knowing that they would be used in the United States.[46]

107. Additionally, Google configures its Ads-related services, products, and platforms, including Google Ads, Google Ad Manager, Ads Data Hub, AdSense, Ad Mob, Google Marketing Platform, and Google Display & Video 360, so that they all are governed by and integrated with the accused Ad Traffic Quality bot-detection and -filtration methods, or similar methods. These ads-related services manage ads across Google-owned and -operated platforms like Google Search and YouTube. For all of these services, products, and platforms, invalid traffic filtration is performed via Google Ad Traffic Quality and all "use the same primary sources to revise invalid traffic." [47]

108. Google also provides technical support and instruction to publishers on how to avoid invalid traffic within the Ad Traffic Quality system.[48] By instructing third parties how to use the accused methods for infringing purposes, Google knowingly induces these third parties to commit infringing acts.

109. In addition, Google has indirectly infringed and continues to indirectly infringe the '008 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, infringing methods with knowledge that they are especially designed or adapted to operate in a manner that infringes the '008 Patent and despite the fact that the infringing technology is not a staple article of commerce suitable for substantial non-infringing use. Google knowingly incorporates methodology for assessing a

---

[46] *See, e.g.*, *Traffic Quality: We protect you from invalid activity and advertising fraud*, Google Ads, available at https://www.google.com/ads/adtrafficquality/ (last visited Jan. 14, 2026).

[47] *See Description of Methodology*, Ads Data Hub, available at https://developers.google.com/ads-data-hub/resources/description-of-methodology (last visited Jan. 14, 2026).

[48] *See Google AdSense Help: Monetization and ads*, Google, available at https://support.google.com/adsense/answer/1112983?hl=en (last visited Jan. 14, 2026).

confidence level that an operator of a client computing device interacting with a server is a human being rather than a bot into the accused Ad Traffic Quality or similar bot-detection and -filtration methods such that they operate in an infringing manner. By incorporating such methodology into its Ad Traffic Quality or similar bot-detection and -filtration methods, Google contributes to infringing use, which lack substantially noninfringing uses because the accused Ad Traffic Quality methods are designed and constructed to operate in a manner that infringes the ’008 Patent.

110. All of Google’s acts of infringement have caused damage to Nobots, and Nobots is entitled to recover from Google (or any successor entity to Google) the damages sustained by Nobots as a result of Google’s wrongful acts in an amount subject to proof at trial.

**COUNT TWO**
**INFRINGEMENT OF U.S. PATENT NO. 11,810,014**

111. Plaintiff repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

112. Google has infringed and continues to infringe at least Claim 1 of the ’014 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States, without authorization, utilities that practice at least Claim 1 of the ’014 Patent. Google is liable for its infringement of the ’014 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c).

113. Google designs, constructs, imports, offers for sale, and/or sells CAPTCHA instrumentalities that perform a method for generating a value indicative of a likelihood that a human or an autonomic computer application is operating a client computer attempting access to a protected page of a website, by collecting and receiving active and passive data of the client computer, and analyzing some of that data in conjunction with model data based on human interactions from a prior session with the same website. Based on that value, and a determination

of whether that value meets predetermined criteria, the accused instrumentalities either allow the client computer to access a protected page or require the operator of the client computer to decipher a CAPTCHA test. If a CAPTCHA test is provided and a response is received, the Accused Systems perform a second analysis to assess the accuracy of the CAPTCHA response and generate a second value, which, if it meets predetermined criteria, will cause the accused instrumentalities to grant the client computer access to the protected page.

114. Google's reCAPTCHA instrumentalities each infringe at least Claim 1 of the '014 Patent.

115. Claim 1 of the '014 Patent recites "[a] non-transitory machine readable medium having stored thereon instructions for performing a method for generating a value indicative of a likelihood that a human or autonomic computer application is operating a client computer attempting access to a protected page of a website, which when executed by at least one machine, causes the at least one machine to perform operations comprising:

a) provide data collection data that causes the client computer to collect active data relating to interactions of the client computer with a given page of the website;

b) receive at least some of the collected active data from the client computer and at least some passive data from the client computer;

c) perform a first analysis comprising analyzing at least some of the received active data and at least some of the received passive data in conjunction with model data based on human interactions from a prior session with the same website;

d) generate a first analysis value based on the first analysis, wherein the client computer is allowed to access the protected page without requiring an operator of the client computer to decipher a CAPTCHA test if the first analysis value meets a

first analysis predetermined criteria;

e) determine that the first analysis value fails to meet the first analysis predetermined criteria;

f) provide a CAPTCHA test to the client computer based on the determination that the first analysis value fails to meet the first analysis predetermined criteria;

g) receive a response of the client computer to the CAPTCHA test;

h) perform a second analysis comprising assessing accuracy of the response of the client computer to the CAPTCHA test; and

i) generate a second analysis value based on the second analysis, wherein the client computer is granted access to the protected page based on the second analysis value meeting a second analysis predetermined criteria."

