**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| NOBOTS LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>GOOGLE LLC,<br><br>*Defendant*. | Case No. 1:22-cv-585-ADA<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF DR. ALAN T. SHERMAN REGARDING CLAIM CONSTRUCTION**

# Table of Contents


I. QUALIFICATIONS ....... 1

A. Education ....... 1

B. Career Synopsis ....... 1

C. Publications ....... 5

II. SCOPE OF ASSIGNMENT AND APPROACH ....... 5

III. EXECUTIVE SUMMARY ....... 6

IV. LEGAL STANDARDS AND MY OPINIONS AS TO THE APPLICABLE LEVEL OF SKILL ....... 7

A. Claim Construction Principles ....... 7

B. The Person of Ordinary Skill in the Art ....... 9

V. TECHNOLOGICAL BACKGROUND ....... 10

A. CAPTCHAs (Completely Automated Public Turing test to tell Computers and Humans Apart) ....... 10

B. Other Methods for Telling Computers and Humans Apart ....... 13

C. Overview of the Asserted Patents ....... 14

VI. DISPUTED CLAIM TERMS ....... 15

A. "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" ('008 claim 18) ....... 16

B. "active data" ....... 23

C. "passive data" ....... 30

# Table of Exhibits

| Exhibit | Description |
|---|---|
| 1 | U.S. Patent No. 9,595,008 (Asserted Patent) |
| 2 | U.S. Patent No. 11,810,014 (Asserted Patent) |
| 3 | Excerpts of U.S. Provisional Patent Application No. 61/003743 ("Provisional Application") |
| 4 | Excerpts of U.S. Patent Application No. 12/313,502 ("'008 File History") |
| 5 | Luis von Ahn et al., "CAPTCHA: Using Hard AI Problems for Security," in Advances in Cryptology — EUROCRYPT 2003 (May 2003) ("von Ahn I") (GOOG-NOBOTS-PA-00005444) |
| 6 | KyoungSoo Park et al., *Securing Web Service by Automatic Robot Detection*, Proceedings of the USENIX '06 Annual Technical Conference (2006) ("Park") (GOOG-NOBOTS-PA-00014478) |
| 7 | U.S. Patent App. Pub. No. 2007/0239604 ("O'Connell I") (GOOG-NOBOTS-PA-00001536) |
| 8 | U.S. Patent App. Pub. No. 2007/0255821 ("Ge") (GOOG-NOBOTS-PA-00000606) |
| 9 | U.S. Patent App. Pub. No. 2008/0114624 ("Kitts I") (GOOG-NOBOTS-PA-00000917) |
| 10 | Excerpts of U.S. Patent No. 7,373,524 ("Motsinger") (GOOG-NOBOTS-PA-00001404) |
| 11 | Pang-Ning Tan & Vipin Kumar, "Discovery of Web Robot Sessions Based on Their Navigational Patterns," 6 *Data Mining and Knowledge Discovery* (2002) ("Tan") (GOOG-NOBOTS-PA-00003368) |
| 12 | Neil Daswani et al., "Online Advertising Fraud," *in Crimeware: Understanding New Attacks and Defenses* (Markus Jakobsson & Zulfikar Ramzan, eds. 2008) ("M. Jakobsson") (GOOG-NOBOTS-PA-00013182) |
| 13 | Excerpts from Alexander J. Vincent, *JavaScript: Developer's Dictionary* (1st ed. 2002) ("Vincent") (GOOG-NOBOTS-PA-00004269) |
| 14 | *Google LLC v. Nobots LLC*, IPR2022-00940, Paper 13 (Dec. 1, 2022) ("Institution Decision") |
| 15 | *Google LLC v. Nobots LLC*, IPR2022-00940, Paper 38 (Nov. 29, 2023) ("Final Written Decision") |
| 16 | Ayse Pinar Saygin et al., "Turing Test: 50 Years Later," in *Minds and Machine*s, vol.10, at 463-516 (2001) ("Saygin") (GOOG-NOBOTS-PA-00002783) |
| 17 | Clark Pope et al., Is it Human or Computer? Defending E-Commerce with Captchas (2005) ("2005 Pope") (GOOG-NOBOTS-PA-00014342) |

| Exhibit | Description |
|---|---|
| 18 | Greg Kochanski et al., *A Reverse Turing Test Using Speech*, 7th International Conference on Spoken Language Processing (Sept. 16-20, 2002) ("Kochanski") (GOOG-NOBOTS-PA-00003820) |
| 19 | Roman V. Yampolskiy & Venu Govindaraju, *Embedded Noninteractive Continuous Bot Detection*, 5 ACM Comput. Entertain. (Mar. 1, 2008), pp. 1-11 ("Yampolskiy") (GOOG-NOBOTS-PA-00013792) |
| 20 | Declaration of David Martin dated July 7, 2022 (Dkt. 50-1) |
| 21 | Richard Atterer et al., Knowing the user's every move: user activity tracking for website usability evaluation and implicit interaction (2006) ("2006 Atterer") (GOOG-NOBOTS-PA-00014349) |
| 22 | U.S. Patent Application Publication No. 2006/0224898 to Ahmed ("Ahmed") (GOOG-NOBOTS-PA-00015340) |
| 23 | Nobots LLC's Disclosure of Extrinsic Evidence (May 22, 2026) |

I, Alan T. Sherman, state and declare as follows:

1. I am a consultant with more than 40 years of experience in computer security. I have been retained on behalf of Defendant Google LLC ("Google") to provide technical background information and my opinion to the Court concerning various patent claim limitations from the perspective of the "person of ordinary skill in the art." The opinions, their factual support, and the related discussion of background technology presented herein are true to the best of my knowledge and, if called to testify, I could and would testify competently to them.

# I. QUALIFICATIONS

2. I submit this report at the request of Google and as an expert in computer security, including network security, cryptology, and authentication. My qualifications in these areas, as well as other areas, are established below and by my curriculum vitae, a true and correct copy of which is attached as Attachment A hereto.

## A. Education

3. I received my PhD in Computer Science from the Massachusetts Institute of Technology, specializing in cryptology. My dissertation was entitled "Cryptology and VLSI (a two-part dissertation): I. Detecting and exploiting algebraic weaknesses in cryptosystems. II. Algorithms for placing modules on a custom VLSI chip." My mentor was Ronald Rivest, an inventor of the RSA public-key cryptosystem.

## B. Career Synopsis

4. My current employment is as a tenured Professor of Computer Science at the University of Maryland, Baltimore County (UMBC). In that capacity I conduct research, teach BS, MS, and PhD level courses in computer science, mentor graduate students doing research, and direct PhD dissertations in computer science. I also directed the UMBC Center for Information Security and Assurance (CISA), and I am associate director of the UMBC Institute for

Cybersecurity (UCI), which activities resulted in UMBC being designated as a National Center of Academic Excellence in Cyber Defense (CAE-CD) and Cyber Research (CAE-R) by the National Security Agency (NSA) and the Department of Homeland Security (DHS). Courses I have taught include cryptography, information assurance, cybersecurity research, algorithms, and discrete math. My research focuses on high-integrity voting systems, cybersecurity, cryptology, formal-methods analysis of cryptographic protocols, discrete algorithms, and cybersecurity education.

5. Concurrently with my PhD at MIT in 1987, I served as an Instructor of Computer Science at Tufts University. I was promoted to the position of Assistant Professor in September of 1986. At Tufts, I taught classes including cryptography, algorithms, and computer programming.

6. I joined the UMBC in 1989 as an Assistant Professor of Computer Science. In 1995, I was promoted to Associate Professor with tenure, and again promoted to full professor in July 2014, in the Department of Computer Science and Electrical Engineering.

7. In addition to my academic career, I have extensive experience in legal consulting as well as contracting with both public and private entities in the development of computer and network technologies and their security protocols. My legal consulting career spans over twenty years, and I have been called upon as an expert witness in patent litigation matters for such entities as Google, Apple, Inc., Sony Corp., IBM, McAfee, Wowza, Microsoft, RSA, and Strikeforce. In that capacity, I have not only provided expert opinions but also served as a cryptologic expert on inventorship, claim construction, invalidity, non-infringement, and damages involving cryptographic patents.

8. My cryptologic consulting work experience has spanned over forty years, involving the development and analysis of network security, cryptographic systems, and authentication protocols. For example, in that capacity, I have analyzed software security and conducted

cryptologic research at NAI Labs under contracts from the Defense Advanced Research Projects Agency (DARPA) and other government agencies. This work included designing new fast authentication systems, and designing and analyzing algorithms for managing cryptographic keys in large dynamic groups. Furthermore, I have conducted evaluations of security protocols in software products at Phoenix Technologies and multi-media broadcast systems at LuxSAT, Inc., and evaluated the security of security infrastructure under development at InfoScape Corporation. In addition, I devised an authentication algorithm for use by Mattel in hand-held games; in 2005, I conducted an evaluation of two-factor authentication security and key management at 2Factor, LLC; and in 2008-2010, I evaluated the security of the SafeIDKey authentication hardware dongle developed by ID2P for use in the mortgage industry.

9. My research in cryptology, the security of voting systems, information assurance, and cybersecurity has been funded by the National Science Foundation (NSF), the National Security Agency, and U.S. Election Assistance Commission.

10. My research includes design and analysis of an authentication system that uses power line communications as a second channel for location authentication. My research on the Scantegrity voting system has been published in top venues for my field, including the IEEE Transactions on Information, Forensics, and Security, the Proceedings of the USENIX Security Conference, and the Proceedings of the USENIX/Accurate Electronic Voting Technology Workshop (EVT). In 2009 and 2011, the city of Takoma Park, Maryland, used the Scantegrity voting system to elect its mayor. It was the first time any end-to-end voter verifiable voting system with ballot privacy was ever used in any binding municipal election. Protocols within the Scantegrity system use encryption, hashing, and digital signatures.

11. I have designed and analyzed cryptographic protocols. For example, in 2020 I analyzed the Secure Remote Password (SRP) Protocol for authentication, and in 2020 I designed and analyzed a new protocol for Private User Discovery with Minimal Information Disclosure (UDM) for discovering users in anonymous communication systems. In 2024 I analyzed the Session Binding Proxy Protocol (SBP), and in 2025 I analyzed the FIDO UAF authentication protocol. In 2026 I analyzed the secureDNA protocol and presented that work at the Network and Distributed System Security Symposium (NDSS) 2026 research conference. In 2026 I also analyzed the C2PA protocol for verifying the provenance of digital media.

12. My research on voting includes the design of Direct Recording Equipment (DRE) voting machine that uses a type of trusted cryptographic hardware known as a Trusted Platform Module (TPM).

13. I have supervised student projects that have included the design and implementation of cryptographic hardware, including “How to generate repeatable keys using Physical Unclonable Functions” and “A preliminary FPGA implementation and analysis of Phatak’s quotient-first scaling algorithm in the reduced-precision residue number system.”

14. My research at UMBC has been supported by the National Science Foundation (NSF), the National Security Agency (NSA), and IBM. For example, beginning September 2018, I was the Principal Investigator on two cybersecurity grants from NSF and one from NSA, including a five-year $4,988,073 grant from NSF. Beginning August 2025, I am Principal Investigator on a three-year $969,645 cybersecurity and AI grant from NSF.

15. I have received a number of research appointments during my career. For example, I have served as a Member at the National Center for the Study of Elections, UMBC, and as a Research Affiliate in the Theory of Computational Research Group at MIT. I have also served, by

joint appointment, with the University of Maryland Institute for Advanced Computer Studies (UMIACS).

16. As is apparent from my background, my career has focused on the fields of computer science, cybersecurity, and cryptology. From my experience in academia to my research at NAI Labs in support of DARPA, I possess extensive knowledge of both theoretical and practical applications of cryptology, authentication, discrete algorithms, and network security.

### C. Publications

17. I am a named inventor on four United States patents, which focus on secure communications, key management, and authentication protocols.

18. I am the author or co-editor on two books VLSI Placement and Routing: The PI Project, Springer-Verlag (New York, 1989); and Advances in Cryptology: Proceedings of Crypto 82, Plenum Press (New York, 1983). I have also published over thirty-six articles in peer-reviewed journals and forty-six articles in peer-reviewed research conferences.

## II. SCOPE OF ASSIGNMENT AND APPROACH

19. I have been retained on behalf of Google to provide information and opinions to assist the Court in its determination of the meaning of certain claim limitations of United States Patent Nos. 9,595,008 and 11,810,014 (the "Asserted Patents") based upon the intrinsic record and extrinsic evidence as understood by a person of ordinary skill in the art. In this declaration, I will refer to each of those patents by its last three digits—for example, the '008 patent—and I will refer to the patents collectively as the Asserted Patents.

20. The '008 patent and the '014 patent are provided as **Exhibit 1** and **Exhibit 2**, respectively. For brevity, I may not refer to the exhibit numbers each time the patents are cited. My declaration cites to the patents in the form of column:line citations ("X:Y"), unless otherwise stated.

21. I have provided a list with my curriculum vitae (Attachment A) of the cases in which, in the past five years, I have provided litigation support, including expert testimony at trial or by deposition.

22. I am being compensated at $650 per hour for each hour of my time spent preparing for and providing testimony in this matter, including the preparation of this declaration. This compensation is not dependent on, nor related to in any manner, the outcome of the current litigation or the Court's claim construction rulings.

23. The documents and materials that I considered in connection with forming my opinions set forth in this declaration include the patents, patent applications, technical documents, and other references set forth in the Table of Exhibits or cited herein. I also have reviewed portions of Google's Invalidity Contentions dated April 15, 2026, although the contentions have not formed the basis for any of my opinions with respect to the disputed claim terms set forth in this declaration.

## III. EXECUTIVE SUMMARY

24. I will begin the substantive portion of my declaration by briefly setting forth the standards that I understand to govern the Court's task of construing disputed patent claim terms. I will then provide background information on the technology relevant to the Asserted Patents. I will then render my opinions on the meaning of the disputed claim terms as those terms are used in the Asserted Patents.

25. Based on my review of the Asserted Patents and the other documents referenced herein, as well as my knowledge and expertise in the field of computer security, I have arrived at the following opinions. A person of ordinary skill in the art, reading the Asserted Patents at the time that the patents were filed in 2007 (or 2008) would have understood the disputed claim terms to have the following meanings, as proposed by Google:

| Section Below | Claim Term | Claim(s) In Which Term Appears | Google's Proposed Construction |
|---|---|---|---|
| VI.A | "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" | '008 claim 18 | Indefinite |
| VI.B | "active data" | '014 patent, claims 1, 4, 6, 9, 10, 11, 12, 15, 16, 18, 19, 22, 24, and any asserted claims that depend therefrom | "data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location, including, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics" |
| VI.C | "passive data" | '014 patent, claims 1, 4, 9, 11, 12, 15, 16, 18, 19, 22, 24, and any asserted claims that depend therefrom | "data available from a computing device user's interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location, including, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc." |

## IV. LEGAL STANDARDS AND MY OPINIONS AS TO THE APPLICABLE LEVEL OF SKILL

### A. Claim Construction Principles

26. I understand that claim construction is the process by which the Court construes the meaning of certain terms in the patent claims. I understand that in arriving at this meaning, the

person of ordinary skill in the art considers the intrinsic record of the patent—the claim language, the specification of the patent, and the file history developed during prosecution of the patent before the U.S. Patent Office.

27. I also understand that extrinsic evidence—which consists of evidence external to the patent and prosecution history, such as expert opinions and testimony, inventor testimony, dictionaries, and learned treatises—may be considered but cannot be used to contradict the meaning taught by the intrinsic record.

28. I understand that differences among claims can be a useful guide in understanding the meaning of particular claim terms. For example, I am familiar with the doctrine of "claim differentiation" where the presence of dependent claims that add a particular limitation to an independent claim gives rise to a presumption that the limitation in question is not present in the independent claim.

29. I further understand that a patent is invalid for indefiniteness only if its claims, read in light of the specification and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. I understand that "reasonable certainty" does not require absolute precision in the language of the claims. Rather, the claims must be precise enough to give clear notice of what is claimed and what is still available in the public domain. In addition, if a claim contains an obvious mistake that a court cannot correct, then the claim is indefinite. I also understand that a court may correct the claim only if the correction is not subject to reasonable debate based on consideration of the claim language and the specification, and the prosecution history does not suggest a different interpretation of the claims. In determining whether a claim can be corrected, the court must consider how a potential correction would impact the scope of a claim. I further understand that when analyzing definiteness, the claims must be

interpreted from the perspective of a person of ordinary skill in the art at the time the invention was made in light of the specification and prosecution history.

30. I understand that, in general, a term or phrase found in the introductory words of the claim—that is, the preamble of the claim—should be construed as a limitation if it recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim. Conversely, a preamble term or phrase is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention. In making this distinction, one should review the entire patent to gain an understanding of what the inventors claimed they actually invented and intended to encompass by the claims.

31. I understand that language in the preamble limits claim scope (i) if dependence on a preamble phrase for antecedent basis indicates a reliance on both the preamble and claim body to define the claimed invention; (ii) if reference to the preamble is necessary to understand limitations or terms in the claim body; or (iii) if the preamble recites additional structure or steps that the specification identifies as important.

**B. <u>The Person of Ordinary Skill in the Art</u>**

32. I have been informed by counsel for Google, and I understand, that the "person of ordinary skill in the art" is a hypothetical person who is presumed to be familiar with the relevant technical field and its literature at the time when the patent applications were filed.

33. In my opinion, a person of ordinary skill in the art, as of the priority date of each Asserted Patent, would have had a bachelor's degree in computer science or a related field with coursework relating to computer science, plus two years' academic and/or industry experience in computer security. More education could substitute for experience, and vice versa. I understand this is the same level of skill in the art adopted by the Patent Trial and Appeal Board ("PTAB") in

the *inter partes* review ("IPR) proceedings for the '008 patent, and that Nobots did not dispute it. *See* Ex. 15 (Final Written Decision) at 8.

34. I understand that the Asserted Patents claim priority to U.S. Provisional Application No. 61/003,743 (the "Provisional Application"), filed November 19, 2007, although any given claim of those patents may not be entitled to the earliest claimed date. *See* Ex. 3 (Provisional Application). I also understand that Google contends that the claims of the Asserted Patents are not entitled to a priority date any earlier than November 19, 2008.

35. At all times, I have understood and interpreted the claims of the Asserted Patents from the point of view of the person of ordinary skill in the art as of the 2008 timeframe with respect to the claims of the Asserted Patents. However, the opinions set forth in this declaration would not change if the Court were to determine that all claims of the Asserted Patents were entitled to an earlier priority date.

## V. TECHNOLOGICAL BACKGROUND

36. To assist the Court, I will provide some background on the technology relevant to the Asserted Patents.

### A. CAPTCHAs (Completely Automated Public Turing test to tell Computers and Humans Apart)

37. The '008 and '014 patents relate to methods for assessing whether the operator of a computing device is a human being rather than an autonomic computer application—e.g., a computer running software that attempts to access the resource in an automated fashion without the continuous involvement of human operators. Such autonomic computer applications often are called "bots," short for "robots." Some bots serve as beneficial tools, crawling websites to populate search engines, or performing repetitive tasks such as checking the validity of URL links. Other bots are malicious, for example, registering for free email addresses for future spamming,

generating automated "clickthroughs" on online ads to boost affiliate revenue, cracking passwords by quickly trying every possible password, or testing vulnerabilities in servers to compromise machines for other uses.

38. Protecting websites and other computer resources from access by bots is an area in the field of access control, which is part of the field of computer security. The goal of access control generally is to ensure that an online resource such as a webpage, or an online user account, can be accessed only by authorized users, and not by bots or other humans who are not authorized to access that resource.

39. Techniques for controlling access to a computer resource can take several different forms, depending on the type or level of control needed or desired. For example, sometimes it is necessary or desirable to restrict access to a particular (human) user, as in the case of an online bank account. In that case, the typical task of the access control system is to authenticate the identity of a user who is attempting to gain access to the resource, and to confirm that the identified user is on the list of those who are authorized. This task can be done, for example, by requiring the user to enter a secret password known only to the authorized user and to the access control system (i.e., a "shared secret"). In other applications, it may be necessary only to prevent automated access by computer bots, and not to perform full identity authentication. For instance, to prevent bots from registering for thousands of free email accounts, an access control system may be tasked with allowing only human users to register, but if the users can be proven to be humans and not bots, determining each human's specific *identity* may not be required before deciding to allow the human to register for an email account.

40. The latter type of access control task—requiring users to demonstrate that they are human, without requiring them to prove their personal identities—led to the development in the

late 1990s and early 2000s of CAPTCHA, an acronym for "Completely Automated Public Turing test to tell Computers and Humans Apart."

41. The conceptual foundation for CAPTCHAs traces back to Alan Turing's 1950 "imitation game," commonly known as the Turing test. In that test, a human interrogator communicates with a human and a machine and attempts to determine which is which. If the interrogator cannot reliably distinguish the machine from the human, the machine is said to have passed the test. *See* Ex. 16 (Saygin); Ex. 17 (2005 Pope).