116. The accused reCAPTCHA instrumentalities, including at least reCAPTCHA v2, v3, and Enterprise, meet every element of this claim.[49] Each of the accused reCAPTCHA instrumentalities requires a server to provide a value indicating a judgment of whether a human or bot is operating a client computing device that is interacting with a server. Google is clear about the purpose of its reCAPTCHA instrumentalities: to monitor data or provide tests that distinguish between humans and computers.[50] And reCAPTCHA v3 and reCAPTCHA Enterprise, for instance, provide explicit "scores" that indicate a judgment of whether the user is a human or a bot.

---

[49] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google's products infringe the '014 Patent.

[50] *See What is CAPTCHA?*, Google Workspace Admin Help, available at https://support.google.com/a/answer/1217728?hl=en (last visited Jan. 14, 2026).

**Figure 38**

## Interpreting the score

reCAPTCHA v3 returns a score (1.0 is very likely a good interaction, 0.0 is very likely a bot). Based on the score, you can take variable action in the context of your site. Every site is different, but below are some examples of how sites use the score. As in the examples below, take action behind the scenes instead of blocking traffic to better protect your site.

| Use case | Recommendation |
| --- | --- |
| homepage | See a cohesive view of your traffic on the admin console while filtering scrapers. |
| login | With low scores, require 2-factor-authentication or email verification to prevent credential stuffing attacks. |
| social | Limit unanswered friend requests from abusive users and send risky comments to moderation. |
| e-commerce | Put your real sales ahead of bots and identify risky transactions. |

reCAPTCHA learns by seeing real traffic on your site. For this reason, scores in a staging environment or soon after implementing may differ from production. As reCAPTCHA v3 doesn't ever interrupt the user flow, you can first run reCAPTCHA without taking action and then decide on thresholds by looking at your traffic in the admin console. By default, you can use a threshold of 0.5.

**Source**: *reCAPTCHA v3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

117. Each of the accused reCAPTCHA instrumentalities requires the provision of data collection data to a user's client computing device, and the receipt and collection of active and passive data in return.

**Figure 39**




**Source**: *Protect Your Business from Phishing, Malware, and Fraud with Google Cloud Tools (Cloud Next '19)*, Google Cloud Tech (Apr. 11, 2019), available at https://www.youtube.com/watch?v=5JEReUAX5Jk (last visited Jan. 23, 2026).

118. Each of the accused reCAPTCHA instrumentalities requires the analysis of that active and passive data, in conjunction with model data based on human interactions from a prior session with the same website, and the generation of a value based on that analysis. For instance, Google notes publicly that it uses this data to calculate a "risk score" of whether the user is a human or a bot "by using machine learning models based on user behavior patterns."[51] Machine learning models are trained by digesting large amounts of model data. This model data includes human interactions from prior sessions with the same website. For instance, Google notes publicly that its reCAPTCHA instrumentalities "work[] best with context about how humans and bots interact with

[51] *See reCAPTCHA Enterprise Product Demo*, Google Cloud Tech, available at https://www.youtube.com/watch?v=ic3Fj2B1LR4 (at 1:40) (last visited Jan. 14, 2026).

your website."[52]

119. Further, certain of the accused reCAPTCHA instrumentalities require that, if the value generated meets a predetermined threshold, the user will be granted access to a protected page; if the value generated does not meet that threshold, the user will be provided with a CAPTCHA test. For instance, in in reCAPTCHA v2, the user may be determined to have failed the initial classification threshold of "highly suspicious traffic." In that case, the user can be subject to immediate blocking "on the spot," prior to the administration of any CAPTCHA challenges.[53] If the user is not "highly suspicious," but somewhat suspicious, that user may face "very difficult CAPTCHAs."[54] If the user is not suspicious, the user will not face a CAPTCHA at all.