42. The term "CAPTCHA" was coined in the early 2000s by computer scientists at Carnegie Mellon University. *See* Ex. 1 ('008 patent) at 1:22-24[1]; Ex. 5 (von Ahn I) at 294. CAPTCHA tests are often described as "reverse Turing tests" because they are administered by a computer rather than by a human. *See* Ex. 18 (Kochanski) at GOOG-NOBOTS-PA-00003820; Ex. 19 (Yampolskiy) at GOOG-NOBOTS-PA-00013795. A CAPTCHA is a challenge-response test designed to prevent automated access to a resource by presenting a test that humans can pass but automated programs generally cannot. The "CA" in CAPTCHA—"Completely Automated"—reflects that the access-control software generates and administers the test, and evaluates the response, automatically and without human intervention on the control side. CAPTCHA and identity-authentication systems answer different questions: CAPTCHA asks whether the user is human; identity authentication asks whether the user is a *particular* human.

43. As the Asserted Patents acknowledge, by the mid-2000s, CAPTCHAs were widely used to prevent abuse, with visual CAPTCHAs in use "as the primary test by nearly every top

---

[1] The '008 and '014 patents share a specification. For simplicity, the citations in this document are to the '008 patent unless otherwise noted.

Internet site including Yahoo, Google, You Tube, Microsoft's Live ID, MySpace, Facebook, Wikipedia, Craigs List," and others. Ex. 1 ('008 patent) at 1:57-60.

### B. Other Methods for Telling Computers and Humans Apart

44. By 2007, it was known that CAPTCHAs might not be the most desirable solution in some circumstances. CAPTCHAs can discourage legitimate website visitors from interacting with a site, as human users do not want to solve puzzles every time they access a web page. *See* Ex. 6 (Park) at 260. In addition, CAPTCHAs could be defeated by tricking people into solving CAPTCHAs, or even hiring real people to solve them.

45. Other methods for distinguishing human users from bots also were in wide use by the early 2000s. Ad networks, in particular, were using hundreds or even thousands of signals to determine whether HTTP requests might be generated by a bot instead of a human, such as monitoring the presence or absence of mouse movement or mouse clicks, keyboard interactions, navigation/selection tendencies, the user's IP address and geographic location, cookies, and so on. *See, e.g.*, Ex. 7 (O'Connell I) at [0005], [0020], [0027]-[0029]; Ex. 8 (Ge) at Abstract; Ex. 9 (Kitts I) at [0046]-[0049]; Ex. 10 (Motsinger) at 4:17-5:25; Ex. 11 (Tan); *see also* Ex. 12 (M. Jakobsson) at GOOG-NOBOTS-PA-00013535 ("Developing a bot that behaves like a human and cloaks its behavior is challenging. An ad network may use hundreds or thousands of signals to determine whether HTTP requests might have been generated by a machine instead of a human.").

46. For example, a standard way of detecting bots in the early 2000s (and now) was to examine computer cookies returned to the server by the user's computer. A cookie is a file that a server may leave in a client computing device's memory for later examination or analysis. Cookies can be used to identify a particular user and associate multiple user requests to a webserver into a single session. The server can examine a user's cookie and compare it to a database of cookies associated with known bots, or it may analyze the number and frequency of transactions associated

with that cookie to determine whether the user is behaving like a bot. For example, a user who disallows setting cookies, routinely deletes them, or modifies them could be a malicious user or a bot.

47. Other methods of detecting bots were "active," in the sense that they involved acquiring data that the client computing device ordinarily would not store. As the Asserted Patents explain, Internet browsers and malware applications at the time were capable of logging and transmitting a user's mouse movements and keystroke combinations. *See, e.g.*, Ex. 1 ('008 patent) at 4:3-35; *see, e.g.*, Ex. 13 (Vincent) at GOOG-NOBOTS-PA-00005236, -245-49 (describing keystroke and mouse event handlers supported by Internet Explorer and Netscape Navigator as of 2002). This method takes advantage of the fact that humans may use a mouse or keyboard to access servers, whereas bots do not need to generate mouse or keyboard activity. If mouse movement or keyboard typing is detected, the user is likely human rather than a bot.

48. To detect mouse movements or keystrokes by the user, a website might include bits of JavaScript called "event handlers" or "event listeners" in a web page. When the browser loads the web page, the event listeners are installed in the browser, where they wait to detect mouse movements or keystrokes by the user. For example, a hyperlink in a web page could be used to detect many kinds of events involving interactions with the mouse, including mouse movement and keystrokes. Such event handlers helped to make web pages more dynamic (e.g., by showing a pop-up notice when the mouse moves over a hyperlink), but keyloggers and other event listeners also can be used by malicious attackers to steal passwords, banking credentials, and other sensitive data.

## C. <u>Overview of the Asserted Patents</u>

49. The '008 and '014 patents, which share the same specification, describe methods of determining whether the operator of a client computing device accessing a server is a human or

a bot by checking for the presence or absence of "acquired and/or available data relating to the [user's] operation of the computing device," such as "user biometrics" including "mouse movements and/or key strokes inputted by the user . . . attempting to access [the] server," which the patent categorizes as "active data." Ex. 1 ('008 patent) at 1:65-2:33, 2:54-3:32, 4:44-57. "[I]f no [such] activity is recorded there is a very high probability that the user is actually a bot," and therefore "further access is denied." *Id.* 4:62-64. On the other hand, if user biometrics are present but inconsistent with human activity patterns, that "would indicate the potential that the user is a bot," and "[a]ccess could then be denied, or further CAPTCHA tests presented." *Id.* 5:29-31. In addition, the client computing device's "browser cookies, destination IP histories, originating IP address," and so on may be compared with "model data" relating to human interaction to determine the likelihood that the operator of the client computing device is human. *Id.* 2:54-4:4. The patents also describe calculating a "confidence level" or "probability value" corresponding to the likelihood that the operator of the client computing device is human. *Id.* 2:18-25, claim 1.

## VI. <u>DISPUTED CLAIM TERMS</u>

50. The disputed terms addressed below raise a common issue: their meaning must be determined from the intrinsic record, not from any fixed technical meaning that a person of ordinary skill would have brought to the Asserted Patents. In particular, claim terms such as "active data" and "passive data" were not terms of art with settled meanings in computer security at the relevant time. Before reviewing the Asserted Patents, I had not encountered those phrases as standard technical terms used to classify bot-detection data, and I am not aware of any standard technical dictionary that defines "active data" or "passive data" as such. Consistent with that understanding, Nobots identifies dictionary definitions for the individual words "active" and "data," but identifies no dictionary or other accepted technical definition for the phrases "active data" or "passive data." Ex. 23 (Nobots' Disclosure of Extrinsic Evidence) at 7–9. Moreover, the

definitions Nobots identifies for "active" ("moving, working, or operating, not at rest") and "data" (e.g., "[i]nformation, in any form, on which computer programs operate") would not inform a person of ordinary skill as to the scope of "active data" or "passive data" in the context of the Asserted Patents. It therefore would be unhelpful and inadequate to construe those disputed terms by relying on a purported "plain and ordinary meaning," as Nobots proposes. Instead, the terms should be construed in view of the intrinsic evidence.

### A. "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" ('008 claim 18)

| Nobots' Proposed Construction | Google's Proposed Construction |
|---|---|
| "repeating b)-d) and comparing the first instance of the value of e) to the second instance of the value of e)" | Indefinite |

51. The term "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" is recited in claim 18 of the '008 patent. My understanding of this term as it is used in claim 18 of the '008 patent is informed by the claims, specification, and prosecution history of the Asserted Patents, as well as my knowledge and expertise in the field of computer security.

52. It is my opinion that a person of ordinary skill in the art would have understood the disputed term "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" to be indefinite.

53. Claim 18 depends from claim 1 of the '008 patent and recites: "[t]he method of claim 1 further comprising repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)."

54. Claim 1 in turn recites as follows:

> 1. A method for assessing a confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application, the method comprising:
>
>    a) a single user of a client computing device requesting data from a server;
>
>    b) the server presenting data issued by the server to the client computing device;
>
>    c) monitoring at least some data generated by the user at the client computing device in response to the issued data;
>
>    d) comparing the monitored data to model data relating to human interaction with or in response to the issued data; and
>
>    e) generating a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of an autonomic user with or in response to the issued data.

55. On its face, claim 18 contains a drafting error. Claim 18 recites "comparing the first instance of the value of d)" with "the second instance of the value of d)," but step d) of claim 1 does not recite or generate any value. The only "value" recited in claim 1 is "generat[ed]" in step e). However, simply replacing "the value of d)" with "the value of e)" does not resolve the problem because claim 18 does not expressly repeat step e), the step that generates the claimed value. Nor would it make sense to read claim 18 as "repeating a)-c) and comparing the first instance of the value of e) to the second instance of the value of e)," because that reading would require a second instance of the value generated in step e) without repeating either step d)—the comparison step that precedes generation of the value—or step e), which generates the value.

56. The prosecution history is only somewhat helpful. During prosecution, when claim 1 (then-pending claim 2) was first introduced into the application, it contained only four steps—steps a) through d)—which correspond to steps b) through e) in issued claim 1, as shown below:

> 2. (New) A method for assessing the likely user status of a client computing device interacting with a server wherein the computing device is in bi-directional operative communication with the server, the method comprising:
>
> a) presenting issued data to the client computing device;
>
> b) monitoring at least some data generated at the client computing device in response to the issued data;
>
> c) comparing the monitored data to model data relating to human interaction with or in response to the issued data; and
>
> d) generating a value that represents a likelihood that the monitored data results from human interaction with or in response to the issued data.

*See* Ex. 4 ('008 file history) at NOBOTS_00000043-45.

57. In response to an office action, Nobots[2] amended claim 1 to insert a new step a) and adjusted the lettering for the other four steps in claim 1—old step a) became new step b), old step b) became new step c), and so on—as shown below.

---

[2] I understand that Nobots' principal, Tim Heikell, was the patent applicant for the Asserted Patents. For simplicity, I refer to the patent applicant as "Nobots" in this declaration.

> 2. (Currently Amended) A method for assessing a confidence level that an operator ~~the likely user status~~ of a client computing device interacting with a server ~~wherein the computing device is in bi-directional operative communication with the server~~ is a human being rather than an autonomic computer application, the method comprising:
>
> a) a single user of a client computing device requesting data from a server;
>
> ~~a)~~ b) the server presenting ~~issued~~ data issued by the server to the client computing device;
>
> ~~b)~~ c) monitoring at least some data generated by the user at the client computing device in response to the issued data;
>
> ~~c)~~ d) comparing the monitored data to model data relating to human interaction with or in response to the issued data; and
>
> ~~d)~~ e) generating a value that represents a ~~likelihood~~ confidence level that the monitored data ~~results from~~ is a result of human interaction on the client computing device rather than that of an autonomic user with or in response to the issued data.

*Id.* at NOBOTS_00000090.

58. Although original steps a) through d) in claim 1 were re-lettered as steps b) through e), Nobots did not make corresponding amendments to claim 18. *Id.* at NOBOTS_00000090-93. As issued, claim 18 therefore still recites "repeating a)-c)" and comparing two instances of "the value of d)," even though the steps of claim 1 had been renumbered and the value-generating step had become step e).

59. It is therefore my opinion that a person of ordinary skill in the art would have understood the disputed term "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" to be indefinite for at least two reasons.

60. **First**, a person of ordinary skill would not know whether "repeating a)-c)" in issued claim 18 should be interpreted to mean "repeating b)-d)" or "repeating a)-d)." On the one hand, interpreting "repeating a)-c)" to mean "repeating b)-d)" would shift the original step references

forward by one letter to account for the insertion of new step a). Under that interpretation, additional data could be issued, monitored, and compared to model data without requiring a further request for data from the server under step a).

61. On the other hand, interpreting "repeating a)-c)" to mean "repeating a)-d)" would repeat all but the last step of issued claim 1, as claim 18 did before claim 1 was amended. The contrast with claims 16 and 17 reinforces the ambiguity. Claims 16 and 17 expressly require repetition "for a single user instance," while claim 18 omits that limitation. That omission at least permits the reasonable view that claim 18's repeated sequence is not confined to the same user instance and may include a renewed request for data from the server—i.e., step a) of issued claim 1. For these reasons, in my opinion, a person of ordinary skill would not be reasonably certain whether "repeating a)-c)" means repeating steps b)-d), repeating steps a)-d), or something else.

62. **Second**, a person of ordinary skill would understand that the limitation "the second instance of the value of d)" is independently ambiguous. As discussed above, step d) of claim 1 does not generate a value, while step e) does. Although "the first instance of the value of d)" might be understood to refer to the value generated in step e) of claim 1, claim 18 does not explain how a second value of d) should be computed. In particular, claim 18 does not recite repeating step e) to generate a "second instance" of that value. A person of ordinary skill would be left to guess whether the second value of d) refers to the second value of e) computed from repeating steps a)-d), the second value of e) computed from repeating steps b)-d), a value somehow computed from step d) during the repetition of steps a)-d) or b)-d), or something else. The written description does not resolve this ambiguity because it does not disclose repeating any steps of the claimed method or comparing first and second generated values. Even as originally drafted before the amendments

to claim 1, claim 18 (then-pending claim 19) did not recite repeating the "generating a value step," as that was step d) of claim 1 (then-pending claim 2):

| |
|---|
| 19. (New) The method of claim 2 further comprising repeating a) – c) and comparing the first instance of the value of d) to the second instance of the value of d). |

*Id.* at NOBOTS_00000045.

63. I understand that Nobots contends that the disputed term in claim 18 should be construed to mean "repeating b)-d) and comparing the first instance of the value of e) to the second instance of the value of e)." For the reasons discussed above, however, it would be at least equally reasonable to construe "repeating a)-c)" to mean "repeating a)-d)." In any event, Nobots' proposed construction does not resolve the independent ambiguity created by the phrase "the second instance of the value of d)." If claim 18 is construed to require repeating steps b)-d), but not step e), a person of ordinary skill would not know where the "second instance of the value of e)" is generated or how that second value is obtained. Under these circumstances, a person of ordinary skill would have to guess what claim 18 requires.

64. I also have considered the opinion of Nobots' claim construction expert, Dr. David Martin, filed in support of Nobots' responsive claim construction brief in 2022. *See* Ex. 20 (Martin Declaration) (also at Dkt. 50-1). Dr. Martin acknowledged that "Claim 18 does not explicitly repeat generating a value," but opined that "a person of ordinary skill in the art would understand that a second value is generated following the repetition of steps b)-d)." Dkt. 50-1 at 14. As support, Dr. Martin relied on the patent's statement that "comparing acquired and/or available data . . . to suitable models embodying human user derived data (model data)" in most embodiments "yields a probability value." Ex. 1 ('008 patent) at 2:18–22; *see* Dkt. 50-1 at 14. Dr. Martin also relied on the specification's disclosure that "sample points of a dataset" may be selected "for comparison" and that "an exact match could then invoke a more intensive comparison with the same stored

datasets, where again access can be denied when an exact or statistically sufficient match is found." Ex. 1 ('008 patent) at 5:5–12; *see* Dkt. 50-1 at 14. In my opinion, Dr. Martin's analysis confirms the ambiguity rather than resolving it: he treats the repeated comparison in step d), relying in part on the "more intensive comparison" embodiment, as though the comparison itself supplies a second generated value. But claim 1 separately recites the comparison step in step d) and the value-generating step in step e), and Nobots' proposed construction repeats only steps b)-d), not step e). Dr. Martin's opinion therefore depends on reading into claim 18 an implied value-generation requirement that is not included in Nobots' proposed construction and is not recited in claim 18 or in the pre-amendment claim from which claim 18 originated.

65. I also have considered Nobots' arguments regarding claim 18 in the IPR proceedings as set forth in the PTAB's institution and final written decisions. *See* Exs. 14–15.

66. In the institution decision, the PTAB observed that both parties identified "a disparity in the lettering of steps" in dependent claims including claim 18, resulting from Nobots' prosecution amendment adding a new step a) to claim 1. Ex. 14 (Institution Decision) at 8–9. The PTAB further stated that "claim 1 originally included letter[ed] steps 'a)' through 'd),' but after amendment, those steps became steps 'b)' through 'e),'" and that the dependent claims, including claim 18, were "not updated to reflect the resulting shift in step lettering." *Id.* at 9. For purposes of institution, the PTAB treated those dependent claims as corrected by shifting the step references forward by one letter. *Id.* at 9, 20 n.8.

67. In its final written decision, the PTAB again treated claim 18's step references as corrected, observing that "the record clearly reflects that the step lettering in claim 18 should be shifted forward, such that each of steps a)–d) are understood to refer to each of steps b)–e) of claim 1." Ex. 15 (Final Written Decision) at 20 n.14; *id.* 9–10. The PTAB nevertheless considered claim

18 under both theories addressed by the parties: as corrected to refer to the first and second instances of the "value of e)," and as written to refer to the first and second instances of the "value of d)." *Id.* at 23–28. The PTAB concluded that Google had not shown claim 18 unpatentable under either approach. *Id.*

68. In my opinion, the PTAB's analysis and interpretation of claim 18 do not resolve the indefiniteness issue presented here. The PTAB addressed whether Google's asserted prior art disclosed or rendered obvious claim 18 under the IPR grounds; it did not decide whether Nobots' proposed correction is the only reasonable correction, whether "repeating a)-c)" is reasonably susceptible to more than one interpretation, or whether claim 18 remains indefinite because it does not expressly repeat the value-generating step. I have been informed by counsel that indefiniteness was not before the PTAB—and was not briefed in the IPR proceedings—because indefiniteness is not a statutory ground for invalidating a patent in an IPR. Accordingly, although the PTAB stated that "treating the claims as corrected is the appropriate approach here," *id.* at 10, the PTAB's final written decision did not resolve, for purposes of indefiniteness, the ambiguity of "repeating a)-c)" or "the second instance of the value of d)." For the same reasons, the PTAB's treatment of claim 18 in the IPR does not change my opinion that a person of ordinary skill would not be reasonably certain what claim 18 requires.

69. Because the meaning of this claim limitation is not reasonably certain in view of the specification and prosecution history, it is my opinion the disputed term "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" is indefinite.

### B. <u>"active data"</u>

| **Nobots' Proposed Construction** | **Google's Proposed Construction** |
| --- | --- |
| Plain and ordinary meaning with the explanation that "active data includes, without | "data acquired from a computing device user's interactions therewith and within the |

| Nobots' Proposed Construction | Google's Proposed Construction |
|---|---|
| limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics." | computing environment where such data is not normally stored (logged) or transmitted to a remote location, including, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics" |

70. The term "active data" is recited in claims 1, 4, 6, 9, 10, 11, 12, 15, 16, 18, 19, 22, and 24 of the '014 patent. My understanding of the term "active data" as it is used in the '014 patent claims is informed by the claims, specification, and prosecution history of the Asserted Patents, as well as my knowledge and expertise in the field of computer security.

71. It is my opinion that a person of ordinary skill in the art would have understood the disputed term "active data" to mean "data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location, including, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics."

72. The term "active data" did not have a fixed, well-understood meaning in the field of computer security independent of the Asserted Patents. A person of ordinary skill in the art would therefore look to the intrinsic evidence to understand how the patents use that term.

73. The specification of the '014 patent states that "active model data" comprises:

> data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics.

Ex. 2 ('014 patent) at 3:3-15. The patent presents this description of "active model data" as a definition. *See id.* 3:57-58 ("With the foregoing ***definitions*** in mind, operation of the various invention embodiments can be better understood.").[3]

74. The patent contrasts "active model data" with "passive model data." Active model data is data from user's interactions with the computing environment that is "not normally stored (logged) or transmitted to a remote location." *Id.* at 3:3-7. "Passive model data," by contrast, is data from a user's interactions with the computing environment that ***is*** "normally stored (logged) or transmitted to a remote location," *id.* at 3:19–22. In my opinion, this distinction between data is "not normally stored (logged) or transmitted" and data that is "normally stored (logged) or transmitted" is central to how the patent distinguishes active data from passive data.

75. Although the patent does not separately define the term "active data" in a standalone sentence, as opposed to "active model data," a person of ordinary skill in the art reading the '014 patent would have understood the same active/passive distinction to apply when the patent refers to "active data." The patent's definitions of "available data" and "acquired data" confirm this understanding. The patent defines "available data" as data associated with the computing

[3] Emphasis added in quotes unless otherwise noted.

device's operation and interaction with the Internet that is "***generally recorded*** within the computing device and/or by other devices that have been affected by the computing device's operation," and states that "this is also a type of passive data." *Id.* at 3:28-34. By contrast, the patent defines "acquired data" as data associated with the computing device's operation and interaction with the Internet that is "***generally not recorded*** within the computing device and/or by other devices that have been affected by the computing device's operation," but at least some of which has been recorded or transmitted to a remote location, and states that "this is a type of active data." *Id.* at 3:34-42. The patent further explains that "available data represents data that is readily harvestable by query," while "acquired data requires some form of information capture means." *Id.* at 4:9-13. These definitions confirm that the active/passive distinction in the patent turns on whether the data is generally recorded, logged, or transmitted in ordinary operation, or instead must be specially captured.