120. Each of the accused reCAPTCHA instrumentalities requires that, if a user performs a CAPTCHA test, that response will be received by the server, analyzed for accuracy, and used to generate a second value based on that second analysis, wherein the user will be granted access to the protected page if the second value exceeds a second predetermined threshold. For example, Google's reCAPTCHA software system receives data on and analyzes each of the user's reCAPTCHA performances. As Google puts it: "reCAPTCHA returns a score for each request."[55] If the score is above the risk score threshold set by the reCAPTCHA customer, then Google's reCAPTCHA software may allow the user to be granted access to a protected page. This is among the actions that a reCAPTCHA customer may take. For instance, Google notes that a reCAPTCHA

---

[52] *See Introducing reCAPTCHA v.3*, Google Search Central, available at https://www.youtube.com/watch?v=tbvxFW4UJdU&t=1s (at 1:47) (last visited Jan. 14, 2026).
[53] *See* reCAPTCHA: Tough on Bots, Easy on Humans, Great on Mobile – Google I/O 2016, Google for Developers, https://www.youtube.com/watch?v=r-HlJyNWfoY (at 8:30-9:00) ("If [you're] a well-behaved human, we give you a green check directly. For bad bots, we reject you right on the spot. . . But for everything else in-between, [if] we're not sure, or we think you're suspicious, we give you different CAPTCHAs.") (last visited Jan. 14, 2026).
[54] *Id.* at 9:50.
[55] *Interpret assessments for websites*, reCAPTCHA, available at https://docs.cloud.google.com/recaptcha/docs/interpret-assessment-website (last visited Jan. 14, 2026).

customer may specify a "login action", which is "returned as part of the assessment."[56]

121. Google makes, distributes, uses, imports, offers for sale, and/or sells utilities and products, such as reCAPTCHA v2 Checkbox, reCAPTCHA v2 Invisible, reCAPTCHA v3, and reCAPTCHA Enterprise, that infringe at least Claim 1 of the '014 Patent.

122. Google has sold, and continues to sell and offer for sale, these utilities in the United States, including through Google websites (https://cloud.google.com/recaptcha-enterprise), to companies throughout the State of Texas and in this District.[57]

123. In addition, Google indirectly infringed, and continues to indirectly infringe, the '014 Patent by actively inducing its infringement in violation 35 U.S.C. § 271(b).

124. In addition to Google, entities, consumers, and businesses who use Google's reCAPTCHA instrumentalities directly infringe the '014 Patent by using the accused Google reCAPTCHA instrumentalities.

125. Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the reCAPTCHA instrumentalities with knowledge and the specific intent that its efforts will result in the direct infringement of the '014 Patent by these third parties.

126. Such active steps include, for example, advertising and marketing the infringing

---

[56] *Install score-based keys on websites*, reCAPTCHA, available at https://docs.cloud.google.com/recaptcha/docs/instrument-web-pages (last visited Jan. 14, 2026).

[57] *See, e.g.*, *Honor Code Reporting Form*, Baylor Univ., https://cm.maxient.com/reportingform.php?BaylorUniv&layout_id=5 (last visited Nov. 5, 2021) (reflecting that the page is protected by reCAPTCHA v2 Invisible, one of the infringing methods of reCAPTCHA).

utilities to entities, consumers, and businesses[58] and selling such utilities to consumers knowing and intending that they would be used in the United States.

127. Google user guides for the accused reCAPTCHA instrumentalities likewise facilitate infringement, instructing consumers about, among other things, how to "start using reCAPTCHA."[59] By instructing third parties how to use the accused utilities for infringing purposes, such as to limit website access using the infringing systems, Google knowingly induces these third parties to commit infringing acts:

**Figure 40**




**Source**: *reCAPTCHA v3*, reCAPTCHA, https://developers.google.com/recaptcha/docs/v3 (last visited Nov. 5, 2021).

128. In addition, Google has indirectly infringed and continues to indirectly infringe the

---

[58] *See, e.g.*, *Top 10 Use Cases for reCAPTCHA Enterprise to Defend Against OWASP Web-Automated Attacks*, Google Cloud, available at https://services.google.com/fh/files/misc/owasp_handbook_again.pdf (last visited Jan. 14, 2026); *reCAPTCHA Enterprise*, Google Cloud, available at https://cloud.google.com/recaptcha-enterprise (last visited Nov. 7, 2021); *What Is reCAPTCHA?*, reCAPTCHA, available at https://developers.google.com/recaptcha (last visited Nov. 7, 2021).

[59] *Developer's Guide*, reCAPTCHA, available at https://developers.google.com/recaptcha/intro (last visited Nov. 7, 2021).

’014 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, infringing systems with knowledge that they are especially designed or adapted to operate in a manner that infringes the ’014 Patent and despite the fact that the infringing technology is not a staple article of commerce suitable for substantial non-infringing use. Google knowingly incorporates instrumentalities for judging whether a human or bot is interacting with a server into the accused Google reCAPTCHA systems such that they operate in an infringing manner. By incorporating such instrumentalities into its reCAPTCHA systems, Google contributes to infringing use as consumers use the confidence levels generated by the accused utilities to block, monitor, and flag bots, which lack substantially non-infringing uses because the accused reCAPTCHA instrumentalities are designed and constructed to operate in a manner that infringes the ’014 Patent.