76. The examples of active data in the '014 patent are consistent with this distinction. The patent identifies "pointing device vector movements and/or cadence" (mouse movements), "key stroke combinations and/or cadence," and "time differentials between stimulus . . . and user response" as examples of active model data. *Id.* at 3:7-15. The patent also explains that information about a user's mouse movements and keystrokes may be obtained through specific data-collection mechanisms, including modification of an existing program, a covert program, or a servlet/Java applet. *Id.* at 3:3-15, 4:18-24. In that discussion, the patent explains that "many malware applications log keystrokes and periodically pass them to remote servers for malicious purposes," and that "similar technology can be used to exploit necessary aspects of the invention embodiments." *Id.* A person of ordinary skill in the art would have understood this discussion to

confirm that the identified examples of active data are not data that would be "normally stored (logged) or transmitted to a remote location" absent some data-collection mechanism.

77. That understanding is consistent with my knowledge of the field. For example, at the priority date, information about keystroke and mouse movements would have had to be intentionally collected before it could be analyzed by a server-side bot-detection system. *See* Ex. 13 (Vincent) at GOOG-NOBOTS-PA-00005236, -245-49 (describing JavaScript keystroke and mouse event handlers). Likewise, information regarding a "time differential between stimulus . . . and user response," Ex. 2 ('014 patent) at 3:9–14—such as how long it takes a user to click a button or fill out a form—would require intentional collection and transmission before it could be analyzed by a server-side bot-detection system. S*ee* Ex. 21 (2006 Atterer) at GOOG-NOBOTS-PA-00014354 (describing methods for tracking "[t]ime-based metrics such as the average time spent on a page, amount of time the mouse pointer hovers over elements . . . , and time of usage of elements (time taken for form fields, click frequency, general typing speed)"). As the '014 patent acknowledges, such techniques were known in the prior art. *See, e.g.*, Ex. 2 ('014 patent) at 4:42–45 ("Existing available browsers and operating systems provide the means necessary to temporarily install logging code, if such is elected.").

78. I understand that Nobots has proposed that "active data" be given its "plain and ordinary meaning" with an explanation that includes the examples listed in the second sentence of the patent's definition of "active model data." Nobots' proposal confirms that the examples in the specification are needed to explain the term "active data"; otherwise, no "plain and ordinary meaning with explanation" would be necessary. But Nobots' proposal omits the first sentence of the patent's definition, which explains what distinguishes active data from passive data: active data is data from the user's interactions with the computing environment that is not "normally stored

(logged) or transmitted to a remote location." In my opinion, omitting that language removes the distinction the patent draws between active data and passive data.

79. I have also considered the opinion of Nobots' previous claim construction expert, Dr. David Martin, filed in support of Nobots' responsive claim construction brief in 2022. *See* Ex. 20 (Martin Declaration) (also at Dkt. 50-1). In my opinion, Dr. Martin's analysis does not establish that "active model data," or the derivative term "active data," had a plain and ordinary meaning to a person of ordinary skill in the art. Dr. Martin did not cite any technical dictionary, treatise, article, or other technical source for his assertion that "active model data" "has a plain and ordinary meaning—referring to model data corresponding directly to user actions." *Id.* at 4. In addition, Dr. Martin acknowledged that the examples of "active model data" in the specification provide "further clarity and guidance" to a person of ordinary skill in the art. *Id.* That acknowledgment is consistent with my opinion that the term's meaning comes from the specification, not from a fixed plain meaning independent of the patent.

80. I understand that Dr. Martin opined that "portions of the specification" "conflict with Google's" construction because the specification describes "a type of active data" as data which "has/have been recorded and/or transmitted to a remote location, such as a server." *Id.* at 6. I disagree. The full sentence, which Dr. Martin quotes only in part, states that "acquired data" is data that is "***generally not recorded*** within the computing device and/or by other devices that have been affected by the computing device's operation," but at least some of which "has/have been recorded and/or transmitted to a remote location, such as a server." Ex. 2 ('014 patent) at 3:34-42. Read in full, this passage supports Google's construction. It explains that acquired data—identified by the patent as a "type of active data"—is generally not recorded in ordinary operation, but may be specially captured and then recorded or transmitted for purposes of the alleged invention.

81. Extrinsic evidence also supports my opinion that "active data" did not have a fixed plain and ordinary meaning in the field. For example, I have reviewed U.S. Patent Application Publication No. 2006/0224898 to Ahmed ("Ahmed"). *See* Ex. 22. Ahmed describes two embodiments of "passive data": "keystroke dynamics" and "mouse dynamics." *Id.* at [0083]. The '014 patent, however, identifies those same categories of information—"pointing device vector movements and/or cadence" and "key stroke combinations and/or cadence"—as examples of active data. Ex. 2 ('014 patent) at 3:7-9. This inconsistent use of "active" and "passive" terminology in the field confirms that a construction based only on "plain and ordinary meaning" would not be helpful to a person of ordinary skill in the art, or to the jury.

82. I also have considered Nobots' Disclosure of Extrinsic Evidence. Consistent with my opinion that "active data" did not have a fixed plain and ordinary meaning in the field, Nobots identifies dictionary definitions for the individual words "active" and "data," but identifies no dictionary or other accepted technical definition for the phrase "active data." *See* Ex. 23 (Nobots' Disclosure of Extrinsic Evidence) at 7–8. In my opinion, the individual word definitions Nobots identifies for "active" and "data" would not inform a person of ordinary skill as to the scope of "active data" in the context of the '014 patent.

83. The intrinsic and extrinsic evidence therefore confirm my opinion that a person of ordinary skill in the art would have understood the disputed term "active data" to mean "data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location, including, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog

box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics."

**C. <u>"passive data"</u>**

| Nobots' Proposed Construction | Google's Proposed Construction |
|---|---|
| Plain and ordinary meaning with the explanation that "passive data includes, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc." | "data available from a computing device user's interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location, including, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc." |

84. The term "passive data" is recited in claims 1, 4, 9, 11, 12, 15, 16, 18, 19, 22, and 24 of the '014 patent. My understanding of the term "passive data" as it is used in the '014 patent claims is informed by the claims, specification, and prosecution history of the Asserted Patents, as well as my knowledge and expertise in the field of computer security.

85. It is my opinion that a person of ordinary skill in the art would have understood the disputed term "passive data" to mean "data available from a computing device user's interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location, including, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc."

86. Like "active data," the term "passive data" did not have a fixed, well-understood meaning in the field of computer security independent of the Asserted Patents. A person of

ordinary skill in the art would therefore have looked to the intrinsic evidence to understand how the ’014 patent uses that term.

87. The specification of the ’014 patent defines the related term “passive model data.” Specifically, the patent states that “passive model data” comprises:

> data available from a computing device user’s interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc.

Ex. 2 (’014 patent) at 3:19-27. The patent presents this description of “passive model data” as a definition. *See id.* 3:57-58 (“With the foregoing ***definitions*** in mind, operation of the various invention embodiments can be better understood.”).

88. As discussed above for “*active data*,” the patent draws a distinction between active and passive data based on whether the data is “normally stored (logged) or transmitted” in ordinary operation. The patent defines “[a]ctive model data” as data from a user’s interactions with the computing environment that is “not normally stored (logged) or transmitted to a remote location.” *Id.* at 3:3-7. By contrast, it defines “[p]assive model data” as data from a user’s interactions with the computing environment that is “normally stored (logged) or transmitted to a remote location.” *Id.* at 3:19–22. In my opinion, that distinction is central to how the patent uses the terms “active data” and “passive data.”

89. Although the patent does not separately define the term “*passive data*” in a standalone sentence, as opposed to “passive model data,” a person of ordinary skill in the art reading the ’014 patent would have understood the same active/passive distinction to apply when

the patent refers to "passive data." The patent's definitions of "available data" and "acquired data" confirm this understanding.

90. As discussed above, the patent defines "*available data*" as data associated with the computing device's operation and interaction with the Internet that is "***generally recorded*** within the computing device and/or by other devices that have been affected by the computing device's operation," and states that "this is also a type of passive data." *Id.* at 3:28-34.

91. By contrast, the patent defines "*acquired data*" as data associated with the computing device's operation and interaction with the Internet that is "***generally not recorded*** within the computing device and/or by other devices that have been affected by the computing device's operation," but at least some of which has been recorded or transmitted to a remote location, and states that "this is a type of active data." *Id.* at 3:34-42. The patent further explains that "available data represents data that is readily harvestable by query," while "acquired data requires some form of information capture means." *Id.* at 4:9-13. These definitions confirm that passive data is data generally recorded, logged, or transmitted in ordinary operation, rather than data that must be specially captured.

92. The examples of passive data in the '014 patent are consistent with this distinction. The patent identifies browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, and third-party data regarding abusers as examples of passive model data. *Id.* at 22–27. A person of ordinary skill in the art would have understood those examples to involve data that is "normally stored (logged) or transmitted" or otherwise available from a computing device's interactions with a computing environment. For example, an originating IP address is normally transmitted as part of network communications,

and browser cookies and IP histories are examples of information that may be stored or logged in ordinary operation.

93. I understand that Nobots has proposed that "passive data" be given its "plain and ordinary meaning" with an explanation that includes the examples listed in the second sentence of the patent's definition of "passive model data." Nobots' proposal confirms that the examples in the specification are needed to explain the term "passive data"; otherwise, no "plain and ordinary meaning with explanation" would be necessary. But Nobots' proposal omits the first sentence of the patent's definition, which explains what distinguishes passive data from active data: passive data is data from user's interactions with the computing environment that is "normally stored (logged) or transmitted to a remote location." In my opinion, omitting that language removes the distinction the patent draws between passive and active data.

94. I have also considered Dr. Martin's opinion filed in support of Nobots' responsive claim construction brief in 2022. *See* Ex. 20 (Martin Declaration) (also at Dkt. 50-1). In my opinion, Dr. Martin's analysis does not establish that "passive model data," or the derivative term "passive data," had a plain and ordinary meaning to a person of ordinary skill in the art. Dr. Martin did not cite any technical dictionary, treatise, article, or other technical source for his assertion that "passive model data" "has a plain and ordinary meaning—referring to model data that does not immediately describe user interface interactions but rather is data that is observable by remote computers due to user interactions or model data that is used to analyze such observable data." *Id.* at 7. In addition, Dr. Martin acknowledged that the examples of "passive model data" in the specification provide "further clarity and guidance" to a person of ordinary skill in the art. *Id.* That acknowledgment is consistent with my opinion that the term's meaning comes from the specification, not from a fixed plain meaning independent of the patent.

95. Extrinsic evidence also supports my opinion that “passive data” did not have a fixed plain and ordinary meaning. For example, I have reviewed the Ahmed prior-art reference, which describes two embodiments of “passive data”: “keystroke dynamics” and “mouse dynamics.” Ex. 22 (Ahmed) at [0083]. The ’014 patent, however, identifies the same general categories of information—“pointing device vector movements and/or cadence” and “key stroke combinations and/or cadence”—as examples of active data. Ex. 2 (’014 patent) at 3:7-9. This dissonance confirms that a construction based only on “plain and ordinary meaning” would not be helpful to a person of ordinary skill in the art, or to the jury.

96. I also have considered Nobots’ Disclosure of Extrinsic Evidence, which identifies dictionary definitions for the individual word “data,” but identifies no dictionary or other accepted technical definition for “passive” or the phrase “passive data.” *See* Ex. 23 (Nobots’ Disclosure of Extrinsic Evidence) at 8–9. In my opinion, the individual word definitions Nobots identifies for “data” would not inform a person of ordinary skill as to the scope of “passive data” in the context of the ’014 patent.

97. The intrinsic and extrinsic evidence therefore confirm my opinion that a person of ordinary skill in the art would have understood the disputed term “passive data” to mean “data available from a computing device user’s interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location, including, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc.”

* * *

98. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 2, 2026, at Ellicott City, Maryland.

Alan T. Sherman

Alan T. Sherman, Ph.D.

# ATTACHMENT A

# Curriculum Vitae

May 19, 2026

## Alan Theodore Sherman

### Personal Data

Date of birth: February 26, 1957
Place of birth: Cambridge, Massachusetts
Citizenship: USA
Marital status: married, children born 1996 and 2003

### Research Areas

Security of voting systems, formal-methods analysis of cryptographic protocols, cybersecurity education, cybersecurity, cryptology, discrete algorithms.

### Education

| | | |
|---|---|---|
| Ph.D. | Feb. 1987 | MIT, computer science |
| S.M. | June 1981 | MIT, electrical engineering and computer science |
| Sc.B. | June 1978 | Brown University, mathematics, *magna cum laude* |
| H.S. Diploma | June 1974 | Lafayette High School, *salutatorian*, Williamsburg, Va. |

### Experience in Higher Education

*July 2014–present.* University of Maryland, Baltimore County (UMBC), Baltimore, Maryland. Professor of Computer Science (with tenure), Department of Computer Science and Electrical Engineering.

*July 1995–June 2014.* University of Maryland, Baltimore County (UMBC), Baltimore, Maryland. Associate Professor of Computer Science (with tenure), Department of Computer Science and Electrical Engineering.

*August 1989–July 1995.* University of Maryland, Baltimore County (UMBC), Baltimore, Maryland. Assistant Professor of Computer Science, Computer Science Department.

*September 1986–August 1989.* Tufts University, Medford, Massachusetts. Assistant Professor of Computer Science, Department of Computer Science.

*September 1985–August 1986.* Tufts University, Medford, Massachusetts. Instructor of Computer Science, Department of Computer Science.

*January 1979–January 1982.* Massachusetts Institute of Technology (MIT), Cambridge, Massachusetts. Teaching Assistant, Department of Electrical Engineering and Computer Science.

## Experience Outside of Higher Education

### A. Consulting and Contracting

*June 2023–present.* Quinn Emanuel, Urquhart & Sullivan, Chicago, IL. Serving as a cryptologic expert witness for Google in *[confidential] vs. Google* in a patent dispute involving secure data storage.

*July 2022–present.* Benesch, Chicago, IL. Serving as a cryptologic expert witness for *Smartmatic in Smartmatic vs. My Pillow and Michael Lindell, FOX News, Newsmax, and OAN* in defamation lawsuits involving voting machines in the 2020 U.S. election.

*April 2022–present.* Munger, Tolles, and Olson, Los Angles, CA. Serving as a cryptologic expert witness for Google in *Nobots vs. Google* in a patent dispute involving bot detection.

*January 2021–2024.* Quinn Emanuel Urquhart & Sullivan, Washington, DC. Serving as a cryptologic expert witness for Google in *Google vs. Sonos* in a patent dispute involving digital rights management.

*2021–2022.* Olson Law Firm, Atlanta, Georgia. Serving as a cryptologic expert witness for Pro Marketing Sales in *Pro Marketing Sales vs. Secturion Systems* in a business dispute involving hardware-security patents (via IMS Expert Services).

*March 2020–present.* Arnold & Porter, Palo Alto, CA. Serving as a cryptologic expert witness for Google in *[confidential] vs. Google* in a patent dispute involving 2-Step Verification.

*February 2020.* Marcus Millet (of Lerner David), Westfield, NJ. Analyzed the security of a new encryption method.

*October 2019–present.* Angara, Abello, Concepcion, Regala & Cruz, Pensacola, FL. Serving as a cryptologic expert witness for Smartmatic in *Avante vs. Smartmatic* (Phillippines) in a patent dispute involving voting machines (via IMS Expert Services).

*January 2019–2022.* Baker & McKenzie, Dallas, TX. Serving as a cryptologic expert witness for Giesecke+Devrient in *Giesecke+Devrient vs. U.S.* in patent litigation involving electronic authentication.

*January 2019–November 2019.* Cooley, Palo Alto, CA. Serving as a cryptologic expert witness for Facebook in *Blackberry vs. Facebook* in a patent dispute involving modular bias.

*October 2018.* Johnson, Mirmiran & Thompson, MD. Analyzed the security of the random-draw process used by the State of Idaho to issue hunting permits for big-game animals.

*July 2018–May 2020.* Olson Law Firm (initially Alston & Bird), Atlanta, Georgia. Serving as a cryptologic expert witness for Pro Marketing Sales in *Pro Marketing Sales vs. Cyber Solutions International* in a business dispute involving hardware-security patents (via IMS Expert Services).

*September 2016–April 2017.* Blank Rome, Washington, DC. Served as cryptologic expert witness for P&RO in *P&RO Solutions Group vs. CiM Maintenance* in patent litigation involving a work-order management system.

*July 2016–present.* Blank Rome, Washington, DC. Serving as cryptologic expert witness for Strike Force in *Strike Force vs. Duo*, *Strike Force vs. Centrify*, and *Strike Force vs. Trustwave*, in patent litigation involving multi-channel authentication.

*August 2015–January 2016.* Wood Law, LLP, Kansas City, MO. Served as cryptologic expert witness for plaintiff in *Alexander and Symington vs. BF Labs*, a class-action consumer protection case. Wrote a report estimating the number of Bitcoins mined by BF Labs using special-purpose hardware.

*August 2014–March 2015.* Lerner, David, Littenberg, Krumholz & Mentlik, LLP, NJ. Served as cryptologic expert witness for SPA Syspatronic in *SPA Syspatronic vs. U.S.* in patent litigation involving cryptographic portable data-carrying devices.

*July 2014–January 2016.* Blank Rome, Washington, DC. Serving as cryptologic expert witness for Strike Force in *Strike Force vs. Phone Factor* in patent litigation involving multi-channel authentication. Wrote validity and infringement reports.

*May 2014–July 2015.* Sidley Austin, Washington, DC. Served as cryptologic expert witness on invalidity for Apple in *Content Guard vs. Apple* in patent litigation involving digital rights management. Wrote invalidity IPRs.

*May 2013–March 2014.* Kirkland & Ellis, Chicago, IL. Served as a cryptologic expert witness on invalidity for Apple in *Intertrust vs. Apple* in patent litigation involving digital rights management. Wrote invalidity reports in support of five IPRs.

*May 2013–May 2014.* Perkins Coie, Seattle, WA. Served as a cryptologic expert witness on non-infringement for McAfee in *Uniloc vs. McAfee* in patent litigation involving product activation (via Rubin Anders).

*April 2013–June 2013.* Quinn Emanuel, Redwood Shores, CA. Researched prior art as expert cryptologic witness for IBM in *Softvault vs. IBM* in a patent litigation matter involving embedded controllers(via Thomson Reuters).

*June 2012–December 2014.* Kirkland & Ellis, Chicago, IL. Analyzed the validity of two cryptographic patents dealing with streaming media for Wowza Media

Systems in *Adobe vs. Wowza*. Wrote invalidity and security reports and was deposed as expert witness.

*April 2012–September 2013*. Morgan, Lewis & Brockius, Houston, TX. Provided technical advice on prior art for Rite Aid in *TQP Development vs. DirectTV, et al.* (via Thomson Reuters, Rockville, MD).

*October 2011–March 2012*. Fish & Richardson, Boston, MA. Devised a technical work-around for Microsoft in the second damages phase of *Uniloc vs. Microsoft* concerning a patent for product activation, helping to reduce damages from $388 million to an amount reported to be about $80 million. Wrote report and was deposed as expert witness.

*July 2008–May 2010*. ID2P Technologies, Inc., Lake Forest, CA. Evaluated the security of the SafeIDKey Authentication Device.

*July 2008–July 2009*. Kenyon & Kenyon, New York City, Provided technical advice as expert witness for Sony in *Certicom vs. Sony.*

*August–September 2007; July 2008–January 2009*. Kirkland & Ellis, New York City. Provided technical advice as expert witness concerning a cryptographic patent.

*July 2006–April 2007*. WilmerHale, Boston, Massachusetts and Washington, DC (via Silicon Valley Expert Witness Group, Inc., Washington, DC). Provided technical advice as expert witness for RSA in *PRISM vs. RSA Security, Inc., et al.*, in which PRISM alleged patent infringement.

*July 2006–April 2007*. State of Maryland, Attorney General's Office, Baltimore, Maryland. Wrote report and provided technical advice as expert witness in *Shade vs. State of Maryland State Board of Elections, et al.*, in which Shade sought to decertify the Diebold AccuvoteTS electronic voting system on the basis of poor security.

*July 2005*. State of Maryland, Attorney General's Office, Baltimore, Maryland. Testified as an expert witness in *Fox vs. State of Maryland Department of Budget and Management*, in which Fox sought access under FOIA to the unredacted SAIC report on the security of the Diebold AccuvoteTS electronic voting system.

*May 2005*. 2factor, L.L.C, Centreville, Virginia. Evaluated the security of the 2factor Authentication and Key-Management System.

*August 4, 1997–April 2003*. Cryptologic Consultant, NAI Labs at Network Associates, Inc., Rockville, Maryland—formerly Advanced Research and Engineering Division of Trusted Information Systems (TIS), Inc. Analyzed the security of the TIS RecoverKey product and performed cryptographic research in support of DARPA and other government contracts on key management

for large dynamic groups, ultra-fast network authentication, and distributed sensor networks. Contractual arrangements last made through TAC Worldwide Companies. Supervisors: Dennis K. Branstad, David Balenson, Pete Dinsmore, Michael St. Johns.