129. Google has infringed and continues to infringe at least Claim 16 of the ’014 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States, without authorization, utilities that practice at least Claim 16 of the ’014 Patent. Google is liable for its infringement of the ’014 Patent pursuant to 35 U.S.C. § 271(a), (b), and (c).

130. Google’s Ad Traffic Quality instrumentalities and other, similar bot-detection and bot-filtration instrumentalities each infringe at least Claim 16 of the ’014 Patent.

131. Google designs, constructs, imports, offers for sale, and/or sells software instrumentalities, including the Ad Traffic Quality instrumentality, that provide a value indicating a judgment of whether a human or an autonomic computer application operating a client computer is interacting with a server, by requesting and receiving active and passive data of the client computer, and analyzing that data in conjunction with model data based on human interactions

from a prior session with the same website. Based on that value, and whether that value meets predetermined criteria, the accused instrumentalities request further data from the user.

132. Claim 16 recites "[a] non-transitory machine readable medium having stored thereon instructions for performing a method for providing a value indicating a judgment of whether a human or an autonomic computer application operating a client computer is interacting with a server, which when executed by at least one machine, causes the at least one machine to perform operations comprising:

a) provide data collection data requesting active and passive data of the client computer;

b) receive active and passive data responsive to the data collection data, the received active data relating to interactions of the client computer with a website of the server;

c) analyze the received active data and the received passive data for indication of a human or an autonomic computer application operating the client computer, wherein the analyzing includes analyzing the received active data and the received passive data in conjunction with model data based on human interactions from a prior session with the same website and developing a first analysis value;

d) determine that the first analysis value fails to meet a first analysis predetermined criteria; and

e) provide a request for further data from the client computer based on the determination that the first analysis value fails to meet the first analysis predetermined criteria.

133. Each of the accused Ad Traffic Quality or similar instrumentalities meets every

element of this claim.[60] Each of the accused Ad Traffic Quality or similar instrumentalities requires a server to provide a value indicating a judgment of whether a human or bot is operating a client computing device that is interacting with a server. This enables Google's Ad Traffic Quality team to detect, block, filter, monitor, and flag potential and actual bots, facilitating accurate billing for advertisements.[61]

134. Google's Ad Traffic Quality instrumentalities, or similar bot-detection and bot-filtration instrumentalities, protects Google-managed ads. Google's Ad Traffic Quality instrumentalities, or similar software instrumentalities, operate across Google-owned and -operated platforms, including the protection of Google Accounts (which are linked to the ads a user sees), and also govern the ad management for the millions of third-party websites that use Google's services.

135. Each of the accused Ad Traffic Quality instrumentalities comprises a server providing data collection data requesting active and passive data of the client computer. Google's Ad Traffic Quality system causes Google servers to send data collection data, including JavaScript code, that requests active and passive data of the client computing device.

136. Each of the accused Ad Traffic Quality instrumentalities comprises the receipt of active and passive data responsive to the data collection data, the received active data relating to interactions of the client computer with a website of the server. These data include mouse movements and clicks (types of active data), as well as IP addresses or functionally equivalent data from mobile applications (types of passive data).

[60] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Google's products infringe the '014 Patent.
[61] *See Google Ad Manager Help: Prevent invalid clicks and impressions*, Google, available at https://support.google.com/admanager/answer/1298900 (last visited Jan. 11, 2026).

**Figure 40**

Google Ads Help

Describe your issue

Both Google and their partners deliver the advertisements to users; however, Google maintains control over and performs the processes related to measurement and advertiser reporting of click activity. When a user clicks on an advertisement, whether delivered by Google or a partner, via any one of the products administering the product, the click activity is tracked by Google Ads through the ads redirect servers.

Measurement of click activity is based on the Google Ads click measurement methodology, which utilizes a technology infrastructure to manage and monitor click events. A click is recorded (measured) when Google Ads has received an initiated click and sends the user an HTTP 302 redirect to the advertiser landing page or website (or other intermediate server such as an advertiser's agent). These measured click events are recorded to data logs within an event file system. The data log files are then accumulated, edited and compiled through fully automated processes to produce click measurement and advertiser reporting. The editing process includes the process of filtering erroneous or corrupt data, identified non-human traffic including robots and other automated processes, and other identified invalid click activity. The filtered clicks are considered invalid, which means they are not billable to the advertiser. Google prepares click reports for advertisers which can be directly accessed by the respective advertiser.

**Source**: *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 14, 2026).

**Figure 41**

Many websites, such as news sites and blogs, partner with Google to show ads to their visitors. Working with our partners, we may use cookies for a number of purposes, such as to stop you from seeing the same ad over and over again, to detect and stop click fraud, and to show ads that are likely to be more relevant (such as ads based on websites you have visited).