*July–August 2002.* LuxSAT, Inc., Luxenburg, Netherlands. Evaluated security of a multimedia-on-demand broadcast system. Via Plus Five Consulting, Palo Alto, CA. Point of Contact: Robert W. Baldwin.

*January 2002.* InfoScape Corporation, Redmond, WA. Evaluated the security of protocols in InfoScape Technologies. Via Plus Five Consulting, Palo Alto, CA. Point of Contact: Robert W. Baldwin.

*September 2001.* Phoenix Technologies, San Jose, CA. Evaluated the security of the FirstAuthority StrongROM and StrongClient products. Point of contact: Sameer Mathur.

*March 27, 1997.* Science Applications International Corporation (SAIC), McLean, Virginia. Science & Technology Assessment Division. Advised government agencies on the impact of technology advances on cryptography and signals intelligence for the year 2010.

*March 28, 1991.* Synchronetics, Baltimore, Maryland. Suggested improvements to text-retrieval algorithms used in an automatic system that converts linear text to hypertext. Coordinated through the Technology Extension Service, University of Maryland.

*October 5 and 23, 1990.* Digital Systems Corporation, Walkersville, Maryland. Outlined a cryptographic scheme to authenticate control signals for electronically-operated vault doors. Coordinated through the Technology Extension Service, University of Maryland.

*July 10–12, 1982.* Mattel Inc., Hawthorne, California. Consultant, Mattel Toys. Devised a cryptographic method to authenticate electronic game scores on a 4-bit microprocessor.

## B. Research Appointments

*2024–present.* Associate Director, UMBC Cybersecurity Institute.

*2006–2009.* Member, National Center for the Study of Elections, UMBC.

*August 1995–August 1998; August 1989–October 1992.* Joint appointment, University of Maryland Institute for Advanced Computer Studies (UMIACS), University of Maryland College Park, College Park, Maryland.

*September 1985–August 1988.* MIT Laboratory for Computer Science, 545 Technology Square, Cambridge, Massachusetts. Research Affiliate, Theory of Computation Research Group.

*June 1979–August 1985.* MIT Laboratory for Computer Science, 545 Technology Square, Cambridge, Massachusetts. Research Assistant. Performed research in cryptology and VLSI layout algorithms under the supervision of Professor Ronald L. Rivest.

**C. Other Employment**

*Summer 1977.* Computer Sciences Corporation, NASA Langley Research Center, Hampton, Virginia. Programming Aide. Helped maintain and improve navigation, guidance, and flight control software for computers aboard NASA's Boeing 737 experimental research airplane.

*Summers 1974–1976.* Colonial Williamsburg Foundation, Williamsburg, Virginia. Interpreter at Magazine. Guided tours through historic powder magazine and demonstrated firing the Brown Bess musket while dressed in eighteenth-century apparel.

*Summer 1974.* NASA Langley Research Center, Hampton, Virginia. Participant, Career Exploration Program. Analyzed three algorithms used to compute trigonometric functions on a navigation flight computer aboard NASA's 737 experimental research airplane. Supervisor: Dr. Terry A. Straeter.

*October 1965–September 1974.* Colonial Williamsburg Foundation, Williamsburg, Virginia. Member, Colonial Williamsburg Fife and Drum Corps (Fife Sergeant, November 1972–September 1974). Played fife in hundreds of parades and ceremonies. Duties as Fife Sergeant included supervising and rehearsing the senior corps's fife section and helping oversee fife instruction for the junior corps.

## Honors Received

### Awards for Scholarship

- Best Paper Best paper in computing education research at the ACM Technical Symposium on Computer Science Education (SIGSCE), Toronto, Canada (March 2023).
- Outstanding Case Study Award for 2012 by the American Academy of Forensic Sciences, based on a paper by Josiah Dykstra and Alan T. Sherman published in the *Journal of Network Forensics*.
- Listed in the following *Who's Who* publications by Marquis:
  *Who's Who in America*
  *Who's Who in the East*, 25–26th+ editions (94–96+)
  *Who's Who in Science and Engineering*, 2nd edition (94+)
  *Who's Who in American Education*, 3rd–5th+ editions editions (92–95+)
  *Who's Who in the Media*
- Member, *Sigma Xi*, MIT (April 1981).
- Fellowship, German Academic Exchange Office (June 1978). To attend a Goethe Institute Summer Language Program.
- Member, *Phi Beta Kappa*, Brown University (April 1978).
- Member, *Sigma Xi*, Brown University (March 1978).

### Teaching Awards

- Senior Class Award, Tufts University (May 1986). Awarded primarily for teaching CSC–150c Cryptology, fall 1985.
- Forgivable Loan, General Electric Foundation/Ford Foundation, MIT (November 1983). Awarded primarily for excellence in teaching at MIT.

### Other Awards and Accomplishments

- Meritorious Service Award, United States Chess Federation (August 1997). For contributions to college chess.
- Promoted to the rank of shodan (first-degree black belt) in the Japanese martial art of Tomiki Aikido, as certified by the Japan Aikido Association (February 1995).
- Top Faculty Chess Player, Pan-American Open (1993, 1994, 1998, 1999[tie], 2001).
- Erdös Number 3: One path of coauthorships to Paul Erdös is via Andrew Odlyzko and Ronald Rivest.

## Funding

### External — Research

- *August 2026–July 2029,* $2,498,790, National Science Foundation, CoPI (Roberto Yus PI), "CyberAI SFS: Preparing the Next Generation of AI-Enabled Cybersecurity Professionals at UMBC," in review. At UMBC.
- *August 2025–July 2028,* $969,645, National Science Foundation, Principal Investigator (Roberto Yus CoPI), "SFS AI + Cybersecurity: Preparing the Next Generation of Artificial Intelligence and Cybersecurity Professionals." At UMBC.
- *August 2025–May 2026,* $487,999, Kanas State University (KSU), Principal Investigator, "CyberCorps SFS Renewal: Strengthening the National Cybersecurity Workforce," subaward of KSU's NSF SFS grant. At UMBC.
- *June 1, 2023–August 31, 2023,* $43,500, National Security Agency (via Northeastern Univerity), Principal Investigator, "Automatically Binding Cryptographic Context to Messages in Network Protocols using Formal Methods" (To support an INSuRE+C research project involving three graduate students: Enis Golszewski, Jonathan Fuchs, and Sophia Hamer). At UMBC.
- *September 1, 2022–August 31, 2025,* $262,209. National Science Foundation, Principal Investigator, "Examining Pedagogy in Cybersecurity at Military Academies (EPIC)" (Linda Oliva, CoPI, for a collaborative grant with University of Illinois and University of Minnesota). At UMBC.
- *May 1, 2021–June 31, 2023,* $220,000. National Science Foundation, Co-Principal Investigator, "AI and Cybersecurity: From Research to the Classroom" (Tim Finin and Anupaum Joshi, CoPIs). At UMBC.
- *September 1, 2020–August 31, 2021,* $29,728. National Security Agency, Principal Investigator, "DoD Cybersecurity Scholarship Program with Protocol Analysis Lab" (Richard Forno, CoPI). At UMBC.
- *September 1, 2019–August 31, 2020,* $128,592. National Security Agency. Principal Investigator, "Cybersecurity Scholarship Program" (Richard Forno, CoPI). At UMBC.
- *September 1, 2018–August 2023,* $4,988,073 (non-participant costs amount for research: $358,426). National Science Foundation. Principal Investigator, "UMBC CyberCorps Program Renewal and Building Research-Based SFS Relationships between Community Colleges and Four-Year Schools" (Richard Forno, CoPI). At UMBC.
- *September 1, 2018–August 31, 2021,* $309,967 (amount for research: $309,967). National Science Foundation, SFS Capacity. Principal In-

vestigator, "Validation of Concept Assessment Tools for Cybersecurity" (Dhananjay Phatak and Linda Oliva, CoPIs, for a collaborative grant with University of Illinois). At UMBC.

- *September 1, 2018–August 31, 2019,* $96,864 (amount for research: $96,864). National Security Agency. Principal Investigator, "Protocol Analysis Lab" At UMBC.
- *September 1, 2017–August 31, 2018,* $124,981 (amount for research: $124,981). National Security Agency. Principal Investigator, "Protocol Analysis Lab" At UMBC.
- *September 2018–August 2019,* $1,095,359. National Science Foundation. Principal Investigator, "Supplement to UMBC Cybersecurity Scholarship for Service Program and Innovations in Cybersecurity Education Workshop Series" (Richard Forno CoPI). At UMBC.
- *September 2017–August 2018,* $325,846. National Science Foundation. Principal Investigator, "Supplement to UMBC Cybersecurity Scholarship for Service Program and Innovations in Cybersecurity Education Workshop Series" (Richard Forno CoPI). At UMBC.
- *September 2017–August 2018,* $650,212. National Science Foundation. Principal Investigator, "Supplement to UMBC Cybersecurity Scholarship for Service Program and Innovations in Cybersecurity Education Workshop Series" (Richard Forno CoPI). Supports two research projects, each with GRA: SecurityEmpire educational multiplayer computer game, and verifiable randomness. At UMBC.
- *September 2017–August 2018,* $165,293 (amount for research: $165,293). National Security Agency. Principal Investigator, "Creating a Cybersecurity Curriculum Assessment Tool with CAE Collaboration" (Linda Oliva and Dhananjay Phatak, CoPIs. Geoffrey Herman, CoPI, for a collaborative grant with University of Illinois). At UMBC.
- *September 1, 2015–August 31, 2016,* $146,917 (amount for research: $146,917). National Security Agency. Principal Investigator, "Creating Concept and Curriculum Assessment Tools for Cybersecurity" (Linda Oliva and Dhananjay Phatak, CoPIs. Geoffrey Herman, CoPI, for a collaborative grant with University of Illinois). At UMBC.
- *August 2013–August 2014,* $271,435 (amount for research: $271,435). National Science Foundation. Principal Investigator, "Supplement to UMBC Cybersecurity Scholarship for Service Program and Innovations in Cybersecurity Education Workshop Series" (Richard Forno CoPI). Supports two research projects, each with GRA: SecurityEmpire educational multiplayer computer game, and verifiable randomness. At UMBC.
- *August 2013–July 2015,* $44,206 (non-participant cost amount for re-

search: $28,574). National Science Foundation. Co-Principal Investigator, "INSuRE EAGER" (Melissa Dark, Purdue, PI). At UMBC (subcontract from Purdue).

- *August 2012–August 2017,* $2,542,169 (non-participant cost amount for research: $293,864). National Science Foundation. Principal Investigator, "UMBC Cybersecurity Scholarship for Service Program and Innovations in Cybersecurity Education Workshop Series" (Richard Forno CoPI). At UMBC.
- *August 2012–December 2013,* $83,280 (amount for research: $83,280). National Security Agency. Principal Investigator, "University of Maryland, Baltimore County (UMBC) Information Assurance Scholarship Program 2012-2013" (Richard Forno Co-PI). Research funds are for the project, "Teaching information assurance concepts to high school students through our new social media game SecurityEmpire: Outreach to academia" (Marc Olano and Linda Oliva, Co-Investigators). At UMBC.
- *August 2011–December 2012,* $85,537 (amount for research: $85,463). National Security Agency. Principal Investigator, "University of Maryland, Baltimore County (UMBC) Information Assurance Scholarship Program 2011-2012" (Richard Forno Co-PI). At UMBC. Research funds are for the project, "Teaching information assurance concepts to high school students through a new social media game: Outreach to academia" (Marc Olano and Linda Oliva, Co-Investigators). At UMBC.
- *August 2010–December 2011,* $74 (amount for research: $0). National Security Agency. Principal Investigator, "University of Maryland, Baltimore County (UMBC) Information Assurance Scholarship Program 2010-2011" (John Pinkston Co-PI). At UMBC.
- *September 2009–December 2010,* $19,205 (amount for research: $0). National Security Agency. Principal Investigator, "DoD IASP Scholarships at UMBC" (John Pinkston Co-PI). At UMBC.
- *September 2008–September 2013,* ∼$7,500,000 (my portion: ∼$25,000–50,000). Multi-Disciplinary University Research Initiative (MURI), AFOSR. Investigator (Tim Finin, PI), "A framework for managing the assured information sharing lifecycle." At UMBC.
- *September 2008–September 2009,* $66,346 (amount for research: $0) National Security Agency. Principal Investigator, "DoD IASP Scholarships at UMBC," (John Pinkston Co-PI). At UMBC.
- *September 13, 2007–September 12, 2008,* $36,300 (amount for research: $30,583 ) National Security Agency. Principal Investigator, "DoD IASP Scholarships at UMBC," (John Pinkston Co-PI). At UMBC.
- *October 1, 2006–September 30, 2007,* $29,940. National Science Foun-

dation, Principal Investigator, “SGER: CT-ISG: The VoComp University Voting Systems Competition.” At UMBC.

- *September 15, 2006–January 30, 2008* $65,646 (amount for research: $11,760). National Security Agency. Principal Investigator, “DoD IASP Scholarships at UMBC,” (John Pinkston Co-PI). At UMBC.
- *August 29, 2005–August 29, 2007,* $63,833 (with extension), (amount for research: $21,014). National Security Agency. Principal Investigator, “DoD IASP Scholarships at UMBC,” (John Pinkston Co-PI). At UMBC.
- *September 14, 2004–September 14, 2006,* $ 143,999 (with extension), (amount for research: $0). National Security Agency. Principal Investigator, “DoD IASP Scholarships at UMBC,” (John Pinkston Co-PI). At UMBC.
- *August 2003–August 2004,* $57,021 (amount for research: $53,449). National Security Agency. Principal Investigator, “DoD IASP Scholarship Grant, with NDU/IRMC Partnership” (John Pinkston Co-PI). At UMBC.
- *August 2002–August 2003,* $120,384 (amount for research: $110,000). National Security Agency. Principal Investigator, “DoD IASP Scholarship Grant, with NDU/IRMC Partnership” (John Pinkston Co-PI). At UMBC.
- Fall 2001–Summer 2002, $37,000 (amount for research: $37,000). Department of Defense. Principal Investigator (Peng Liu and John Pinkston Co-PIs), “Program Initiation Award,” for UMBC Center for Information Security and Assurance. At UMBC.
- *April 1997–April 1998,* $43,735. National Security Agency. Investigator, “A security architecture for intelligent software agents: Adding security to KQML” (Tim Finin Co-Investigator). At UMBC (via subcontract from UMCP under Principal Investigator Joseph JaJa).
- *December 1, 1995–June 30, 1996,* $35,597. IBM, Thomas J. Watson Research Center. Principal Investigator, “Efficient implementation of cryptographic algorithms for electronic commerce.” At UMBC.
- *Summer 1995,* $6,283 (my portion). National Science Foundation (via subcontract from UMCP). Member, Maryland Collaborative for Teacher Preparation (MCTP). At UMBC.
- *March 1–September 1, 1995,* $5,328. National Security Agency. Principal Investigator, “Maryland Theory Day at UMBC” (Co-Principal Investigator: Richard Chang). Mathematical Sciences Program. At UMBC.
- *March 1–June 1, 1993,* $3,860. National Science Foundation. Principal Investigator, “Maryland Theory Day at UMBC” (Co-Principal Investigator: Richard Chang). Division of Computer and Computation Research, CCR-93-08170. At UMBC.

- *August 1989–August 1992,* ∼$20,000 (50% Joint Appointment). University of Maryland Institute for Advanced Computer Studies (UMIACS), Collegel Park. At UMBC.
- *March 15, 1988–August 31, 1989,* $15,000. National Science Foundation. Investigator, "VLSI algorithms" in "Research instrumentation award for memory increase to Ncube parallel processor" (Co-Principal Investigators: James G. Schmolze and Beth Adelson). Computer and Information Science and Engineering, CCR-87-16916. At Tufts University.

**Internal — Research**

- *August 2025–August 2026,* $20,000, COEIT Interdisciplinary Proposals, Principal Investigator (Maria Sanchez CoPI), "Integrating Cybersecurity Concepts into Introductory Engineering Education." At UMBC.
- *2024–2025,* $44,992, Cybersecurity Leadership—Exploratory Grant Program, Principal Investigator, "Modeling and Formal-Methods Analysis of the secureDNA Protocol." At UMBC.
- *July 1, 2020,–June 30, 2022,* $3,490 (amount for research $3,490), Hrabowski Innovation Fund Competition, UMBC, Principal Investigator, "Evaluation and Enhancement of a Learning Unit on Quantum Algorithms," (Linda Oliva, CoPI). At UMBC.
- *Summer 1990,* $4,000. UMBC. Principal Investigator, "Relationships among algebraic and security properties of cryptographic functions." Summer Faculty Fellowship. At UMBC.

**External — Research through Consulting**

*Note: I helped write these grant proposals, which could not have been coordinated through UMBC in part because portions have a sensitive nature or because of other restrictions by the sponsor.*

- *May 2011 -November 2012,* $25,000, U.S. Election Assistance Commission. Consultant (Richard Carback, PI), "Post-election auditing with voter-verified privacy preserving receipts." At City of Takoma Park, MD.
- *September 2000–April 2001,* $200,000, Contractor, extension to previous contract. [Project title and funding source withheld at request of client.] Through Maryland Procurement Office. At NAI Labs at Network Associates, Inc., Glenwood, MD.
- *Spring 2000,* $200,000, Contractor. [Project title and funding source withheld at request of client.] Through Maryland Procurement Office. At NAI Labs.
- *July 1999–December 2001,* ∼$1,500,000 (exact amount NAI sensitive). Defense Advanced Project Agency (DARPA). Contractor, "A communications security architecture and cryptographic mechanisms for distributed

sensor networks (SENSIT)" (David W. Carman, Principal Investigator). At NAI Labs.

- *September 1998–August 2000,* ∼$1,500,000 (exact amount NAI sensitive). Defense Advanced Project Agency (DARPA). Contractor, "Adaptive cryptographically synchronized authentication (ACSA)" (Dennis Branstad, then David Balenson, then David Carman, Co-Principal and Principal Investigators). At NAI Labs.
- *September 1997–December 2000,* ∼$1,500,000 (exact amount NAI sensitive). Defense Advanced Project Agency (DARPA). Contractor, "Dynamic Cryptographically Context Management (DCCM)" (Dennis Branstad, then David Balenson, then Peter Dinsmore, Principal Investigators). At NAI Labs.

**External — Chess**

- As Director of the UMBC Chess Program, I raised over $218,957 for UMBC Chess in over 38 grants, gifts, and awards from over 14 sponsors (1995–present). Sponsors included The Abell Foundation, US Chess Federation, Connections Academy, and Maryland State Department of Education.

*Note:* I was instrumental in gaining favorable publicity for UMBC with feature stories and appearances on the following national TV and radio shows about UMBC chess (selected):
*CNN Headline News* (December ∼28, 1996—2.5 mins),
NPR's *Morning Edition* (May 9, 1997)—∼3 mins),
ABC's *Good Morning America* (March 3, 1999—3.5 mins),
NBC's *Today Show* (March 5, 2001—4.5 mins), and
CNN's *Next* (February 2002—3 mins),
BBC World Radio (circa 2001)
NPR's "Maryland Morning with Sheilah Kast" (December 27, 2006).
NPR's "Tell Me More" (April 12, 2010–5.5 mins).
I estimate that the cash value to UMBC (based on the cost of a comparable duration and type of national TV advertising) of this publicity **exceeds five million dollars.**

## Student Projects Supervised

### A. Ph.D. Dissertations—As Advisor (10)

Jonathan Fuchs "Formal-Methods Analysis of Protocol Composition," UMBC (expected August 2027). Thesis advisor.

Cyrus Bonyadi "Toward a Unifying Theory of Concensus in Distributed Computing," UMBC (August 2024). Thesis co-advisor (with Haibin Zhang and Sisi Duan).

Enis Golaszewski "Automatically Binding Cryptographic Context to Messages in Network Protocols using Formal Methods," UMBC (expected May 2024). Thesis advisor. [I supported Golaszewski under my SFS grant.]

Chao Liu "Building Practical, Efficient, and Reliable, Distributed Systems," UMBC (December 2021). Thesis co-advisor (with Haibin Zhang and Sisi Duan).

Farid Javani, "Mixing Algorithms with Oblivious Transfer," UMBC (May 2021). Thesis advisor.

Edward J. Birrane, "Virtual circuit provisioning in challenged sensor internetworks: With application to the Solar System Internet," Department of CSEE, UMBC (December 2014). Thesis co-advisor (with M. Younis). [The CSEE Dept. nominated Birrane for the 2014 ACM Dissertation Award.]

Josiah Dykstra, "Digital forensics for cloud computing: Framework, tools, and legal analysis for Infrastructure-as-a-Service cloud computing," Department of CSEE, UMBC (May 2013). Thesis advisor. [In May 2012, Dykstra won the Dept.'s CSEE Research Review award for best research by a PhD student.]

Russell A. Fink, "Applying trustworthy computing to End-to-End electronic voting," Department of CSEE, UMBC (December 2010). Thesis advisor. [In May 2008, Fink won the Dept.'s CSEE Research Review award for best research by a PhD student.]