We store a record of the ads we serve in our logs. These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you. We store this data for a number of reasons, the most important of which are to improve our services and to maintain the security of our systems. We anonymize this log data by removing part of the IP address (after 9 months) and cookie information (after 18 months).

**Source**: *Privacy & Terms: Advertising*, Google, available at https://policies.google.com/technologies/ads (last visited Jan. 23, 2026).

137. Each of the accused Ad Traffic Quality instrumentalities comprises analysis of active and passive data for indication of whether the user of the client computing device is a human or a bot, where that data is analyzed in conjunction with model data based on human interactions from a prior session with the same website and developing a first value.

As Figure 42 shows, passive data collected by Ad Traffic Quality instrumentalities include the user's IP address.

**Figure 42**

- **Non-human traffic:** Non-human traffic including robots, spiders, crawlers, and agents (collectively referred to as robots) represents programmatic activity on the website. This activity is comprised of programs making requests for web pages on the website and recursively following the links on the page to other pages within the website, including in many cases, the links to the ad servers. This activity may include system monitoring tools designed to ensure the website is functioning properly and content indexing or retrieving processes such as those used by search engines to populate their databases. When a user's browser or robot makes a request of a server for content, it typically provides certain data to the web server in addition to the specific request, including their IP address and user agent. The user agent typically provides certain information to the web server such as browser type (Internet Explorer, FireFox, Safari, Netscape, Opera, and so forth), browser version, the computer's operating system, and so forth and may also include information identifying itself to the server. Such information is used to filter out non-human traffic.

**Source**: *Google Ad Manager Help: Invalid traffic detection and filtration methodology*, Google, available at https://support.google.com/admanager/answer/141811?sjid=8505171532405550315-NC#googleAdManagerIABFiltration (last visited Jan. 11, 2026).

**Figure 43**

## How Google prevents invalid activity

Our specialists carefully monitor clicks and impressions on Google ads to protect your interests as well as those of advertisers. To do this, we use both automated systems and human reviews, analyzing all ad clicks and impressions for any invalid traffic that may artificially drive up an advertiser's costs or a publisher's earnings.

Google's proprietary technology analyzes clicks and impressions to detect invalid traffic. Our system uses sophisticated filters to distinguish between activity generated through normal use by users and activity that may pose a risk to advertisers, and advertisers are not charged for this activity.

**Source**: *Google Ad Manager Help: Prevent invalid clicks and impressions*, Google, available at https://support.google.com/admanager/answer/1298900 (last visited Jan. 11, 2026).

As part of that analysis, Google compares the user's monitored data to model data of human interaction. For instance, Google's Ad Traffic Quality methods might compare a user's mouse

movement (e.g., a perfectly straight line) with model data of human mouse movements (which, in the aggregate, show that a typical human mouse movement is a jittery or crooked line) to determine that the user is a bot.

**Figure 44**

Google Ads Help

Describe your issue

Both specific identification (including obeying robot instruction files, filtration lists, and publisher test activity) and activity-based filtration methods (including analyzing multiple sequential activities, outlier activity, interaction attributes, and other suspicious activity) are utilized in filtration.

In addition, the following parameters apply to the filtration methodology:

- Third-party filtration is not used by Google.
- Robot instruction files (robots.txt) are employed.
- Sources used for identification of non-human activity: Google uses the IAB/ABCe International Spiders & Robots List as well additional filters based on past robotic activities. The IAB Robots List exclude file is used.
- Activity based filtration processes: Activity-based identification involves conducting certain types of pattern analyses, looking for activity behavior that is likely to identify non-human traffic. Google's Ad Traffic Quality team has systems in place to determine any suspicious activities and does such activity based filtering appropriately.

**Source**: *Google Ads Help: Description of Methodology*, Google, available at https://support.google.com/google-ads/answer/2616016?hl=en#zippy=%2Cpurchased-traffic-reporting-disclosure%2Cplacement-position-reporting-disclosure%2Cmachine-learning%2Cconnected-tv%2Cvideo-data-reporting%2Cclick-data-reporting%2Cbusiness-partner-qualification%2Cfiltration-methodology%2Cvideo-impression-viewability-and-trueview-views-measurement-methodology%2Cclick-measurement-methodology%2Cwhat-is-not-included-in-the-audit-process%2Cwhat-is-included-in-the-audit-process%2Cwhat-is-google-accredited-for (last visited Jan. 11, 2026).