Richard T. Carback, "Engineering practical end-to-end election systems," Department of CSEE, UMBC (December 2010). Thesis advisor. [In May 2011, Carback won the Dept.'s CSEE Research Review award for best research by a PhD student.]

F. John Krautheim, "Building trust into utility cloud computing," Department of CSEE, UMBC (May 2010). Thesis co-advisor (with D. Phatak). [I fully supported Krautheim under my DoD IASP grants.]

Muhammad Rabi, "Relationships among algebraic and security properties of cryptographic functions, and a security architecture for intelligent agents" Computer Science Department, UMBC (August 1998). Thesis co-advisor (with T. Finin).

## B. Ph.D. Dissertations—As Reader

Shan Huang "Advancing Cybersecurity Education throughAssessment and Gamified Learning," Siebel School of Computing and Data Science, University of Illinois Urbana-Champaign (April 2026). Reader (Advisor: Geoffrey Herman).

Michael Oehler "Private packet filtering: Searching for sensitive indicators without revealing the indicators in collaborative environments," Department of CSEE, UMBC (December 2013). Reader (Advisor: Phatak).

Xiaonong Gu, "A new classification algorithm," Math Department, UMBC (October 1999). Reader (Advisor: Rukhin).

David M. Lazoff, "Network reliability and optimal resource allocation in distributed database systems," Department of Computer Science and Electrical Engineering, UMBC (August 1996). Reader (Advisor: Stephens).

Zhi-Ming Lin, "DAVE: An automatic layout compiler for mixed analog/digital integrated circuits," Ph.D. Thesis, Department of Electrical Engineering, University of Maryland College Park (1991). Reader.

## C. M.S. Theses and Projects[1]—As Advisor (29)

Kirellos Abou Elsaad "A Formal Methods Analysis of the Session Binding Proxy Protocol," MS Thesis, UMBC (May 2022), Thesis Advisor (co-advisor Edward Zieglar).

Akriti Anand "Design and Implementation of MeetingMayhem: A Web-Based Cybersecurity Educational Game," MS Thesis, UMBC (May 2021). Thesis co-advisor (with Marc Olano).

Alejandra Diaz "Phishing in an Academic Community: A Study of User Susceptibility and Behavior" MS Thesis, UMBC (May 2018). Thesis co-advisor (with A. Joshi).

David C. Harris Jr. "Detecting DDOS Attacks in Software Defined Networks: An Experimental Study of Three Stream Sampling Methods", MS Thesis, UMBC (May 2017). Thesis advisor.

Jackson Schmandt "Attacking and Defending the Automotive CAN Bus" MS Thesis in Computer Engineering, UMBC (May 2016). Thesis Co-Advisor (with Banerjee).

Geet Parekh "Developing a concept inventory for cybersecurity," MS Thesis, UMBC (August 2015). Thesis advisor.

[1] Prior to the merger of the CS and EE Departments at UMBC circa 1996, there was no thesis option for MS students in CS.

Chirag Shah "A usability study of the PICO authentication device: User reactions to Pico implemented on an Android phone," MS Thesis, UMBC (August 2014). Thesis advisor.

Nathan Price "How to generate repeatable keys using Physical Unclonable Functions: Correcting PUF errors with iteratively broadening and prioritized search," MS Thesis, UMBC (May 2014). Thesis advisor. [I fully supported Price under my NSF SFS grant.]

Christopher Nguyen, "Fast modular exponentiation using residue domain representation: A hardware implementation and analysis," MS Thesis, UMBC (December 2013). Thesis co-advisor (with D. Phatak).

Nikhil Joshi, "Experimental evaluation and implementation of the Spread Identity Framework," MS Thesis, UMBC (December 2011). Thesis co-advisor (with D. Phatak).

William Newton, "Chaum's protocol for detecting man-in-the-middle: Explanation, implementation, and analysis," MS Thesis, UMBC (December 2010). Thesis advisor.

Bhushan Sonawane, "Spread Identity: A new dynamic address translation mechanism for anonymity and DDoS defense," MS Thesis, UMBC (December 2010). Thesis co-advisor (with D. Phatak).

Vivek Relan, "Location authentication through powerline communication: Design, protocol, and analysis of a new out-of-band strategy," MS Thesis, UMBC (December 2010). Thesis co-advisor (with D. Phatak).

Richard Carback, "Security enhancements to the Punchscan voting system," MS Thesis, UMBC (May 2008). Thesis advisor.

Allen Stone, "OBID: An ontology-based intrusion-detection system," MS Thesis, UMBC (May 2007). Thesis advisor.

Kevin Fisher, "Security analysis of the Punchscan high-integrity voting system," MS Thesis, UMBC (December 2006). Thesis advisor.

Nicholas Dickerson, "Arpdefender: Detecting and recovering from ARP cache poisoning attacks," MS Thesis, UMBC (fall 2004). Thesis advisor.

Anthony Falcone, "DTEL: A digital telestrator for spectator chess," MS Thesis, UMBC (April 2000). Thesis advisor.

Pavel Pasmanik, "Using more information from evaluation functions: An improvement to the Crafty chess program," UMBC (December 1997). Chairperson, Advisory Committee.

Ali Selcuk, "Linear cryptanalysis of RC-5," MS Thesis, UMBC (December 1997). Thesis advisor.

Qi He, "A new electronic cash scheme with flexible denominations," MS Thesis, UMBC (May 1997). Thesis advisor.

Bryan Olson, CMSC-693 Project, "A new radix sort," Computer Science Department, UMBC (August 1995). Chairperson, Advisory Committee.

Ravada Sivakumar, "Experimental analysis of a partitioning algorithm for the Steiner minimum tree problem in $R^2$ and $R^3$," CMSC-693 Project, Computer Science Department, UMBC (August 1993), Chairperson, Advisory Committee.

Thomas R. Cain, "How to break Gifford's cipher," CMSC-693 Project, Computer Science Department, UMBC (April 1993), Chairperson, Advisory Committee.

Katherine A. South, "Solving recurrences with generating functions: A tutorial," CMSC-693 Project, Computer Science Department, UMBC (June 1993), Chairperson, Advisory Committee.

Kirthivasan Venkatraman, "The vowel-count method in solving single columnar transposition ciphers: Its effectiveness and improvement," CMSC-693 Project, Computer Science Department, UMBC (January 5, 1992). Chairperson, Advisory Committee.

Konstantinos Kalpakis, "Refinements of a partitioning algorithm for the Steiner tree problem in $d$-dimensional Euclidean space," CMSC-693 Project, Computer Science Department, UMBC (December 19, 1991). Chairperson, Advisory Committee.

Kiran S. Panesar, "The vowel-count for solving single columnar transposition ciphers: Quantification, analysis, and improved tests," CMSC-693 Project, Computer Science Department, UMBC (August 21, 1991). Chairperson, Advisory Committee.

Virginia Schneeman, "Simulated annealing and iterative improvement: An experimental comparison," CMSC-693 Project, Computer Science Department, UMBC (August 18, 1991). Chairperson, Advisory Committee.

## D. MS Theses—As Reader

Ajinkya Borle "New Frobenius Based Scaling Methods for Schulz-Type Matrix Inversion," MS Thesis, UMBC (November 2016). Reader (Advisor: Lomonaco).

Jackson Schmandt "Attacking and Defending the Automotive CAN Bus," MS Thesis, UMBC (December 2016). Reader (Advisor: Banerjee).

Jason Dowd, "Identifying malware using $N$-Gram clustering metrics," MS Thesis, UMBC (August 2014). Reader (Advisor: Nicholas).

Fahad Zafar, "Tiny encryption algorithm for cryptographic gradient noise," MS Thesis, UMBC (December 2009). Reader (Advisor: Olano).

Wei-cheng Lin, "Weak keys of the Data Encryption Standard: Regularities and cycle properties," CMSC-693 Project, Computer Science Department, UMBC (May 15, 1990). Reader (Advisor: Sidhu).

## E. Undergraduate Theses

Horace H. Dediu, "The design and implementation of a multiprocessor simulator," honors thesis, Department of Electrical Engineering, Tufts University (fall 1988). Reader.

## F. Independent Study Projects (selected)

Sasha Arsenyuk, "Formal analysis of the OPAQUE protocol," CMSC-491: Independent study in computer science, Dept. of CSEE (spring 2020), UMBC.

Travis Mayberry, "Implementation improvements to the Scantegrity II voting system," CMSC-699: Independent study in computer science, Dept. of CSEE (spring 2010), UMBC.

John Conway, "Implementation improvements to the Scantegrity II voting system," CMSC-499: Independent study in computer science, Dept. of CSEE (spring 2010), UMBC.

Michael Rushanan, "Range voting in practice," CMSC-690: Independent study in computer science, Dept. of CSEE (spring 2009), UMBC.

Brian Roberts, William Byrd, Matthew Baker, John Simmons, "Cyber Defense Exercises at UMBC" (summer 2003). Supervisor of summer lab assistants.

Anthony Falcone, "Design and implementation of a digital telestrator for exhibition chess matches," CMSC-699: Independent Study in Computer Science, Dept. of CSEE (spring 98), UMBC.

Michael D. Miller, "Course tools for CMSC-443: Cryptology," independent study project (spring and summer 1995), UMBC.

Brian E. Brzezicki and Uriel Nordenberg, "Hypermedia tools for teaching discrete mathematics," non-credit independent study project (summer 94, fall 94), UMBC.

Ann Pollack, "On the complexity of module orientation problems in VLSI layout," CMSC-699: Independent Study in Computer Science, Computer Science Department, UMBC (spring 1994).

David M. Lazoff, "An exact formula for the expected wire length between two randomly chosen terminals," CMSC-699: Independent Study in Computer Science, Computer Science Department, UMBC (spring 1994).

Predag Tosic, "Discrete mathematics for computer science," Independent study and credit by examination for CMSC-203, UMBC (summer 1993).

Thomas R. Cain, "Cryptanalysis of filter generators," CMSC-699: Independent Study in Computer Science, Computer Science Department, UMBC (fall 1992, spring 1993).

Muhammad A. Rabi, "Introduction to cryptology," CMSC-699: Independent Study in Computer Science, Computer Science Department, UMBC (spring 1992).

Ellen F. Rakatansky, "A relaxation method for breaking transposition ciphers," CSC-194: directed study, Department of Computer Science, Tufts University (spring 1987). [In addition to our work on transposition ciphers, Ratakansky and I solved the 1986 Cryptogift $50,000 Puzzle Game sponsored by the The Swiss Colony.]

Margaret A. Konner, "Implementing a new cryptographically secure pseudorandom number generator based on the elliptic logarithm problem," CSC-194: directed study, Department of Computer Science, Tufts University (spring 1986).

David Hunt, Margaret A. Konner, Sarah B. Levine, Stanley N. Marshall III, Ellen F. Rakatansky, and Andriés E. Sadler, "Cryptanalysis of the $100,000 Decipher II Puzzle," extracurricular group project, Department of Computer Science, Tufts University, (fall 1985).

Robert Baldwin, Ravi Bopanna, John Chang, Joseph Marshall, and David Saslow, "Solving the $100,000 Decipher Puzzle," IAP (Independent Activities Period) Course 4505, MIT, (January 1984). [In March 1985, Baldwin and I eventually solved the puzzle. The work carried out during this mini-course laid the foundation for our solution.]

## Scholarly and Creative Works[2]

### A. Books (2)

1. Sherman, Alan T., *VLSI Placement and Routing: The PI Project*, Springer-Verlag (New York, 1989). 189 pages.

2. Chaum, David, Ronald L. Rivest, and Alan T. Sherman, eds., *Advances in Cryptology: Proceedings of Crypto 82*, Plenum Perss (New York, 1983). 331 pages.

### B. Book Chapters (2)

3. Sherman, Alan T., Erin Lanus, Moses Liskov, Edward Zieglar, Richard Chang, Enis Golaszewski, Ryan Wnuk-Fink, Cyrus J. Bonyadi, Mario Yaksetig, and Ian Blumenfeld, "Formal methods analysis of the Secure Remote Password Protocol" in *Logic, Language, and Security: Essays Dedicated to Andre Scedrov on the Occasion of His 65th Birthday*, Vivek Nigam et al., Eds., LNCS 12300 Festschrift, Springer (2020), 103–126.

4. Carback, Richard T., David Chaum, Jeremy Clark, Aleksander Essex, Travis Mayberry, Stefan Popoveniuc, Ronald L. Rivest, Emily Shen, Alan T. Sherman, Poorvi L. Vora, John Wittrock, and Filip Zagorski. "The Scantegrity voting system and its use in the Takoma Park elections" in *Real-World Electronic Voting: Design, Analysis and Deployment*, edited by Feng Hao and Peter Y. A. Ryan. Taylor and Francis (April 2016), 237–276.

### C. Research Articles in Refereed Journals (36)

5. Javani, Farid, and Alan T. Sherman, "BVOT: Self-Tallying boardroom voting with oblivious transfer," *Information Security Journal: A Global Perspective*, 33 (1), (2024), 42-53.

6. Orr, Selma Gomez, Cyrus Jian Bonyadi, Enis Golaszewski, Alan T. Sherman, Peter Peterson, Richard Forno, Sydney Johns, and Jimmy Rodriguez, "Shadow IT in higher education: Survey and case study for cybersecurity" *Cryptologia*, 48 (1), (2024), 26-90.

7. Blanchard, Enka, Ryan Robucci, Ted Selker, and Alan T. Sherman, "Phrase-Verified Voting: Verifiable low-tech remote boardroom voting," *Cryptologia*, 46(1), (2021), 67–101.

[2]For a more complete and detailed list of my earlier works, see the separate document *Scholarly and Creative Works*. Until 2003, I always listed authors in alphabetical order.

8. Poulson, S., Herman, G., Peterson, P., Oliva, L. M., Golaszewski, E., Gorti, A., Scheponik, T., Sherman, A. T., “Psychometric Evaluation of the Cybersecurity Concept Inventory,” *ACM Transactions on Computing Education*, 22(1), (2021), 1–18.

9. Chaum, David, Mario Yaksetig, Alan T. Sherman, and Joeri de Ruiter, “UDM: Private user discovery with minimal information disclosure,” *Cryptologia*, (2021), 1–33.

10. Golaszewski, Enis, Alan Sherman, Linda Oliva, Peter A. H. Peterson, Michael R. Bailey, Scott Bohon, Cyrus Bonyadi, Casey Borror, Ryan Coleman, Johannah Couture, Elias Enamorado, Maksim E. Eren, Mohammad Khan, Emmanuel Larbi, Kyle Marshall, William Morgan, Lauren Mundy, Gabriel Onana, Selma Gomez Orr, Lauren Parker, Caled Pinkey, Mykah Rather, Jimmy Rodriguez, Bryan Solis, Wubnyonga Tete, Tsigereda B. Tsega, Edwin Valdez, Charles K. Varga, Brian Weber, Ryan Wnuk-Fink, Armand Yonkeu, Lindsay Zetlmeisl, Damian Doyle, Casey O’Brien, Joseph Roundy, Jack Suess, “Project-Based learning continues to inspire cybersecurity students,” *ACM Inroads*, 11(2), (December 2019), 46–54.

11. Sherman, A. T., Oliva, L. M., Golaszewski, E., Phatak, D., Scheponik, T., Herman, G., Choi, D. S., Offenberger, S. E., Peterson, P., Dykstra, J., Bard, G. V., Chattopadhyay, A., Sharevski, F., Vrecenar, R., “The CATS Hackathon: Creating and refining test items for cybersecurity concept inventories,” *IEEE Security & Privacy*, 17(6) (October/November 2019), 77–83. [available as arXiv preprint arXiv:1901.09286]

12. Sherman, Alan; Enis Golaszewski, Edward LaFemina, Ethan Goldschen, Mohammed Khan, Lauren Mundy, Mykah Rather, Bryan Solis, Wubnyonga Tete, Edwin Valdez, Brian Weber, Damian Doyle, Casey O’Brien, Linda Oliva, Joseph Roundy, and Jack Suess, “The SFS Summer Research Study at UMBC: Project-Based learning inspires cybersecurity students,” *Cryptologia*, 43(4) (March 2019), 293–312.

13. Sherman, A. T., Golaszewski, E., LaFemina, E., Goldschen, E., Khan, M., Mundy, L., Rather, M., Solis, B., Tete, W., Valdez, E., Weber, B., Doyle, D., O’Brien, C., Oliva, L. M., Roundy, and J., Suess. “Project-Based learning inspires cybersecurity students: A Scholarship for Service research study,” *IEEE Security & Privacy*, 17(3), (2019), 82–88.

14. Sherman, Alan T. and Farid Javani, “On the origins and variations of blockchain technologies,” *IEEE Security & Privacy* (January/February 2019), 72–77.

15. Diaz, Alejandra Diaz, Alan T. Sherman, and Anupam Joshi, "Phishing in an academic community: A study of user susceptibility and behavior," *Cryptologia* (August 2019), 1–15.

16. Thompson, J., G. L. Herman, T. Scheponik, E. Golaszewski, A. T. Sherman, D. Delatte, D. Phatak, K. Patsourakos, L. Oliva, "Student misconceptions about cybersecurity concepts: Analysis of student think-a-loud interviews," *Journal of Cybersecurity Education*, Vol. 1, No. 5 (2018).

17. Sherman, A. T., D. Delatte, G. L. Herman, M. Neary, L. Olvia, L., D. Phatak, T. Scheponik, T. (2018). "Cybersecurity: Exploring core concepts through six scenarios," *Cryptologia,* Vol. 42, No. 4 (2018), 337–377.

18. Sherman, A. T., M. Dark, A. Chan, A., R. Chon, T. Morris, L. Oliva, J. Springer, B. Thuraisingham, C. Vatcher, R. Verma, S. Wentzel, "INSuRE: Collaborating Centers of Academic Excellence engage students in cybersecurity research," *IEEE Security & Privacy,* Vol. 15, No. 4 (July/August 2017), 72–28.

19. Schmandt, Jackson, Alan T. Sherman, and Nilanjan Banerjee, "Mini-MAC: Raising the bar for vehicular security with a lightweight message authentication protocol," *Journal of Vehicular Communications,* Vol. 9 (2017), 188–196.

20. Parekh, Geet, David DeLatte, Geoffrey L. Herman, Linda Oliva, Dhananjay Phatak, Travis Scheponik, and Alan T. Sherman, "Identifying core concepts of cybersecurity: Results of two Delphi processes" *IEEE Transactions on Education*, Vol. 61, No. 11 (2018), 11–20.

21. Sherman, Alan T., John Seymour, Akshayraj Kore, William Newton, "Chaum's protocol for detecting man-in-the-middle: Explanation, demonstration, and timing studies for a text-messaging scenario," *Cryptologia*, Vol. 41, No. 1 (February 2017), 29–54.

22. Michael Oehler, Dhananjay S. Phatak, and Alan T. Sherman, "A conjunction, language, and system facets for private packet filtering," *Journal of ASE Science*, Vol. 1, No. 2 (August 15, 2013), 103 120.

23. Dykstra, Josiah, and Alan T. Sherman, "Design and Implementation of FROST: Digital Forensic Tools for the OpenStack Cloud Computing Platform," *Digital Investigation*, Vol. 10 (2013), S87–S95.

24. Phatak, Dhananjay, Alan T. Sherman, Nikhil Joshi, Bhushan Sonawane, Vivek G. Relan, and Amol Dawalbhakta, "Spread Identity: A new address remapping mechanism for anonymity and DDoS defense," *Journal of Computer Security*, vol. 21 (2013), 233–281.

25. Dykstra, Josiah, and Alan T. Sherman, "Acquiring forensic evidence from infrastructure-as-a-service cloud computing: Exploring and evaluating tools, trust, and techniques," *Digital Investigation* Vol. 9 (2012), S90–S98.

26. Sherman, Alan T., Dhananjay Phatak, Vivek G. Relan, and Bhushan Sonawane, "Location authentication, tracking, and emergency signaling through power line communication: Designs and protocols for new out-of-band strategies," *Cryptologia*, Vol. 36, No. 2 (2012), 129–148.

27. Dykstra, Josiah, and Alan T. Sherman, "Understanding issues in cloud forensics: Two hypothetical case studies," *Journal of Network Forensics*, Vol. 3, Issue 1 (Autumn 2011), 19–31. [This paper won the Outstanding Case Study Award for 2012 by the The American Academy of Forensic Sciences.]

28. Chaum, David, Richard Carback, Jeremy Clark, Aleksander Essex, Stefan Popoveniuc, Ronald L. Rivest, Peter Y.A. Ryan, Emily Shen, Alan T. Sherman, and Poorvi Vora, Scantegrity II: End-to-End verifiability by voters of optical scan elections through confirmation codes, *IEEE Transactions on Information, Forensics, and Security—special issue on voting,* Vol. 4, No. 4 (December 2009), 611–627.

29. Fink, Russ, Alan Sherman, and Richard Carback, "TPM meets DRE: Reducing the trust base of electronic voting using Trusted Platform Modules," *IEEE Transactions on Information, Forensics, and Security—special issue on voting,* Vol. 4, No. 4 (December 2009), 628–637.