138. Based in part on these "pattern analyses"—comparisons between the user's patterns and a typical human user's patterns—Google's Ad Traffic Quality instrumentalities or similar

software instrumentalities subsequently generate a value that indicates a judgment that the user of the client computing device is either a human or a bot. That value, known as a risk score, is used to block a bot entirely, cause a bot to be monitored more closely, and/or flag a bot as invalid so that views associated with that device are not billed to an advertiser.

139. Each of the accused Ad Traffic Quality instrumentalities comprises a determination that the first analysis value fails to meet a first analysis predetermined criteria; and, if it does fail, provides a request for further data from the client computing device. Based on the failure of the initial threshold set for a particular site, page, app, or action, Google has several options, including blocking a bot entirely (Figure 45), or flagging a bot as potentially invalid for ad-billing purposes and continue to monitor the bot’s activity closely (Figure 46).

**Figure 45**

## Known bot-traffic exclusion

In Google Analytics properties, traffic from known bots and spiders is automatically excluded. This ensures that your Analytics data, to the extent possible, does not include events from known bots. At this time, you cannot disable known bot traffic exclusion or see how much known bot traffic was excluded.

Known bot and spider traffic is identified using a combination of Google research and the International Spiders and Bots List, maintained by the Interactive Advertising Bureau. Visit the Interactive Advertising Bureau (IAB) website for more information.

**Source**: *Analytics Help: Known bot-traffic exclusion*, Google, available at https://support.google.com/analytics/answer/9888366?hl=en (last visited Jan. 11, 2026).

**Figure 46**

## How Google prevents invalid activity

Our specialists carefully monitor clicks and impressions on Google ads to protect your interests as well as those of advertisers. To do this, we use both automated systems and human reviews, analyzing all ad clicks and impressions for any invalid traffic that may artificially drive up an advertiser's costs or a publisher's earnings.

Google's proprietary technology analyzes clicks and impressions to detect invalid traffic. Our system uses sophisticated filters to distinguish between activity generated through normal use by users and activity that may pose a risk to advertisers, and advertisers are not charged for this activity.

**Source**: *Google AdSense Help: Monetization and ads*, Google, available at https://support.google.com/adsense/answer/1348752?hl=en (last visited Jan. 23, 2026).

140. If a user fails a threshold, in certain cases the Ad Traffic Quality will allow that user to access a webpage or see an ad but request additional data on that user. After access, Google will more closely monitor that user's behavior, collecting more data from suspicious users than from non-suspicious users.

141. For example, per the Ad Traffic Quality website: "Some invalid traffic takes more time to detect. If something makes it through our filters but still seems fishy, we'll monitor the traffic data until we can be sure. In some cases, it may take up to several weeks to recognize a suspicious pattern."[62] Google's Ad Traffic Quality methods, or similar bot-detection and -filtration methods, cause multiple requests for data points of user behavior across a single user interaction and/or multiple user interactions. Each batch, or round, of data collection from that user will be analyzed to yield a confidence value, which is used to trigger further data requests or refrain from further requests. For instance, Google's Ad Traffic Quality software causes Google servers to use long-lasting cookies, allowing Google to request data from users for extended periods of time.[63] Extended cookie use and data requests allows Google to detect "irregular patterns" in user behavior. [64]

142. The requests for further data due to failure of an initial threshold also can be observed by the successive disappearance of ads over time, as a user simulates bot-like behavior, by running the same search repeatedly on Google Search. For example, as a user interacts with the website (or app), particularly when a user displays bot-like behavior, Google's accused instrumentalities are configured such that they can request further data from that user, analyze that data, calculate a confidence value regarding the user, and take action as a result. The successive disappearance of ads—of "Sponsored Products" and "Sponsored Results"—is shown in these screenshots, which capture a single user interaction over time, as the user exhibits suspicious behavior (here, repeatedly performing the same search on Google Search).

---

[62] *Traffic Quality: How does Google prevent invalid activity?*, Google Ads, available at https://www.google.com/ads/adtrafficquality/how-we-prevent-it/ (last visited Jan. 14, 2026).
[63] *See Google Privacy & Terms: How Google Uses Cookies*, Google, available at https://policies.google.com/technologies/cookies?hl=en-US (last visited Jan. 14, 2026).
[64] *See Filtering invalid traffic to ensure quality*, Display & Video 360 Help, available at https://support.google.com/displayvideo/answer/6076504 (last visited Jan. 14, 2026).