30. Chaum, David, Aleks Essex, Richard Carback, Alan T. Sherman, Jeremy Clark, Stefan Popoveniuc, and Poori Vora, "Scantegrity: End-to-End voter-verifiable optical-scan voting," *IEEE Security & Privacy*, vol. 6, no. 3 (May/June 2008), 40–46. Special issue on e-voting, David R. Jefferson and Aviel D. Rubin, eds.

31. Sherman, Alan T., and David A. McGrew, "Key establishment in large dynamic groups using one-way function trees," *IEEE Transactions on Software Engineering*, 29:5 (May 2003), 444–458.

32. Rabi, Muhammad, and Alan T. Sherman, "An observation on associative one-way functions in complexity theory," *Information Processing Letters*, **64**:5 (December 1997), 239–244.

33. Cain, Thomas, and Alan T. Sherman, "How to break Gifford's Cipher," *Cryptologia*, **XXI**:3 (July 1997), 237–286.[3]

[3] This paper was accepted before I became an editor of *Cryptologia*.

34. Ravada, Sivakumar, and Alan T. Sherman, "Experimental evaluation of a partitioning algorithm for the Steiner tree problem in $R^2$ and $R^3$," *Networks*, **24**:8 (December 1994), 409–415.

35. Ganesan, Ravi, and Alan T. Sherman, "Statistical techniques for language recognition: An empirical study using real and simulated English," *Cryptologia*, **XVIII**:4 (October 1994), 289–331.

36. Konstantinos Kalpakis, and Alan T. Sherman, "Probabilistic analysis of an enhanced partitioning algorithm for the Steiner tree problem in $R^d$," *Networks*, **24**:3 (May 1994), 147–159.

37. Ganesan, Ravi, and Alan T. Sherman, "Statistical techniques for language recognition: An introduction and guide for cryptanalysts," *Cryptologia*, **XVII**:4 (October 1993), 321–366.

38. Baldwin, Robert W., and Alan T. Sherman, "How we solved the $100,000 Decipher Puzzle (16 hours too late)," *Cryptologia*, **XXIV**:3 (July 1990), 258–284.

39. Levine, Robert Y., and Alan T. Sherman, "A note on Bennett's time-space tradeoff for reversible computation," *SIAM Journal on Computing*, **19**:4 (August 1990), 673–677.

40. Kaliski, Burton S. Jr., Ronald L. Rivest, and Alan T. Sherman, "Is the Data Encryption Standard a group? (Results of cycling experiments on DES)," *Journal of Cryptology*, **1**:1 (1988), 3–36.

### D. Other Research Publications in Refereed Journals (2)

41. Kuszmaul, B. C., and A. T. Sherman, "*Socrates 2.0 beats Grandmaster Sagalchik," *International Computer Chess Association Journal* (June 1995), 124–125.

    [This refereed journal article reports on a chess match (March 24, 1995) that I organized, one of the first in which a computer defeated a human grandmaster under certified tournament conditions. http://www.cs.umbc.edu/conferences/mtd95/mm_match/ ]

42. Lazoff, David M., and Alan T. Sherman, "Expected wire length between two randomly chosen terminals," Problem 95-6, *SIAM Review*, vol. 37 (June 1995), 235.

    Lazoff, David M., and Alan T. Sherman; together with W. Boehm, "Expected wire length between two randomly chosen terminals," Problem 95-6 and solution, *SIAM Review*, vol. 38 (June 1996), 321–324.

    [This refereed problem&solution reports on a useful problem and its solution. In 1996, *SIAM Review* published an elegant solution by Boehm, including a passaage from my

1994 technical report in which Lazoff and I had independently described and analyzed our own solution in more detail. See: "An exact formula for the expected wire length between two randomly chosen terminals," Technical Report TR CS-94-08, Computer Science Department, University of Maryland, Baltimore County (July 20, 1994, revised August 2, 1994). 14 pages.]

**E. Works Submitted for Publication (In Review) (2)**

43. Golaszewski, Enis, Neal Krawetz, Alan T. Sherman, Edward Zieglar, Sai K. Matukumalli, Roberto Yus, Carson L. Kegley, Michael Barthel, William Bowman, Bharg Barot, Kaur Kullman, "Verifying Provenance of Digital Media: Security Analysis of C2PA and its Implementation," whitepaper (May 2026), 32 pages, to be submitted to *IEEE Security & Privacy 2027*. Available as https://eprint.iacr.org/2026/804.

44. Blanchard, Enka, Ted Selker, Alan Sherman, Levi Gabasova, Mehdi Bouhamidi, Ryan Robucci, "Usable String Matching by Humans through Overlaid Presentation: Turning Syntactic Tasks into Perceptual Tasks," *International Journal of Human-Computer Studies (IJHCS)* (February 2026), in review.

**F. Articles in Refereed Proceedings of Competitively-Selected Conferences (46)**

45. Huan, Shan, Geoffrey L. Herman, Alan Sherman, "A Classroom-Based Study of CyberGuardian: An Educational Game for Learning Cryptographic Primitives, *Proceedings of Frontiers in Education (FIE) 2026* (2026), 9 pages. [An abstract appears in the *Proceedings of the 57th ACM Technical Symposium on Computer Science Education (SIGSCE) V. 2,* 2026, pages 13671368.]

46. Shan Huang, JiWoo Lee, Geoffrey L. Herman, Alan Sherman, "Why Is It Difficult to Learn Cybersecurity Concepts? A Literature Review and Instructor Survey in Cybersecurity Education, *Proceedings of Frontiers in Education (FIE) 2026* (2026), 9 pages.

47. Sherman, Alan T., Jeremy J. Romanik Romano, Edward Zieglar, Enis Golaszewski, Jonathan D. Fuch, and William E. Byrd, "Analysis of the Security Design, Engineering, and Implementation of the SecureDNA System," *Proceedings of the Network and Distributed System Security Symposium (NDSS) 2026*, Internet Society (February 2026). Available as https://eprint.iacr.org/2025/2223.

48. Golaszewski, Enis, Alan T. Sherman, Edward Zieglar, Jonathan Fuchs, and Sophia Hamer, “Cryptographic binding should not be optional: A formal-methods analysis of FIDO UAF channel binding,” *Proceedings of Security Standardisation Resarch (SSR) 2025*, Springer LNCS (December 2025), 29 pages. Available as https://eprint.iacr.org/2025/2067.

49. Chaum, D., R. Carback, J. Clark, Liu Chao, M. Nejadgholi, B. Preneel, A.T. Sherman, M. Yaksetig, Zeyuan Yin, F. Zagorski, Bingsheng Zhang, “Revisiting Silent Coercion,” *Proceedings of E-VOTE-ID 2025*, (October 2025), 16 pages.

50. Huan, Shan, Geoffrey L. Herman, Alan Sherman, “A user-experience study of CyberGuardian: A role-playing educational game for learning cryptographic primitives in authentic scenarios, *Proceedings of Frontiers in Education (FIE) 2025* (2025), 9 pages.

51. Huan, Shan, Geoffrey L. Herman, Alan Sherman, “Do LLMs Make Cybersecurity Mistakes? An Evaluation of LLMs Performance on Cybersecurity Concept Inventories, *Proceedings of Frontiers in Education (FIE) 2025*, (2025), 9 pages.

52. Enis Golaszewski, Edward Zieglar, Alan T. Sherman, Elsaad, Kirellos Abou, and Jonathan Fuchs, “Limitations of wrapping protocols and TLS channel bindings: Formal methods analysis of the Session Binding Proxy Protocol” in *Proceedings of Security Standardisation Resarch (SSR) 2024*, Springer LNCS (December 2024).

53. Huang, Shan, Lee, J., Zhao, C., Herman, G. L., Sherman, A. T., Olano, M., Oliva, L. M., A User Experience Study of MeetingMayhem: A Web-Based Game to Teach Adversarial Thinking, *ACM conference on Innovation and Technology in Computer Science Education (ITiCSE)*, (March 2024), 7 pages, accepted.

54. Herman, G. L., Huang, S., Peterson, P. A., Oliva, L. M., Golaszewski, E., Sherman, A. T., “Psychometric evaluation of the Cybersecurity Curriculum Assessment,” ACM, *Proceedings of SIGSCE 2023* (2023), 6 pages. [Best research paper award.]

55. Chaum, D., Carback, R., Clark, J., Liu, C., Nejadgholi, M., Preneel, B., Sherman, A. T., Yaksetig, M., Zagorski, F., Zhang, B., “VoteXX: A Solution to Improper Influence in Voter-Verifiable Elections (extended abstract),” *Proceedings of E-VOTE-ID 2022*, University of Tartu Press (October 2022).

56. Sherman, Alan T., Geoffrey L. Herman, Linda Oliva, Peter A. H. Peterson, Enis Golaszewski, Seth Poulsen, Travis Scheponik, and Akshita Gorti “Experiences and lessons learned creating and validating concept inventories for cybersecurity” in *National Cyber Summit (NCS) Research Track 2020*, invited paper, Kim-Kwang Raymond Choo et al., Eds., *Advances in Intelligent Systems and Computing*, Vol. 1271, Springer (2020), 3–34.

57. Lanus, E., A. T. Sherman, R. Chang, E. Golaszewski, R. Wnuk-Fink, C. Bonyadi, and M. Yaksetig, "Analysis of the Secure Remote Password protocol using CPSA (abstract)," *High Confidence Software and Systems Conference (HCSS)* (October 2020).

58. S. Offenberger, G.L. Herman, P. Peterson, A.T. Sherman, E. Golaszewski, T. Scheponik, L. Oliva, "Initial validation of the Cybersecurity Concept Inventory: Pilot testing and expert review" in *Proceedings of the Frontiers in Education Conference 2019* (October 2019).

59. Travis Scheponik, Enis Golaszewski, Geoffrey Herman, Spencer Offenberger, Linda Oliva, Peter A. H. Peterson, Alan T. Sherman, "Investigating crowdsourcing to generate distractors for multiple-choice assessments" in *National Cyber Summit (NCS) Research Track*, NCS 2019, Choo, Morris, Peterson, eds., *Advances in Intelligent Systems and Computing*, Vol. 1055, Springer (2020), pp. 189–201. [revised version available as arXiv preprint arXiv:1909.0423]

60. Chaum, D., D. Das, F. Javani, A. Kate, A. Krasnova, J. De Ruiter, and A. T. Sherman, "cMix: Mixing with minimal real-time asymmetric cryptographic operations," *International Conference on Applied Cryptography and Network Security (ACNS 2017)*, (2017) 557.

61. Sherman, A. T., L. M. Oliva, D. DeLatte, E. Golaszewski, M. Neary, K. Patsourakos, D. Phatak, T. Scheponik, G. L. Herman, and J. Thompson, "Creating a cybersecurity concept inventory: A status report on the CATS Project," *2017 National Cyber Summit* (2017)

62. Scheponik, Travis, Alan T. Sherman, David DeLatte, Dhananjay Phatak, Linda Oliva, Julia Thompson, and Geoffrey L. Herman, "How students reason about cybersecurity concepts," *Frontiers in Education 2016 (FIE)*, (October 12-15, 2016).

63. Olano, Marc, Alan T. Sherman, Linda Oliva, Ryan Cox, Deborah Firestone, Oliver Kubic, Milind Patil, John Seymour, and Isaac Sohn, and Donna Thomas, "SecurityEmpire: Development and evalauation of a digital game to promote cybersecurity education" in *Proceedings of 3GSE '14: 2014 USENIX Summit on Gaming, Games, and Gamification in Security Education*, (San Diego, August 18, 2014), 10 pages.

64. Michael Oehler, Dhananjay S. Phatak, and Alan T. Sherman, "A private packet filtering language for cyber defense," *Proceedings of the Annual Symposium on Information Assurance (ASIA'13)*, (June 4–5, 2013, Albany, NY), 46–55.

65. Dykstra, Josiah, Alan T. Sherman, "Design and implementation of FROST: digital forensic tools for the OpenStack cloud computing platform" in *Proceedings of the*

*2013 Digital Forensics Research Workshop (DFRWS 2013)*, (Monteray, CA, August 4–7), 10 pages.

66. Leschke, Timothy R., and Alan T. Sherman, "Change-Link: A digital forensic tool for visualizing changes to directory trees" in *Proceedings of VizSec '12* (Seattle, WA, October 15, 2012), 8 pages.

67. Dykstra, Josiah, Alan T. Sherman, "Acquiring forensic evidence from infrastructure-as-a-service cloud computing: Exploring and evaluating tools, trust, and techniques" in *Proceedings of the 2012 Digital Forensics Research Workshop (DFRWS 2012)*, (Washington, DC, August 6–8), 9 pages.

68. Sherman, Alan T., Russell A. Fink, Richard Carback, and David Chaum, "Scantegrity III: Automatic trustworthy receipts, highlighting over/under votes, and full voter verifiability" in *online Proceedings of the USENIX/ACCURATE Electronic Voting Technology Workshop / Workshop on Trustworthy Elections (EVT/WOTE '11)* (August 2011). 16 pages. Accessed 11-24-11 from http://www.usenix.org/event/evtwote11/tech/final_files/Sherman.pdf

69. Leschke, Timothy, Alan T. Shermanm, and Penny Rheingans, "Using a fisheye view to visualize change-over-time in support of digital forensic examinations," 2011 Government Forum of Incident Response and Security Teams (GFIRST), (Nashville, TN, August 8-12, 2011), 12 pages. Accessed 4-20-12 from http://www.us-cert.gov/GFIRST/presentations/2011/Visualizing_Change_Over_Time.pdf

70. Phatak, Dhananjay S., Alan T. Sherman, and J. Pinkston, "A new paradigm to approximate oblivious data processing (ODP) for data confidentiality in cloud computing," *IEEE Services 2011*, paper 4065 (Washington, DC, July 2011), 391–398.

71. Fink, Russell A., Alan T. Sherman, Alexander O. Mitchell, and David C. Challener, "Catching the cuckoo: Verifying TPM proximity using a quote timing side-channel (short paper)" in *Proceedings of 4th International Conference on Trust and Trustworthy Computing*, LNCS 6740, McCune, *et al.*, eds., Springer (Berlin, Germany, June 2011), 294–301.

72. Dykstra, Josiah, and Alan T. Sherman, "Understanding issues in cloud forensics: Two hypothetical case studies" in *Proceedings of the 2011 ADFSL Conference on Digital Forensics Security and Law* (May 2011), 191- 206.

73. Carback, Richard T., David Chaum, Jeremy Clark, John Conway, Aleksander Essex, Paul S. Herrnson, Travis Mayberry, Stefan Popoveniuc, Ronald L. Rivest, Emily Shen, Alan T. Sherman, and Poorvi L. Vora, "Scantegrity II municipal

election at Takoma Park: The first E2E binding governmental election with ballot privacy" in *Proceedings of USENIX Security 2010*, (Washington, DC, August 2010). Accessed 11-24-11 from
http://www.usenix.org/events/sec10/tech/full_papers/Carback.pdf

74. Sherman, Alan T., Richard Carback, David Chaum, Jeremy Clark, John Conway, Aleksander Essex, Paul S. Herrnson, Travis Mayberry, Stefan Popoveniuc, Ronald L. Rivest, Anne Sergeant, Emily Shen, Bimal Sinha, and Poorvi Vora, "Scantegrity mock election at Takoma Park" in *Proceedings of the 4th International Conference on Electronic Voting 2010 (e-vote.cc 2010)*, (Lochau, Austria, July 2010).

75. Krautheim, F., Dhananjay S. Phatak, and Alan T. Sherman, Introducing the Trusted Virtual Environment Module: A new mechanism for routing trust in cloud computing in *Proceedings of 3rd International Conference on Trust and Trustworthy Computing*, LNCS 6101, Acquisti, Smith, and Sadeghi, eds., Springer (Berlin, Germany, June 2010), 211–227.

76. Sherman, Alan T., Dhananjay Phatak, Bhushan Sonawane, Vivek G. Relan, "Location authentication through power line communication: Design, protocol, and analysis of a new out-of-band strategy" in *Proceedings of 14th IEEE International Symposium on Power Line Communications and its Applications (ISPLC)*, (Rio de Janeiro, Brazil, March 2010), six pages. To be available on IEEE Explore.

77. Sherman, Alan T., Richard Carback, David Chaum, Jeremy Clark, John Conway, Aleksander Essex, Paul S. Herrnson, Travis Mayberry, Stefan Popoveniuc, Ronald L. Rivest, Anne Sergeant, Emily Shen, Bimal Sinha, Poorvi Vora "Scantegrity mock election at Takoma Park (summary)" in *Proceedings of the NIST Workshop on End-to-End Voting Systems* (Washington, DC, October 2009), 3 pages.

78. Fink, Russell A., and Alan T. Sherman, "Combining end-to-end voting with trustworthy computing for greater privacy, trust, accessibility, and usability (summary)" in *Proceedings of the NIST Workshop on End-to-End Voting Systems* (Washington, DC, October 2009), 3 pages.

79. Chaum, David, Richard Carback, Jeremy Clark, Aleksander Essex, Stefan Popoveniuc, Ronald L. Rivest, Peter Y.A. Ryan, Emily Shen, Alan T. Sherman, "Scantegrity II: End-to-End verifiability for optical scan election systems using invisible ink confirmation codes" in *Online Proceedings of USENIX/ACCURATE Electronic Voting Technology Workshop (EVT/WOTE '08),* (July 28–29, 2008). 13 pages. Accessed 9-1-08 from
http://www.usenix.org/events/evt08/tech/full_papers/chaum/chaum.pdf

80. Carback, Richard, Stefan Popoveniuc, Alan Sherman, and David Chaum, "Punchscan with independent ballot sheets: Simplifying ballot printing and

distribution with independently selected ballot halves" in *On-Line Proceedings of the 2007 IAVoSS Workshop on Trustworthy Elections (WOTE 2007)*, (June 20–22), Ottawa, Canada. 8 pages. Accessed 2-18-08 from http://research.microsoft.com/conferences/WOTE2007/program.htm

81. Sherman, Alan T., Donald F. Norris, Andrew Sears, Aryya Gangopadhyay, Stephen H. Holden, George Karabatis, A. Gunes Koru, Chris M. Law, John Pinkston, and Dongsong Zhang, "An examination of vote verification technologies: Findings and experiences from the Maryland Study" in *Online Proceedings of the USENIX/ACCURATE Electronic Voting Technology Workshop (EVT '06)* (August 1, 2006). 14 pages. Accessed 9-1-08 from http://www.usenix.org/events/evt06/tech/full_papers/sherman/sherman.pdf

82. Fisher, Kevin, Richard Carback, and Alan Sherman, "Punchscan: Introduction and system definition of a high-integrity election system" in *Preproceeedings of the IAVoSS Workshop on Trustworthy Elections (WOTE 2006)*, (June 29–30, 2006), Cambridge, England. 8 pages. Accessed 3/21/07 from http://www.punchscan.org/papers/fisher_punchscan_wote2006.pdf

83. Sherman, Alan T., Brian O. Roberts, William E. Byrd, Matthew R. Baker, and John Simmons, "Developing and delivering hands-on information assurance exercises: Experiences with the Cyber Defense Lab at UMBC" in *Proceedings from the Fifth IEEE Systems, Man and Cybernetics Information Assurance Workshop*, June 10–11, 2004, West Point, New York (Piscataway, NY 2004), 242–249.

84. Dinsmore, Pete, David M. Balenson, Michael Heyman, Peter S. Kruus, Caroline D. Scace, and Alan T. Sherman, "Policy-based security management for large dynamic groups: An overview of the DCCM project," *Proceedings of the DARPA Information Survivability Conference & Exposition (DISCEX 00)*, IEEE Computer Society (January 25–27, 2000), 64–73.

85. Adcock, Jamison M., David M. Balenson, David W. Carman, Michael Heyman, and Alan T. Sherman, "Trading off strength and performance in network authentication: Experience with the ACSA Project," *Proceedings of the DARPA Information Survivability Conference & Exposition (DISCEX 00)*, IEEE Computer Society (January 25–27, 2000), 127–139.

86. Cain, Thomas, and Alan T. Sherman, "How to break Gifford's Cipher (extended abstract)," *Second Annual ACM Conference on Computer and Communications Security*, ACM Press (November 2–4, 1994), 198–209.

87. Kalpakis, Konstantinos, and Alan T. Sherman, "Probabilistic analysis of an enhanced partitioning algorithm for the Steiner tree problem in $R^d$" in *Proceedings of*

*the 13th Annual Allerton Conference on Communication, Control, and Computing*, edited by Paul Van Dooren and Mark Spong, University of Illinois at Urbana-Champaign (1992), 553–564.

88. Kaliski, Burton S. Jr., Ronald L. Rivest, and Alan T. Sherman, "Is the Data Encryption Standard a pure cipher? (Results of more cycling experiments on DES)" in *Advances in Cryptology: Proceedings of Crypto 85*, H. C. Williams, ed., Springer-Verlag (New York, 1986), 212–226.

89. Kaliski, Burton S. Jr., Ronald L. Rivest, and Alan T. Sherman, "Is the Data Encryption Standard a group?" in *Advances in Cryptology: Proceedings of Eurocrypt 85*, Franz Pichler, ed., Springer-Verlag (New York, 1986), 81–95.