**Figure 47**

In the first screenshot, there are six Sponsored Products and three Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 48**

In the second, there are six Sponsored Products and only one Sponsored Result:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 49**

In the third, there are six Sponsored Products and no Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

**Figure 50**

In the fourth, there are no Sponsored Products and no Sponsored Results:




**Source**: Google Search Engine Results Page (screenshot on file, captured January 6, 2026, 10:36 AM PST).

143. As a further example, Google collects data on users when they are signing into a Google account. For example, a user's Google account is linked to the advertisements shown to that user by Google.[65] Google's Ad Traffic Quality system, or a similar software system, uses data

[65] *See Control what data Google uses to show you ads*, My Ad Center Help, available at https://support.google.com/My-Ad-Center-Help/answer/12156161?hl=en (last visited Jan. 11, 2026).

collected by Google to determine whether the user attempting to access the account is legitimate. If the initial data collection yields a confidence value suggesting that the user attempting to sign in might be a bot (and therefore not the legitimate user of the account), Google sends an "extra security question" or "challenge" to the user. Alternatively, if the login is suspicious, Google may send an email or other notification, or else deploy two-factor authentication.

**Figure 51**

# About admin alerts for suspicious login activity

*If you're using a personal Google Account, you can investigate suspicious activity on your account.*

As a Google Workspace administrator, you can use email alerts to notify you if there's suspicious sign-in activity for your users. For example, Google might notice a sign-in attempt that doesn't match a user's normal behavior. Usually, before Google sends you an alert, Google presents the user with an extra security question or challenge. If the user fails or abandons the challenge, the Google sends you the alert. The alert warns you that someone has the suspended user's password. For more information, go to Administrator email alerts.

## Examples of suspicious logins

- A user doesn't follow their usual sign-in pattern, such as a signing in from an unusual location.
- There was a successful sign-in from a suspended user's account.

**Note:** You might also get an alert if a suspicious event occurs when a user is using Mail Fetcher to import mail from another Gmail account, because the messages are being fetched through Google servers.

**Source**: *Google Workspace Admin Help: About admin alerts for suspicious login activity*, Google, available at https://support.google.com/a/answer/7102416?hl=en (last visited Jan. 11, 2026).

**Figure 52**

We monitor every login attempt to your account for suspicious activity. When there is a sign-in attempt from a device you've never used, or a location you don't commonly access your account from, we'll require additional information before granting access to your account. For example, if you sign in from a new laptop and you have a phone associated with you account, you will see a prompt—we're calling these dynamic verification challenges—like this:




**Source**: *New research: Understanding the root cause of account takeover*, Google Security Blog (Nov. 9, 2017), available at https://security.googleblog.com/2017/11/new-research-understanding-root-cause.html (last visited Jan. 11, 2026).

144. Google makes, distributes, uses, imports, offers for sale, and/or sells utilities and products, such as the Ad Traffic Quality system, that infringe at least Claim 16 of the '014 Patent.

145. Google has sold, and continues to sell and offer for sale, these utilities in the United States, including through Google websites, to companies throughout the State of Texas and in this

District. [66]

146. Google committed and is committing the foregoing infringing activities without license from Nobots. Google's acts of infringement have damaged Nobots, as owner and assignee of the '014 Patent. Nobots is entitled to recover from Google the damages it has sustained as a result of Google's wrongful acts in an amount subject to proof at trial. Google's infringement of Nobots's rights under the '014 Patent is ongoing and will continue to damage Nobots.

147. Beginning no later than the filing of this Amended Complaint, Google has had actual knowledge of the '014 Patent. Google's continued infringement following the filing of this Amended Complaint, despite its knowledge of the '014 Patent and Nobots's infringement allegations, is intentional and deliberate and willful.

148. In addition to Google, entities, consumers, and businesses who use Google's advertising-related services, all of which are governed by the Ad Traffic Quality system, directly infringe the '014 Patent by using the accused Ad Traffic Quality methods.

149. Google knowingly induced and induces these acts of infringement with the specific intent to encourage them by taking active steps to encourage and facilitate direct infringement by these third parties, in this District and elsewhere in the United States, through its design, construction, and sale of the infringing products, and through its creation and dissemination of promotional and marketing materials, supporting materials, instructions, and/or technical information relating to the Ad Traffic Quality methods with knowledge and the specific intent that its efforts will result in the direct infringement of the '014 Patent by these third parties.

---

[66] *See Digital Analytics and Advertising Practices for Baylor University*, Baylor University, (Oct. 31, 2019) available at https://brand.web.baylor.edu/sites/g/files/ecbvkj261/files/2021-01/Digital%20Advertising%20Tracking%20Practices%20-%20updated%20Oct%2031%202019.pdf#:~:text=Introduction:%20Digital%20advertising%20tracking%20and%20metric%20collection,websites%20are%20conducted%20via%20a%20tag%20system (last visited Jan. 14, 2026).