90. Rivest, Ronald L., and Alan T. Sherman, "Randomized encryption techniques" in *Advances in Cryptology: Proceedings of Crypto 82*, David Chaum, Ronald L. Rivest, and Alan T. Sherman, eds., Plenum Press (New York, 1983), 145–163.
    [By agreement with Plenum Press, this paper will not be published elsewhere.]

**G. Papers Presented at Competitively-Selected Conferences without Proceedings (2)**

91. Sherman, A. T., D. Chaum, N. Blanchard, C. Vatcher, N. McBurnett, and D. Hurley, "The Random Sample Voting Project," *World Forum on Democracy* (2017).

92. Chaum, David, Neal McBurnett, Pance Ribarski, Alan Sherman, Chris Vatcher, Filip Zagorski, Bingsheng Zhang, et al., "Random-Sample Voting, *Real World Cryptography Conference 2016*, (January 2016).

**H. Patents (4)**

93. Dinsmore, Peter T. Michael Heyman, Peter Kruus, and Alan T. Sherman, United States Patent Number 7,590,247, "System and method for reusable efficient key distribution" (Sept. 15, 2009). Assignee: McAfee, Inc. (Santa Clara, CA). Filed: April 18, 2001.

94. Dinsmore, Peter T., David W. Carman, Michael D. Heyman, Peter Kruus, and Alan T. Sherman, United States Patent Number 7,043,024, "System and method for key distribution in a hierarchical tree" (May 9, 2006). Assignee: McAfee, Inc. (Santa Clara, CA). Filed April 18, 2001.

95. Carman, David W., Michael D. Heyman, and Alan T. Sherman, inventors, United States Patent Number 6,915,426, "System and method for enabling authentication at different authentication strength-performance levels" (July 5, 2005). Assignee: Networks Associates Technology, Inc. (Santa Clara, CA). Filed July 21, 2000.

96. Carman, David W., Michael D. Heyman, and Alan T. Sherman, inventors, United States Patent Number 6,845,449, "System and method for fast nested message authentication codes and error correction codes" (January 18, 2005). Assignee: Networks Associates Technology, Inc. (Santa Clara, CA). Filed June 21, 2000.

## I. Other Publications (21)

97. Golaszewski, Enis, Neal Krawetz, Alan T. Sherman, Edward Zieglar, Sai K. Matukumalli, Roberto Yus, Carson L. Kegley, Michael Barthel, William Bowman, Bharg Barot, Kaur Kullman, "Verifying Provenance of Digital Media: Why the C2PA Specifications Fall Short," whitepaper (April 23, 2026), 7 pages. Available as http://arxiv.org/abs/2604.24890.

98. Chaum, D., Carback, R., Clark, J., Nejadgholi, M., Preneel, B., Sherman, A. T., Yaksetig, M., Zagorski, F., Zhang, B., Yin, Zeyuan, "VoteXX: Extreme coercion resistance," (January 2024), 44 pages. Available: https://eprint.iacr.org/2024/1354

99. Javani, Farid, and Alan T. Sherman, "AOT: Anonymization by oblivious transfer," (May 2021), 20 pages. Available: https://arxiv.org/pdf/2105.10794.pdf

100. Phatak, Dhnanjay, Alan T. Sherman, S.D. Houston, and A. Henry, "PPT: New Low Complexity Deterministic Primality Tests Leveraging Explicit and Implicit Non-Residues. A Set of Three Companion Manuscripts" (August 2019), unpublished manuscript, arXiv preprint arXiv:1908.06964 [217 pages]

101. Sherman, Alan T., "Competitive chess at UMBC: The legacy, the future," *Faculty Voice* (May 22, 2016). Available: http://imerrill.umd.edu/facultyvoice1/?p=3756

102. Price, Nathan, and Alan T. Sherman, "How to generate repeatable keys using Physical Unclonable Functions: Correcting PUF errors with iteratively broadening and prioritized search," IACR Cryptology ePrint Archive 2014/1023, 9 pages.

103. Nguyen, Christopher, Dhananjay S. Phatak, Steven D. Houston, and Alan T. Sherman, "A preliminary FPGA implementation and analysis of Phatak s quotient-first scaling algorithm in the reduced-precision residue number system," IACR Cryptology ePrint Archive 2014/1009, 6 pages.

104. Dhananjay S. Phatak, Q. Tang, Alan T. Sherman, Warren D. Smith, Peter Ryan, and Kostas Kalpakis, "SingleMod and DoubleMod: Simple randomized secret-key encryption with field, with bounded homomorphicity," IACR Cryptology ePrint Archive 2014/670, (September 30, 2014), 24 pages.

105. Sherman, Alan T., Warren D. Smith, and Richard T. Carback III, "Scoring the candidates: Range voting would prevent third-party spoilers—and give voters more say," *MIT News* in *Technology Review*, vol. 111, no. 5 (September/October 2008), M16–M17. Also available on-line: accessed 9-1-08 from http://technologyreview.com/article/21172/

106. Sherman, Alan T., Warren D. Smith, and Richard T. Carback III, "How we think range voting would have affected the 2008 U.S. presidential race," on-line sidebar, *MIT News* in *Technology Review*, vol. 111, no. 5 (September/October 2008), accessed 9-1-08 from http://www.technologyreview.com/article/21211/

107. Donald F. Norris, PI, Andrew Sears, and Charles Nicholas, CoPIs. Anne V. Roland, Ed. Aryya Gangopadhyay, Stephen H. Holden, George Karabatis, A. Gunes Koru, Chris M. Law, John Pinkston, Andrew Sears, Alan T. Sherman, and Dongsong Zhang, "A study of vote verification technologies. **Part I: Technical study appendices**," prepared for the Maryland State Board of Elections, National Center for the Study of Elections of the Maryland Institute for Policy Analysis and Research, University of Maryland, Baltimore County (February 2006). 75 pages. Accessed 6/2/06 from www.umbc.edu/mipar/documents/VoteVerificationAppendiceswebversion.pdf

108. Donald F. Norris, PI, Andrew Sears, and Charles Nicholas, CoPIs. Anne V. Roland, ed. Aryya Gangopadhyay, Stephen H. Holden, George Karabatis, A. Gunes Koru, Chris M. Law, John Pinkston, Andrew Sears, Alan T. Sherman, and Dongsong Zhang, "A study of vote verification technologies. **Part I: Technical study**," prepared for the Maryland State Board of Elections, National Center for the Study of Elections of the Maryland Institute for Policy Analysis and Research, University of Maryland, Baltimore County (February 2006). 68 pages. Accessed 6/2/06 from www.umbc.edu/mipar/documents/VoteVerificationStudyReport-FINAL_001.pdf

109. Sherman, Alan T., "A proof of security for the OFC and LKH centralized group-keying algorithms," NAI Labs TR 02-043D (November 2002). 26 pages.

110. Adcock, Jamison M., David M. Balenson, David W. Carman, Michael Heyman, and Alan T. Sherman, "Trading off strength and performance in network authentication: Experience with the ACSA Project," *Advanced Security Research Journal—NAI Labs*, Vol. 2, No. 1 (winter 2000), 1–14.

111. Balenson, David M., David A. McGrew, and Alan T. Sherman, "Key management for large dynamic groups: One-Way function trees and amortized initialization," Internet Draft (work in progress), Internet Engineering Task Force, draft-irtf-smug-groupkeymgmt-oft-00.txt (July 31, 2000), 37 pages.
    [Revises draft-balenson-groupkeymgmt-oft.00.tex (February 26, 1999).]

112. Balenson, David M., David A. McGrew, and Alan T. Sherman, “Key management for large dynamic groups: One-Way funtion trees and amortized initialization,” *Advanced security Research Journal—NAI Labs*, Vol. 1, No. 1 (fall 1998), 29–46.

113. Chang, Richard, Konstantinos Kalpakis, and Alan T. Sherman, “Report on the 16th Maryland Theory Day,” *SIGACT News*, **28**:2 (June 1997), Whole Number 103, 56–58.

114. Sherman, Alan T., “Workshop: Applying cryptography in electronic commerce” in Proceedings of the 1996 ACM Computer Science Conference, (Philadelphia, PA, February 17, 1996), 148.

115. Chang, Richard, and Alan T. Sherman, “Report on the 8th Maryland Theory Day,” *SIGACT News*, **24**:2 (April 29, 1993), Whole Number 87, 81–82.

116. Sherman, Alan T., “On superpolylogarithmic subexponential functions (Part II),” *SIGACT News*, **22**:2 (spring 1991), Whole Number 79, 51–56.

117. Sherman, Alan T., “On superpolylogarithmic subexponential functions (Part I),” *SIGACT News*, **22**:1 (winter 1991), Whole Number 78, 65–73. [This work was performed at the University of Maryland, College Park on December 11, 1991.]

### J. Works in Preparation (selected)

118. Carback, Richard, Alan T. Sherman, and David Chaum, “A simple approach to mutually-attested threshold software: How to create, seal, and unseal a group secret with encryption and hashing,” (draft: August 3, 2010), 12 pages.

119. Russell A. Fink, Alan T. Sherman, and David C. Challener, “A human attestation protocol for trustworthy electronic voting: Bootstrapping trust using TPMs, smart cards, timings, and scratch-off codes” (June 2010), 17 pages.

120. Carback, Richard, David Chaum, Jeremy Clark, John Conway, Aleksander Essex, Paul S. Herrnson, Travis Mayberry, Stefan Popoveniuc, Ronald L. Rivest, Emily Shen, Alan T. Sherman, Bimal Sinha, and Poorvi Vora, “Exploring Reactions to Scantegrity: Analysis of survey data from Takoma Park voters and election judges” (April 2010), 19 pages.

121. Sherman, Alan T., “A report on the VoComp 2007 international voting system design competition,” (draft: April 22, 2007), 6 pages.

122. Mark, Henry, and Alan T. Sherman, “A unifying theory of the evolution of cognition and mental disorders and a critical role for chess-based psychodiagnostics” (draft: December 9, 2004), 13 pages.

123. Sherman, Alan T., and William Byrd, "Theoretical and experimental evaluation of the Rivest-Sherman attacks on Enigma-like machines: Determining the rotors one at a time from ciphertext only," (draft: August 2003), 60 pages. [I presented this work at MIT on May 12, 2006.]

**K. Theses**

124. Sherman, Alan T., "Cryptology and VLSI (a two-part dissertation): I. Detecting and exploiting algebraic weaknesses in cryptosystems II. Algorithms for placing modules on a custom VLSI chip," Ph.D. Thesis, Department of Electrical Engineering and Computer Science, MIT (October 1986). Thesis supervisor: Ronald L. Rivest. 221 pages.

    [Available as Technical Report TR-381, MIT Laboratory for Computer Science (October 1986), and as VLSI Memo No. 86-343, Microsystems Research Center, MIT (October 1986).]

125. Sherman, Alan T., "On the Enigma cryptograph and formal definitions of cryptographic strength," S.M. Thesis, Department of Electrical Engineering and Computer Science, MIT (June 1981). Thesis supervisor: Ronald L. Rivest. 45 pages.

**Research Presentations (Selected)**

1. "Analysis of the security design, engineering, and implementation of the SecureDNA system,"
   - Network and Distributed System Security Symposium (NDSS) San Diego, CA (February 26, 2026).
2. "Psychometric evaluation of the Cybersecurity Curriculum Assessment,"
   - ACM Technical Symposium on Computer Sceince Education (SIGSCE), Toronto, Canada (March 16, 2023).
3. "VoteXX: A solution to improer influence in voter-verifiable elections,"
   - E-Vote-ID 2022, Bregenz, Austria (October 7, 2022).
4. "cMix: Mixing with minimal real-time asymmetric cryptographic operations,"
   - Applied Cryptography and Network Security (ACNS), Kanazawa, Japan (July 12, 2017).
5. "Creating a cybersecurity concept inventory: A status report on the CATS Project,"
   - 2017 National Cyber Summit, Huntsville, AL (June 7, 2017).
6. "Educational Cybersecurity Assessment Tools (CATs),"
   - Innovations in Cybersecurity Education Workshop (ICEW), UMBC (June 12, 2015).

- Kyushu University, Japan, International Workshop on Cybersecurity: Future Technologies for Cybersecurity (January 7, 2016)

7. "End-To-End voter-verifiable elections: Scantegrity and Random-Sample Elections,"
   - IEEE Intelligence and Security Informatics (ISI), Baltimore, MD (May 29, 2015). Invited talk.
8. "SecurityEmpire: Development and evaluation of a digital game to promote cybersecurity education,"
   - 3GSE '14: 2014 USENIX Summit on Gaming, Games, and Gamification in Security Education, San Diego, CA (August 18, 2014). Invited talk.
9. "Random sample elections,"
   - Rump Session, EVT/WOTE, Washington, DC (August 13, 2013).
   - Rump Session, USENIX Security, Washington, DC (August 14, 2013).
10. "Digital forensics in the cloud,"
    - Forensics Enabled Intelligence (FEI) 2013, Alexandria, VA (April 22, 2013). Invited talk (co-speaker: Josiah Dykstra).
11. "Scantegrity: End-to-end verifiable elections using invisible ink"
    - 2013 Mid-Atlantic Collegiate Cyber Defense Competition (CCDC) Speaker Symposium, Johns Hopkins Applied Physics Laboratory (APL), Scaggsville, MD (April 10, 2013). Invited talk. [video of talk: http://www.maccdc.org/2013-symposium-video/]
12. "Scantegrity III: Automatic trustworthy receipts, highlighting over/under votes, and full voter verifiability"
    - 2011 Electronic Voting Technology Workshop/Workshop on Trustworthy Elections (EVT/WOTE '11), San Francisco, CA (August 8, 2011).
13. "A new paradigm to approximate oblivious data processing (ODP) for data confidentiality in cloud computing"
    - Workshop on Privacy and Security in Cloud Computing, IEEE Services 2011 Washington, DC (July 9, 2011).
14. "Scantegrity II at Takoma Park: The first End-to-End binding governmental election with ballot privacy"
    - CSEE Research Review, UMBC (May 7, 2010).
15. "Location authentication through powerline communication: Design, protocol, and analysis of a new out-of-band strategy"
    - IEEE International Symposium on Powerline Communications and Its Applications (ISPLC), Rio de Janeiro, Brazil (March 30, 2010).
16. "Scantegrity mock election at Takoma Park"

- NIST Workshop on End-to-End Voting Systems, Washington, DC (October 13, 2009).

17. "Voting in America: Problems, past, present, possible solutions"
    - George Washington University (October 18, 2007).
18. "A study of vote verification technologies"
    - USENIX/Accurate Electronic Voting Technology (EVT) Workshop, Vancouver (August 1, 2006)
    - Threat analyses for voting system categories: A workshop on rating voting methods (VSRW 06), (invited talk), Washington, DC (June 9, 2006)
    - MIT Computer Science and Artificial Intelligence Lab (May 11, 2006)
    - CSEE Research Review, UMBC (May 5, 2006)
    - George Washington University (May 4, 2006).
19. "The Rivest-Sherman ciphertext-only attacks on Enigma-like machines"
    - MIT Computer Science and Artificial Intelligence Lab (May 12, 2006)
20. "Developing and delivering hands-on information assurance exercises: Experiences with the Cyber Defense Lab at UMBC"
    - West Point Workshop on Information Assurance, USMA, NY (June 11, 2004)
21. "Key establishment in large dynamic groups"
    - National Security Agency (NSA), MD (October 13, 2000, and fall 1997)
    - MIT Lab for Computer Science (spring 1999)
    - US Naval Academy, Annapolis, MD (March 24, 1999)
    - University of Richmond, VA (January 21, 1999)
    - DARPA, Ballston, VA (March 2, 1998)
    - Trusted Information Systems, Inc., Glenwood, MD (February 27, 1998)
22. "Electronic money"
    - Induction ceremony of the *Sigma Xi* honorary society (invited talk), Villanova University (April 19, 1996).
23. "How to break Gifford's cipher"
    - University of Arizona, Tucson (March 8, 1997). Conference of the Mathematics of Cryptography/Security (invited talk). Southwest Regional Institute in the Mathematical Sciences.
    - Crypto 94 (Rump Session), Univ. of California Santa Barbara (August 23, 1994).
    - AT&T Bell Laboratories, Murray Hill, NJ (July 17, 1994).
    - MIT Laboratory for Computer Science (May 12, 1994).
    - University of Maryland, College Park (March 24, 1994).
    - University of Delaware (March 21, 1994).
24. "Statistical techniques for language recognition: An introduction and empirical study for cryptanalysts"

- University of Pennsylvania (April 15, 1993).

25. "Probabilistic analysis of an enhanced partitioning algorithm for the Steiner tree problem in $R^d$"
    - 13th Annual Allerton Conference on Communication, Control, and Computing, University of Illinois at Urbana-Champaign (October 1, 1992).

26. "A simplified approach to probabilistic polynomial-time complexity classes"
    - UMBC (May 8, 1991).

27. "How we solved the $100,000 Decipher Puzzle (16 hours too late)"
    - Math Colloquium, University of Maryland, College Park (June 11, 2003).
    - Capital Area Theory Seminar, University of Maryland, College Park (April 11, 1990).
    - Eurocrypt 85 (Rump Session), University of Linz, Austria (April 10, 1985).

28. "Tight analysis of Bennett's time-space tradeoff for reversible computation"
    - UMBC (November 1989).

29. "VLSI placement and routing: The PI System"
    - University of Maryland, College Park (April 4, 1990).
    - UMBC (March 14, 1989).
    - Brandeis University (February 2, 1989).

30. "What is a zero-knowledge proof?"
    - Brandeis University (April 30, 1987).

31. "Algorithms for placing modules on a custom VLSI chip"
    - Tufts University (December 2, 1987).
    - MIT VLSI Research Review (May 19, 1986).

32. "Is the Data Encryption Standard a group?"
    - Johns Hopkins University (March 15, 1989).
    - George Mason University (February 16, 1989).
    - The American University (February 15, 1989).
    - Brandeis University (April 18, 1985).
    - Eurocrypt 85, University of Linz, Austria (April 10, 1985).
    - Tufts University (March 18, 1985).

33. "A taxonomy of randomized encryption techniques"
    - Crypto 82, University of California, Santa Barbara (August 23, 1982).

## Service to Department, College, University, Community, Profession

### A. Service to the Profession

*Journal Editor:*

*Cryptologia*, Member Technical Editorial Board (2005–present, December 1994–December 2000).

*Grant Review Panelist:*

National Science Foundation (10-07, 2-07, 3-14, 7-18).

*Grant Reviewer:*

National Science Foundation (8/99, 8/90).

*Promotion Reviewer:*

Wrote letters for promotion reviews to full professor (2018,2019).

*Academic Program Reviewer:*

University of Maryland, University College (UMUC), (spring 2014).

*Program Committee for Competitively-Selected Conferences:*

IASTED International Conference on Communication, Network, and Information Security (CNIS), (spring 2006)
Crypto 95 (spring 95).

*Conference Reviewer:*

2025 Security Standardisation Research
2024 Undone Computer Science
2016 Frontiers in Education (May 2016, May 2019)
1998 USENIX Annual Technical Conference (October 1997)
1st ACM Conference on Computer and Communications Security (spring 93)
Fifth MIT Conference on Advanced Research in VLSI (spring 88).

*Book Reviewer:*

Addison-Wesley (spring 87)
Kluwer Academic Publishers (fall 87)
Prentice Hall (fall 97, spring 88)
Wiley (spring 2014).

*Journal Reviewer:*

*Cryptologia* (10/25, 10/25, 10/24, 9/23, 9/21, 7/21, 4/21, 9/13, 3/12, 3/11, 6/10, 1/07, 12/06, spring 01, summer 93)
*Discrete Applied Mathematics* (fall 83)
*IEEE Security & Privacy* (spring 2017)
*IEEE Transactions on Computers* (spring 89)
*IEEE Transactions on Information, Forensics, and Security* (summer 09)
*IEEE Transactions on Information Theory* (fall 87)
*IEEE Transactions on Systems, Man, and Cybernetics* (spring 85)
*Information and Computation* (7/94)
*Information Processing Letters* (12/03,3/02)
*International Journal of Electronic Government Research* (9-06)

*Journal of Computer and Systems Sciences* (fall 80)
*Journal of Cryptology* (6/10, 3/08, 3/96, 8/91, 3/91, 9/90, 7/90, spring 89)
*Journal of Cybersecurity Education and Practice* (2019)
*SIAM Journal on Computing* (spring 82, fall 80).

*Conference Organizer:*

- Security Standardisation Research (December 13-15, 2026).
- Innovations in Cybersecurity Education Workshop (June 25, 2014; June 12, 2015; June 3, 2016), UMBC.
- VoComp University Voting Systems Competition and Conference (July 16–18, 2007), Portland, Oregon.
- Informatics Maryland: The State of Informatics Success and Challenges (November 28, 2006), Linthicum, Maryland. Organized panel on information assurance.
- Maryland Theory Day at UMBC, April 11, 1997, UMBC. Co-organizer (December 1996–May 1997).
- Workshop: Applying Cryptography in Electronic Commerce, 1996 ACM Computer Science Conference, Philadelphia, PA (February 17, 1996).
- Maryland Theory Day at UMBC, March 24, 1995, UMBC. Co-organizer (August 1994–June 1995).
- Maryland Theory Day at UMBC, March 19, 1993, UMBC. Co-organizer (December 1992–June 1993).
- Crypto 82: A Workshop on the Theory and Practice of Cryptographic Techniques, August 23–25, 1982, University of California, Santa Barbara. Member, Organizing Committee (January–August 1982).