150. Such active steps include, for example, advertising and marketing the infringing utilities to entities, consumers, and businesses and selling such utilities to consumers knowing that they would be used in the United States.[67]

151. Additionally, Google configures its Ads-related services, products, and platforms, including Google Ads, Google Ad Manager, Ads Data Hub, AdSense, AdMob, Google Marketing Platform, and Google Display & Video 360, so that they all are governed by and integrated with the accused Ad Traffic Quality bot-detection and -filtration methods, or similar methods. These ads-related services manage ads across Google-owned and -operated platforms like Google Search and YouTube. For all of these services, products, and platforms, invalid traffic filtration is performed via Google Ad Traffic Quality and all "use the same primary sources to revise invalid traffic." [68]

152. Google also provides technical support and instruction to publishers on how to avoid invalid traffic within the Ad Traffic Quality system.[69] By instructing third parties how to use the accused instrumentalities for infringing purposes, Google knowingly induces these third parties to commit infringing acts.

153. In addition, Google has indirectly infringed and continues to indirectly infringe the '014 Patent as a contributory infringer in violation of 35 U.S.C. § 271(c) by selling or offering to sell in the United States, or importing into the United States, infringing methods with knowledge that they are especially designed or adapted to operate in a manner that infringes the '014 Patent

[67] *See, e.g.*, *Traffic Quality: We protect you from invalid activity and advertising fraud*, Google Ads, available at https://www.google.com/ads/adtrafficquality/ (last visited Jan. 14, 2026).
[68] *See Ads Data Hub: Description of Methodology*, Google, available at https://developers.google.com/ads-data-hub/resources/description-of-methodology (last visited Jan. 14, 2026).
[69] *See Google AdSense Help: Monetization and ads*, Google, available at https://support.google.com/adsense/answer/1112983?hl=en (last visited Jan. 14, 2026).

and despite the fact that the infringing technology is not a staple article of commerce suitable for substantial non-infringing use. Google knowingly incorporates instrumentalities for judging whether a human or bot is interacting with a server into the accused Ad Traffic Quality or similar bot-detection and -filtration systems such that they operate in an infringing manner. By incorporating such instrumentalities into its Ad Traffic Quality or similar bot-detection and -filtration systems, Google contributes to infringing use as consumers use the confidence levels generated by the accused utilities to block, monitor, and flag bots, which lack substantially non-infringing uses, because the accused Ad Traffic Quality instrumentalities are designed and constructed to operate in a manner that infringes the '014 Patent.

154. All of Google's acts of infringement have caused damage to Nobots, and Nobots is entitled to recover from Google (or any successor entity to Google) the damages sustained by Nobots as a result of Google's wrongful acts in an amount subject to proof at trial.

## DEMAND FOR JURY TRIAL

155. Plaintiff Nobots hereby demands a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nobots LLC requests entry of judgment in its favor and against Defendant Google as follows:

A. Declaring that Google has infringed United States Patent No. 9,595,008;

B. Declaring that Google has infringed United States Patent No. 11,810,014;

C. Declaring that Google's infringement of United States Patent No. 9,595,008 has been willful and deliberate, at least from the filing of this Complaint;

D. Declaring that Google's infringement of United States Patent No. 11,810,014 has been willful and deliberate, at least from the filing of this Complaint;

E. Awarding damages to Plaintiff in an amount no less than a reasonable royalty for Google's infringement of United States Patent No. 9,595,008 and United States Patent No. 11,810,014, together with treble damages for willful infringement, prejudgment and post-judgment interest, and costs, as permitted under 35 U.S.C. § 284;

F. Awarding attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

G. Ordering Google to pay supplemental damages to Nobots, including any ongoing royalties and interest, with an accounting, as needed; and

H. Awarding such other costs and further relief as the Court may deem just and proper.

Dated: March 5, 2026

Respectfully submitted,

By: /s/ Andres Healy

Charles L. Ainsworth (Texas 00783521)
Robert Christopher Bunt (Texas 00787165)
PARKER, BUNT & AINSWORTH, P.C.
100 East Ferguson, Suite 418
Tyler, Texas 75702
Tel: (903) 531-3535
Email: charley@pbatyler.com
Email: rcbunt@pbatyler.com

Matthew R. Berry
Andres Healy
John E. Schiltz
Eleanor Runde (*pro hac vice*)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101-3000
Tel: (206) 516-3880
Fax: (206) 516-3883
Email: mberry@susmangodfrey.com
Email: ahealy@susmangodfrey.com
Email: jschiltz@susmangodfrey.com
Email: erunde@susmangodfrey.com

***Attorneys for Nobots LLC***

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on March 5, 2026, and the foregoing was served via e-mail therefrom to all counsel of record.

*/s/ Andres Healy*
Andres Healy