*Board Member:*

- Research Board, Majority Decisions (March 2013–date).
- Technical Advisory Board, Spectocular (June 2013–2024).
- Maryland Center of Academic Excellence (CAE) Collabortation Cyber Security Virtual Resource Lab (Cyber Battle Lab), Capitol College (fall 2010-2012).
- Voting Systems Institute, Washington, DC (2011-date).

## B. Service to the UMBC Department of CSEE

*Director, Center for Information Security and Assurance (CISA).* Wrote successful proposal for UMBC to be designated by DoD/DHS as a National Center of Academic Excellence in Cybersecurity Education (CAE) (fall 2000–fall 2020). Wrote successful applications for renewals of this designation. Wrote successful application for UMBC also to be designated as a National Center of

Academic Excellence in Cybersecurity Research (CAE-R). Recruited students to UMBC to study information assurance, and created the *Cyber Defense Lab (CDL)* for students and faculty to carry out research and educational projects.

*Associate Director, UMBC Center for Cybersecurity.* Wrote renewal applications for UMBC's designation as a CAE (fall 2020–date).

*Director, UMBC Cyber Defense Lab.* Led research projects and organized buweekly talks (fall 2000–date).

*Leader, Security Technology Research Group (STRG).* Organized talks on cryptology (fall 95–fall 00).

*Organizer, CSEE Research Review.* Created and organized an annual meeting of the Dept. to celebrate recent research accomplishments by faculty and students (fall 2022-present, spring 06–spring 13).

*Director, Graduate Program.* Responsible for all aspects of the M.S. and Ph.D. graduate programs in computer science (February 1995–June 1996).

*Department Committee Member:*

- Post-Tenure Review Committee (spring 2018). Evaluated seven faculty members undergoing a five-year post-tenure review.
- Graduate Admissions Committee (fall 2013-present, fall 07–August 2011, Chair February 14-August 15). Evaluated applications to the MS and PhD programs in CS.
- Adjunct Recruitment and Evaluation (fall 12–spring 2013).
- Colloquium/Guest Speaker Committee (Chair: fall 08-spring 02. Member: fall 15-spring 2018, fall 02–spring 07). Organized special talks at UMBC.
- Graduate Committee (fall 23-present, fall 15-present, fall 07–August 08, fall 89–August 96). Discussed and proposed ways to improve the graduate program. Wrote guidelines for the CMSC-693 master's project. Evaluated graduate applications.
- Hiring Committee (24–25, spring 24, fall 12–spring 13, fall 99–August 02, spring 92, spring 17). Read hundreds of applications and met with applicants.
- Graduate Planning Committee (fall 95–fall 96). Developed revised graduate program for newly merged Department.
- Undergraduate Planning Committee (fall 95–spring 96). Made recommendations to improve the undergraduate program in computer science.
- Space Committee (spring 93–summer 94). Organized the selection and purchase of new furniture for the Department's seminar and laboratory areas.

- Tenure and Promotion Committee (fall 96–present). Subcommittee Chair fall 2019, fall 2021.
- Undergraduate Committee (fall 03–August 07, spring 98–August 02, spring 97) Wrote proposal for a departmental honors program in computer science.
- Chair Search Committee (spring 97, fall 03). Interviewed and reviewed candidates for the position of Department Chair.
- Scheduling Committee (spring 1999–spring 03, fall 90–spring 91,).
- Library Committee (spring 91–fall 91). Advised Kuhn Library on book purchases.

*Classroom Observer.* Observed computer science instructors (fall 89–spring 97).

*Comprehensive Examinations.* Wrote and graded the following comprehensive written examinations: M.S. exam in algorithms (fall 89, spring 89, fall 91, fall 92, fall 95); Ph.D. exam in algorithms (summer 90, winter 91, fall 91, winter 92, fall 92, winter 93, fall 93, winter 94, fall 94, winter 95, fall 95, winter 96, fall 96, winter 97, winter 99, summer 99, winter 00, summer 00, winter 01, fall 01, winter 04).

*Advisor.* Advised computer science graduate and undergraduate students (spring 1990–present). Computer Science Advisor to Meyerhoff student (spring 92).

*Course Coordinator.*
CMSC-203 (spring 2001–spring 03)
CMSC-441 (spring 2001, fall 03)
CMSC-443 Cryptology (fall 99–spring 2005).

*Invited Speaker:*

- "Cryptography and language," guest lecture, Linguistics 209, UMBC (November 24, 1997). Instructor: Thomas Field.
- "Electronic money," Honors College (April 8, 1996).
- "How to play mental poker," Undergraduate Computer Science Colloquium (October 13, 1992). Sponsored by Computer Science Department and Honors College.

## C. Service to the UMBC College of Engineering and Information Technology

*Member, Organizing Committee, COEIT Research Day,* Helped organize a new event to promote interdisciplinary research within the College (24–25, spring 2024).

*Department Representative,* Attended receptions and luncheons for prospective engineering students (1997–date).

*College Committee Member:*

- Hiring committee to select new Chair of the Dept. of CSEE (spring 97).
- Space Committee (fall 96–spring 97). Analyzed current space use, and suggested policies and plans for future space use.

## D. Service to the University (other than chess)

*University Committee Member:*

- Member, Faculty Award Review Committee (January 2003).
- Member, Executive Committee, UMBC Chapter of *Phi Beta Kappa* (fall 98–spring 2000).
- Nominating Committee (August 96–spring 97). Nominated members for all standing University Committees.
- 30th Anniversary Steering Committee (spring 96–fall 96). Helped plan UMBC's 30th anniversary celebration.
- *Ad Hoc* Task Force Committee to Study the Student Course Evaluation Questionnaire. (Spring 1992–July 1996). Proposed ways to nurture and to improve effective teaching at UMBC.
- University Subcommittee on Instruction—Information Transfer and Technology Committee (fall 93–August 94). Proposed ways for UMBC to make effective use of emerging educational technologies.
- *Ad Hoc* University Committee on Mathematical Software (spring 1992). Helped develop UMBC policy on mathematical software.

*Department Representative,* Orientation for parents of freshmen (July 13, 1990). President's reception for academically talented students (September 28, 1994). Computer Science transfer students (April 18, 1997). Luncheon for scholarship recipients (spring 97–date).

*UMBC Representative,* Career Fair, Meade High School, April 12, 2012.

*Reviewer,* Technology Incubator, University of Maryland, College Park (9/03).

*Meyerhoff Interviewer,* Interviewed candidates for Meyerhoff scholarships (spring 96, 95, 94).

*Adjudicator,* Oral examination of English proficiency for prospective teaching assistants (August 95, August 94, spring 94).

*Judge,* Twelfth Annual Graduate Research Day (May 2, 1990). Judged oral presentations of research in mathematics and computer science.

*Member,* Steering Committee, Fifth Annual Maryland Computer Bowl (spring 1989). Helped plan and run Computer Bowl. Served as a head judge, and gave computer demonstrations to high school teachers.

### E. Service to the Community (other than chess)

*Women's Self-Defense.* Assisted instructors in the UMBC winter-session course PHED-129/WMST-099: Women's Self-Defense by sharing my expertise as a shodan (first-degree black belt) in the Japanese martial art of Tomiki Aikido (1/94,1/93,1/92). [Instructors: Kim Knapp and Brian Sutherland]

### F. Service to the University and Community Through Chess

*Chair, College Chess Committee*, US Chess Federation (2001–2003). Committee Member, 1996–date. Played an important role in bringing about reforms to college chess eligibility requirements, which took effect in January 2004.

*Director, UMBC Chess Program*, and Faculty Advisor, UMBC Chess Club (fall 1991–date). Initiated and promoted chess activities at UMBC, including recruiting, fundraising, team competition, chess instruction, public relations, special events, and advising Chess Club Officers.

(a) Organized UMBC's participation in the Pan-American Intercollegiate Team Chess Championships (1993–present). UMBC won (or tied for first place) ten times (96,98–02,05,08-09,12)—more times than for any other college in the history of college chess. In 1990, before I became involved, UMBC placed 26th out of 27 teams.

(b) Organized UMBC's participation in the Presidents's Cup ("Final Four of College Chess") (2001–present). UMBC won six times (02–05,08-09)—no college has won more times.

(c) Arranged intercollegiate matches with other schools, with wins over MIT (95), Harvard (96), University of Pennsylvania (97), Princeton (99), and Yale (99).

(d) Raised over $218,000 in external support for chess at UMBC.

(e) Established two endowments for the UMBC Chess Program: UMBC Chess Endowment (unrestricted), UMBC Chess—Alvin S. Mintzes Endowment (restricted to support the UMBC Open—Alvin S. Mintzes Chess tournament). Was instrumental in securing (what has become) a $20,000 bequest to the restricted endowment, and helped bring the unrestricted endowment now to over $10,000.

(f) Recruited many chess-player scholars to UMBC from throughout the world, including some who turned down offers from Harvard, Yale, and MIT. A few examples: International Grandmaster (GM) Ilya J. Smirin ranked 27th in world (95, Belarus); former World Junior Champion International Grandmaster Tal Shaked (98, USA); 2000 USA Junior Champion IM Eugene Perelshteyn (98, USA), now a GM; GM Alexander Onischuk,

2006 USA Champion (02, Ukraine); GM Pawel Blehm, former Captain of World Junior Team (02, Poland); International Woman Grandmasters (WGM) Katerina Rohonyan (04, Ukraine) and Sabina Foisor (08, Romania).

(g) Hosted major chess events, including: 1994-95 Maryland Scholastic Chess Championship (March 11, 1995), Pan-American Chess Championships (December 27–30, 1996, Baltimore), 2000 US Junior Chess Championship and US Junior Chess Open (July 2000), 2006 Pan-American Chess Championships (December 27-30, 2006, Washington, DC), and 2008 President's Cup (April 5-6, 2008, UMBC).

(h) Organized spectator chess events:
Man vs. Machine Match—Sagalchik vs. *Socrates (March 1995),
Exhibition Chess Match—Smirin vs. Morrison (June 21–22, 1996),
UMBC Action Chess Playoffs (October 1998, October 1999),
UMBC Speed Chess Spectacular (May 2003), and
Connections Academy Exhibition Match (August 2008–present).
Developed and applied technology to enhance these events through Internet broadcast of moves, video projection of games from autosensory chessboard, chess telestration, and FM transmission of live sports commentary.

(i) Arranged visits to UMBC by former World Chess Champions Garry Kasparov (May 17, 2007) and Anatoly Karpov (April 6, 2005).

(j) Created, organized, and developed the *Master Preparation* chess course, taught by Grandmaster Smirin, Master Epshteyn, and others. Made this course available to people throughout the world via a variety of internet technologies, including Mbone multicasts, www pages, email, and office hours on the Internet Chess Club. Our 85 Master Preparation videotapes were sold through the WWW Chess Superstore (www.smartchess.com).

(k) Supported the chess club at Arbutus Middle School (fall 2007–present).

(l) Organized UMBC Chess Masters, Johns Hopkins Center for Talented Youth, February 19, 2012, at UMBC (a day of chess activities and instruction for 55 students and their parents).

(m) Created the Summer Chess Camp at UMBC and served as Executive Director (summers 1996–2000).

(n) Wrote articles about Club activities published in the student newspaper *The Retriever*, the *Baltimore Sun*, the *Maryland Chess Newsletter*, and *Chess Life*.

(o) Played on the Faculty Chess Team in annual student-faculty chess matches (spring 91–date).

(p) Was instrumental in UMBC being selected as *Chess College of the Year* in 2000 by the US Chess Federation.

(q) Generated significant favorable publicity for UMBC through chess, including dozens of stories in newspapers including *Baltimore Sun* and *Washington Post*, interviews on National Public Radio, and feature stories on local and national TV—see comment at end of funding section.

## Professional Memberships and Conferences Attended

### A. Membership in Honorary Societies

*Delta Epsilon Phi*
National Honor Society
*Phi Beta Kappa*
*Sigma Xi*

### B. Membership in Professional Organizations

*Current:*
Advanced Computing Systems Organization (USENIX)
Association for Computing Machinery (ACM)
Institute of Electrical and Electronics Engineers (IEEE), Senior Mmeber

*Previous:*
Association of American University Professors (AAUP)
American Mathematical Society (AMS)
International Association for Cryptologic Research (IACR)
Mathematical Association of America (MAA)
Society for Industrial and Applied Mathematics (SIAM)

### C. Conferences Frequently Attended

*Current:*
USENIX Security Symposium (USENIX Security)

*Previous:*
National Cyber Summit
International Cryptology Conference (Crypto)
National Colloquium for Information Systems Security Education (CISSE)
USENIX/ACCURATE Electronic Voting Technology Workshop (EVT/WOTE)

## Teaching Experience

### A. UMBC

*Requried classroom courses taught:*
CMSC-203 Discrete Structures (spring 94, fall 99, spring 00, fall 00, spring 01, fall 01, spring 02, fall 02, spring 08, fall 09, spring 11, fall 17)
CMSC-441 Algorithm Design and Analysis (fall 90, fall 93, spring 95, fall 96, spring 97, spring 23, spring 24
fall 98, spring 01, fall 03, fall 07, fall 08, spring 10, fall 10, fall 12, fall 13, fall 14, spring 15, fall 15, fall 16, spring 17, fall 2019, spring 02)
CMSC-641 Design and Analysis of Algorithms (fall 89, fall 91, fall 92, fall 95, fall 98, fall 23, fall 99, spring 00, fall 01, fall 05, spring 07, spring 09, spring 13, fall 13, spring 16, fall 17, spring 2020, spring 2021, fall 2021)

*Elective classroom courses taught:*
CMSC-443 Cryptography and Data Security (spring 91, fall 94, spring 99, spring 02, spring 11, spring 13)
CMSC-444/644 Information Assurance (fall 06, spring 08, fall 12), (as 491i/691i: fall 05), (as 791i: spring 03, spring 04).
CMSC-491v/691v Electronic Voting (spring 06, spring 07, fall 08, fall 10)
CMSC-603 Advanced Discrete Structures (spring 92–95, spring 99)
CMSC-652 Cryptography and Data Security (spring 90, fall 92, fall 94, spring 97, spring 17, fall 00, fall 02, fall 03, spring 09, spring 15, spring 24)
CMSC-691 Blockchain Technologies and Digital Currencies (spring 18)
CMSC-691 Cybersecurity Research Seminar (spring 14, fall 15, fall 20, fall 22, fall 24, fall 26)
CMSC-691 Special Topics in Cryptology (spring 93)
CMSC-691g Internet Security (spring 96)
CMSC-691u Unix System Security Administration and Policy (spring 07). Instructor of record (Classroom instructors: Geoff Weiss, William Farrell).
CMSC-791 Computer Chess (fall 95)

*Research courses taught:*
CMSC-499 Independent Study in Computer Science
CMSC-693 Research and Writing Skills for Computer Scientists
CMSC-699 Independent Study in Computer Science
CMSC-799 Master's Thesis Research
CMSC-898 PhD Research (pre-candidacy)
CMSC-899 Doctoral Dissertation Research.

*Non-credit chess courses organized:*
Master Preparation (fall 95*, spring 96*, fall 97, fall 98, spring 99, fall 99, spring 00).

(* Coordinated through Continuing Education and delivered over the internet.)

### B. Tufts

*Courses taught:*
CSC-11 Introduction to Computer Science (spring 86)
CSC-71 Data Structures (spring 87)
CSC-60 Algorithms (fall 87, fall 88)
CSC-150c Cryptology (fall 85, spring 87)
CSC-150v VLSI Algorithms (spring 86)
CSC-163 Algorithms (fall 86)
CSC-260 Algorithms (spring 88, spring 89)
CSC-270 Theory of Computation (fall 87, fall 88).

*Courses assisted:*
CSC-11 Introduction to Computer Science (fall 85)
CSC-71 Data Structures (fall 86).

### C. MIT

*Sections taught as Recitation Instructor:*
6.030 Introduction to Computation (fall 79, spring 81: Professor J. C. R. Licklider in charge)
6.001 Structure and Interpretation of Computer Programs (spring 82: Professors Abelson and Sussman in charge).

*Courses assisted as Teaching Assistant:*
6.031 Structure and Interpretation of Computer Programs (spring 79: Professors Abelson, Fano, and Sussman in charge)
6.046 Introduction to Algorithms (fall 82: Professor Ronald Rivest in charge).

**Hobbies**

Piano, ballroom dancing, hiking, tennis, chess, cycling, Tomiki Aikido, downhill skiing, flute.

**Foreign Languages**

Some knowledge of German and Japanese.

## My Coordinates

### A. Mailing Addresses

*Office:*
Dept. of CSEE
UMBC, 1000 Hilltop Circle
Baltimore, MD 21250 USA

*Home:*
3816 Graceland Court
Ellicott City, Maryland, 21042

### B. Telephone Numbers

*Office:*
(410) 455-2666 [Direct. Do not leave messages here; send email. ]
(410) 455-3500 [Department Secretary]

*Home:*
(202) 966-7204 [There is an answering machine on this numbers.]

*Cell:*
(410) 963-4779 [There is an answering machine on this number.]

### C. Fax Numbers

UMBC: (410) 455-3969 [Be sure to write my name on the fax cover page.]
Home: (202) 362-4838

### D. Email Addresses

UMBC: sherman@umbc.edu
Consulting: alantsherman@gmail.com

### E. URL to WWW Home Page

www.csee.umbc.edu/∼sherman

Litigation Support C.V.
**Alan Sherman**

| **2018** | |
|---|---|
| **Client:** | Pro Marketing Sales, Inc. |
| **Opposite:** | Cyber Solutions International et al. |
| **Matter:** | IP litigation regarding hardware security |
| **Case No.:** | 2:17-cv-00038 (N.D. Ga.) |
| **Duties:** | Expert consulting, reports, and deposition testimony regarding hardware security technologies |
| **Status:** | Resolved |

| **2020-present** | |
|---|---|
| **Client:** | Google LLC |
| **Opposite:** | confidential |
| **Matter:** | IP litigation regarding computer security |
| **Case No.:** | confidential |
| **Duties:** | Expert consulting |
| **Status:** | Ongoing |

| **2021-2024** | |
|---|---|
| **Client:** | Google LLC |
| **Opposite:** | Sonos, Inc. |
| **Matter:** | Digital rights management |
| **Case No.:** | 3:21-cv-07559 (N.D. Cal.) (originally filed as No. 6:20-cv-00881 (W.D. Tex.)) |
| **Duties:** | Expert consulting, reports, and deposition testimony regarding digital rights management technologies |
| **Status:** | Ongoing |

| **2022-present** | |
|---|---|
| **Client:** | Google LLC |
| **Opposite:** | Nobots LLC |
| **Matter:** | IP litigation regarding computer security |
| **Case No.:** | 1:22-cv-00585 (W.D. Tex.) |
| **Duties:** | Expert consulting, reports, and testimony regarding computer security issues |
| **Status:** | Ongoing |

| **2021-2022** | |
|---|---|
| **Client:** | Pro Marketing Sales, Inc. |
| **Opposite:** | Secturion Systems, Inc. et al. |
| **Matter:** | IP litigation regarding hardware security |
| **Case No.:** | 1:19-cv-00113 (D. Utah) |
| **Duties:** | Expert consulting and testimony regarding hardware security technologies |
| **Status:** | Resolved |

| **2022-present** | |
|---|---|
| **Client:** | Smartmatic |
| **Opposite:** | Newsmax Media, Inc. |
| **Matter:** | Defamation / Election Security |
| **Case No.:** | N21C-11-028 (Del. Super. Ct.) |
| **Duties:** | Expert consulting, reports, and testimony regarding election security systems |
| **Status:** | Ongoing |

| **2022-present** | |
|---|---|
| **Client:** | Smartmatic |
| **Opposite:** | Fox Corporation et al. |
| **Matter:** | Defamation / Election Security |
| **Case No.:** | Index No. 151136/2021 (N.Y. Sup. Ct., N.Y. County) |
| **Duties:** | Expert consulting, reports, and testimony regarding election security systems |
| **Status:** | Ongoing |

| **2022-present** | |
|---|---|
| **Client:** | Smartmatic |
| **Opposite:** | My Pillow, Inc. and Michael J. Lindell |
| **Matter:** | Defamation / Election Security |
| **Case No.:** | No. 0:22-cv-00098 (D. Minn.) |
| **Duties:** | Expert consulting, reports, and testimony regarding election security systems |
| **Status:** | Ongoing |

| **2023-present** | |
|---|---|
| **Client:** | Google LLC |
| **Opposite:** | confidential |
| **Matter:** | IP Litigation regarding secure memory systems |
| **Case No.:** | confidential |
| **Duties:** | Expert consulting regarding secure memory system technologies |
| **Status:** | Ongoing |