# EXHIBIT 12

# CRIMEWARE

## UNDERSTANDING NEW ATTACKS AND DEFENSES

MARKUS JAKOBSSON
ZULFIKAR RAMZAN

Addison-Wesley

Upper Saddle River, NJ • Boston • Indianapolis • San Francisco
New York • Toronto • Montreal • London • Munich • Paris • Madrid
Capetown • Sydney • Tokyo • Singapore • Mexico City

Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book, and the publisher was aware of a trademark claim, the designations have been printed with initial capital letters or in all capitals.

The authors and publisher have taken care in the preparation of this book, but make no expressed or implied warranty of any kind and assume no responsibility for errors or omissions. No liability is assumed for incidental or consequential damages in connection with or arising out of the use of the information or programs contained herein.

The publisher offers excellent discounts on this book when ordered in quantity for bulk purchases or special sales, which may include electronic versions and/or custom covers and content particular to your business, training goals, marketing focus, and branding interests. For more information, please contact: U.S. Corporate and Government Sales, (800) 382-3419, corpsales@pearsontechgroup.com.

For sales outside the United States please contact: International Sales, international@pearsoned.com.

**This Book Is Safari Enabled**

The Safari® Enabled icon on the cover of your favorite technology book means the book is available through Safari Bookshelf. When you buy this book, you get free access to the online edition for 45 days. Safari Bookshelf is an electronic reference library that lets you easily search thousands of technical books, find code samples, download chapters, and access technical information whenever and wherever you need it.

To gain 45-day Safari Enabled access to this book:

- Go to www.informit.com/onlineedition
- Complete the brief registration form
- Enter the coupon code J6DM-EZRD-F2MK-NEEY-DI7S

If you have difficulty registering on Safari Bookshelf or accessing the online edition, please e-mail customer-service@safaribooksonline.com.

Visit us on the Web: informit.com/aw

*Library of Congress Cataloging-in-Publication Data*

Jakobsson, Markus.

Crimeware : understanding new attacks and defenses / Markus Jakobsson, Zulfikar Ramzan. p. cm.

Includes bibliographical references and index.

ISBN 978-0-321-50195-0 (pbk. : alk. paper) 1. Computer security. 2. Internet–Security measures. 3. Computer crimes. I. Ramzan, Zulfikar. II. Title.

QA76.9.A25J325 2008

005.8–dc22 2007050736

Copyright © 2008 Symantec Corporation

All rights reserved. Printed in the United States of America. This publication is protected by copyright, and permission must be obtained from the publisher prior to any prohibited reproduction, storage in a retrieval system, or transmission in any form or by any means, electronic, mechanical, photocopying, recording, or likewise. For information regarding permissions, write to:

Pearson Education, Inc
Rights and Contracts Department
501 Boylston Street, Suite 900
Boston, MA 02116
Fax (617) 671-3447

ISBN-13: 978-0-321-50195-0
ISBN-10: 0-321-50195-0

Text printed in the United States on recycled paper at Courier in Stoughton, Massachusetts.
First printing, April 2008

# Chapter 11

# Online Advertising Fraud

*Neil Daswani, Chris Mysen, Vinay Rao, Stephen Weis,*
*Kourosh Gharachorloo, Shuman Ghosemajumder,*
*and the Google Ad Traffic Quality Team*

The growth of the web-based online advertising industry has created many new opportunities for lead generation, brand awareness, and electronic commerce for advertisers. In the online marketplace, page views, form submissions, clicks, downloads, and purchases often result in money changing hands between advertisers, ad networks, and web site publishers. Given that these web-based actions have financial impact, criminals have also sought to take advantage of new opportunities to conduct fraud against these parties with the hopes of having some money illegitimately change into their own hands. This chapter discusses some of the many ways, including using crimeware,[1] that fraudsters attempt to leverage so as to defraud various parties involved in the online advertising marketplace. It also describes countermeasures that ad networks have put in place to mitigate such fraud.

## 11.1 History

This section offers an abridged history of online advertising, as a precursor to the discussion of online advertising fraud in later sections. This section is not meant to be comprehensive, but does provide some high-level background as to how online advertising via search engines emerged.

1. For example, clickbots, as described in Section 11.4.2, are an example of crimeware that can be used to conduct online advertising fraud.

Since the commercialization of the World Wide Web (WWW) in the mid-1990s, the marketplace has explored many alternatives to monetize online content and generate sales leads. During the early stages of commercialization, many companies made online brochures about their products and services available. Some early web pages provided email addresses and phone numbers as contact information, and others allowed users to fill out online forms to gather information about customers' needs and contact information as a means of lead generation. These interactive product brochures were an early form of online advertising and still are very prevalent among low-end web sites.

Companies also had to find robust ways of initially attracting users to their web sites. In addition to adding URLs to offline information provided to customers, companies would often add ".com" to their names during the Internet boom that occurred from 1996 to 2001 to advertise their "destination" web sites. To help users find information, products, and services to help satisfy their needs, several directories (e.g., the Yahoo! directory) and keyword search engines (e.g., AltaVista) were developed to help direct users to destination sites. Companies could request or pay to be listed in online directories, and they could optimize their web sites to show up prominently in search results provided by keyword search engines.

Directories sought to monetize their services by displaying banner ads linked to destination pages. Companies that offered such advertising opportunities boasted that advertisements could be "targeted" more precisely than was possible via other forms of advertising. Such companies attempted to do targeting based on user behavior and to classify users into various categories. These targeting efforts were not very successful, however, because making inferences about which categories visitors to a web site should be placed into was difficult based on browsing behavior alone.

By comparison, search services provide much easier methods of targeting; when a user enters a keyword search term, the user is directly telling a search engine what he or she is interested in, and the need to categorize users based on browsing behavior becomes less necessary for successful targeting. In addition, keyword search engines that display textual ads (as opposed to banner ads) provide a user experience that is not only more targeted, but also less intrusive to users. The combination of better targeting and better user experience has resulted in successful online advertising offerings via search engines.

## 11.2 Revenue Models

The accounting of ad revenue from an online advertising campaign generally takes one of three forms:

- *Cost per mille (CPM)*: The advertiser is charged per 1000 impressions.

- *Cost per click (CPC):* The advertiser is charged per click.
- *Cost per action (CPA):* The advertiser is charged per (predetermined) action (e.g., an online sale).

In this section, we describe each of the three models. We also discuss how syndication and referral deals can be used to derive revenue from online advertising activities.

### 11.2.1 Impression-Based Model

Advertisers often pay search engines or online magazines a fixed price for every 1000 banner ads that are displayed–known as cost per mille (CPM). When an ad is displayed, an *ad impression* (or simply *impression*) is said to have taken place. The term "impression" is also used to refer to the creative ad that is displayed in this way.

Charging and accounting by CPM is theoretically easy to implement, because each web server log entry for a banner ad image represents one impression. In practice, CPM advertising can be quite complicated, with many different web servers being involved along the path of delivering a banner to an end user. In addition, web page caching needs to be disabled via HTTP response headers, and HTTP proxies need to abide by such headers. Finally, measuring the effectiveness and results of a CPM-based advertising campaign can be difficult owing to a greater emphasis on branding campaigns and offline sales and the existence of impression spam.

*Impression spam* results from HTTP requests for web pages that contain ads, but that do not necessarily correspond to a user viewing the page. For instance, a web page crawler or "scraping" program might issue an HTTP request for a web page that happens to contain ads. Such a request would need to be distinguished from those requests issued by human users. Also, an advertiser might not receive any feedback when ad impressions occur and may need to completely trust the content provider's or ad network's impression data.

Nevertheless, even during the early commercialization of the Internet, the marketplace immediately recognized that online advertising could improve accountability and return on investment (ROI) over traditional, offline advertisements such as on billboards or television. Each click on a banner ad indicated that an online advertising campaign was driving traffic to an advertiser's site. Online content providers and search engines provided advertisers with click-through rates (CTR), which is the ratio of users' clicks per ad impression. CTRs often depend on the "quality" of banner ads. In practice, CTRs for the early banner ads were often low. Low CTRs could be partially attributed to poor targeting, but may also have been due to technical factors, such as longer download times for large banner ad images by users on dial-up lines.

In addition to low CTRs, another challenge faced by the online advertising industry was advertising sales. It may have not been economical for a small online magazine to hire a sales force to sell its banner ad space to advertisers. This realization motivated the creation of advertising networks that could amortize the cost and overhead of an advertising sales force across large numbers of small web sites. Notably, in the late 1990s, DoubleClick arose as a top-tier banner advertising network. Web sites would lease web page space to DoubleClick, and DoubleClick would find and manage advertisers that paid for ad impressions and clicks on those web pages.

Ad targeting has always been an important aspect of online advertising. Higher CTRs were typically viewed as evidence that the topic of the ad was related to the topic of the web page upon which the ad was placed. The marketplace realized that advertisers would pay more not only based on placement of ads, but also in case of better targeting.

In 2000, Google launched the AdWords CPM-based advertising platform, in which textual ads were targeted based on the keywords for which a user would search. Google initially signed contracts with advertisers to display their ads on a CPM basis on the top of search results pages. In addition, Google auctioned off the ad slots on the right-hand side of search results pages; it eventually did the same for ads shown on the top of search results pages. In this way, a market for charging advertisers based not on the number of ad impressions shown, but rather on the number of times users clicked on ads emerged.

### 11.2.2 Click-Based Model

In 1998, Goto.com, a start-up that arose out of the *idealabs* business incubator, developed a pay-for-placement search engine where advertisers bid to be the top-placed ads next to search results. Advertisers would pay per click (PPC) for their search result ads. The amount the advertiser pays per click is referred to as its cost per click (CPC). In 2001, Goto.com was renamed Overture; in 2003, the company was purchased by its largest customer, Yahoo!.

In 2002, Google relaunched AdWords as a PPC platform. With this new venture, Google not only took advertisers' bids into account, but also took into account an ad's click-through rate. In particular, advertising slots on Google's search results pages are not simply auctioned off to the highest bidder. Instead, an ad slot is allocated to the advertiser whose bid times the predicted CTR of the ad (as computed by the ad network) is highest. As a result, ad placement depends on two factors: the amount an advertiser is willing to pay and the "quality" of the ad, as determined by how often users click on the ad (in addition to many other

factors). In effect, each ad click from a user serves as an implicit vote of the relevance of the ad to the user's query. The result is that not only do users receive more relevant ads, but Google also increases advertisers' revenue by better targeting advertisements.

When advertisers pay per click, it is important that clicks deliver value and ROI to the advertiser. Some clicks might be "invalid" or "fraudulent"; Sections 11.3 and 11.4 define sources of these kinds of clicks. Section 11.5 discusses high-level countermeasures to deal with "click fraud." Fraud exists in both the CPM and the CPC business models; in the former, we speak of "impression fraud," while in the latter we focus on "click fraud."

To complement PPC advertising on its search results pages, in 2003 Google launched AdSense, an online advertising product that allowed web publishers to monetize their content by allowing Google to place ads on their web sites. To ensure the ads are relevant to the user's interest, the entire web page containing the ad slots is analyzed by AdSense to determine a set of relevant topics, and ads about those topics are inserted into the ad slots on the web page. Google pays such publishers a share of the CPC fees paid by the advertisers when the ads are clicked. While the creation of AdSense helped publishers derive revenue for the development of their content, it also introduced new incentives for fraudulent click activity, as discussed in Section 11.3.

### 11.2.3 Action-Based Model

A more generic online advertising model is pay per action, in which the advertiser pays a cost per action (CPA), where an "action" can be defined as the user arriving at a particular "landing" page on the advertiser's site or the user engaging in a commercial transaction. Strictly speaking, CPC-based advertising is just a special case of CPA, in which the "action" is the user clicking on an ad. However, the term "CPA" typically refers to a more involved action than simply clicking on an ad, and it usually connotes that an advertiser is paying based on a commercial transaction. Some suspect that CPA-based advertising might be less susceptible to click fraud, as fraudsters may need to engage in commercial transactions to successfully defraud advertisers. At the same time, if the commercial transaction is not very costly to induce, CPA-based advertising may be just as vulnerable to click fraud as is CPC-based advertising.

From an advertiser's standpoint, CPA-based advertising can be attractive because advertisers are billed only for predefined user actions–for example, making a purchase or generating a sales lead. Advertisers make payments to an ad network only after they have derived value from a click.

Although CPA-based advertising can be well suited for commercial sites, it has some drawbacks. Some advertisers may not have online commerce web sites. For example, they may be advertising simply for brand-name recognition there, with the goal of increasing offline sales (e.g., typical car manufacturers). Also, an advertiser's web site might have usability issues, have high latency, or simply suffer from intermittent failures that may serve as barriers to users completing transactions. Much of the risk involved in a CPA-based advertising model, then, falls on the ad network.

It is also important to consider the effect of CPA on publishers. For every impression displayed on a publisher's page, a bet is being made on which ads will generate the most revenue for that publisher. When choosing between CPM-based advertisers, such a decision is simple—choose the impression that pays the highest CPM. When working with CPC-based advertisers, the sustained CTR of the advertiser is easy enough to determine with a relatively small amount of data, which helps come up with an eCPM (expected CPM) estimate. However, CPA advertising, especially for small advertisers, is difficult to translate into a reliable eCPM. As a result, small CPA advertisers are often not well suited for many publishers' sites and have a harder time getting significant traffic from their campaigns.

### 11.2.4 Syndication

Ad networks can increase their reach by syndicating the ads they deliver to other destination sites, such as search engines and other web properties. In a *syndication* deal, an ad network (which may be run by a search engine) provides a data feed in which the syndicator receives URLs for ad impressions. The syndicator earns a share of the CPC paid by the advertiser when the URLs are clicked on. For example, a hypothetical search engine (`hyp-search.com`) might run a PPC ad network. Another search engine `syn-search.com` that does not have an ad network of its own might enter into a syndication relationship with `hyp-search.com`. Whenever `syn-search.com` receives a query from a user, in addition to providing its search results, it sends the query to `hyp-search.com` via a data feed; in return, it receives ad impression URLs that are relevant to the query. Then `syn-search.com` displays the ad impression URLs on its results pages and receives a share of the CPC the advertiser pays to `hyp-search.com` when users click on the ads.

Figure 11.1 depicts the interactions between the ad network, the syndicator, and the user. (To keep the conceptual depiction simple, note that the arrows in the figure do not correpsond to HTTP requests between web sites, but simply depict




**Figure 11.1:** Syndication.

the flow of data and money.) Upon receiving a query from the user, `syn-search.com` relays the query onto `hyp-search.com`, and then relays the ad impression URL received from `hyp-search.com` to the user. If and when the user clicks on the ad impression URL, `hyp-search.com` pays `syn-search.com` a fraction ($f$) of the CPC paid by the advertiser. Although not shown in the figure, a click on an ad redirects the user to the advertiser's web site (i.e., the click request is sent to the ad network and generates a redirect response).

### 11.2.5 Referral Deals

In a *referral* deal, a web site, A, pays another web site, R, for sending web traffic to A. Web site R puts links to web site A on its web pages. In a CPC referral deal, web site A pays web site R a referral fee every time that a user clicks on a link on R's web pages and arrives at web site A. To provide a simple example, a web site called `great-online-magazine.com` might pay `ref-site.com` a referral fee every time that it displays a link to `great-online-magazine.com` on a page, and that link is clicked on by a user. In general, when a site R puts a link to A on its site as part of a referral deal, the link does not necessarily need to be an "ad," but can be used simply to encourage visitors to site R to visit site A thereafter. Reiter et al. discuss how abuse can take place in referral deals [330].

An important distinction between CPC referral deals and CPC advertising deals is which party takes responsibility for accounting and payment. In a CPC referral deal, web site A typically is responsible for keeping track and paying for the number of referrals sent to it by R. In the case that R is a search engine and A is an

advertiser in a CPC ads deal, the search engine R is typically responsible for keeping track of and charging for referrals that are made to A.

In general, referral deals can be action-based instead of just click-based. That is, A may pay R not just for clicks, but rather for page views or sales made on A's web site. Also, referral deals often involve less complexity than advertising deals in which online auctions take place to determine the web site to which a user may be referred.

## 11.3 Types of Spam

An online ad network can be abused in many ways. Each of the ad revenue models described in the previous section (impression-based, click-based, and action-based), for example, can be subject to a corresponding type of spam (impression spam, click spam, and conversion spam).

Fraud based on such abuse can result in reduced ROI for advertisers, although there are many other reasons that advertiser ROI might suffer. For instance, advertiser ROI might suffer due to low-quality ads, high latency at the advertiser's web site, improperly targeted keywords, noncompetitive sale prices, and many other factors. Nevertheless, fraud is one of many variables that can account for nonoptimal advertiser ROI. In this section, we provide an abridged taxonomy of the various types of spam that may affect an online ad network.

*Spam* is an artifact that does not provide any value, utility, or benefit as expected by one or more parties associated with the artifact. For instance, an email is often considered spam when the recipient of the message does not derive any appreciable value, utility, or benefit from the email. This section focuses on three types of ad-related spam: impression spam, click spam, and conversion spam.

### 11.3.1 Impression Spam

*Impression spam* results from HTTP requests for web pages that a user never sees or that provide advertisers little or no value for their money. Impression spam affects CPM-based advertising campaigns because advertisers should not be charged for such HTTP requests.

Furthermore, impression spam affects CTR calculations, as the denominator in the calculation is the number of page views. Because the ranking of ads in an auction may depend on CPC and CTR, manipulating the CTR can be of interest to a malicious advertiser as an indirect method to manipulate the outcome of the ad auction. In addition, click fraudsters may end up increasing the CTRs of ads that they click on, and higher-than-normal CTRs can serve as evidence of a click fraud

attack. To counter this possibility, click fraudsters may use impression spam to decrease CTRs for ads that they click on in an attempt to avoid detection.

Once HTTP requests that are deemed to be impression spam are filtered out of a web server log, the number of total page views minus those that are deemed to be impression spam should be used in CTR calculations as well as for CPM counts.

### 11.3.2 Click Spam

*Click spam* is a type of spam that occurs when sources other than legitimate users are making HTTP requests for ad impression URLs. Such HTTP requests, which are often called *invalid clicks*, comprise any clicks that an ad network chooses not to charge for. When clicks are marked as invalid, the user agent that issued the click is still directed to an advertiser's web site, but the advertiser is simply not charged for the click.

A *fraudulent click* is one that was issued with malicious intent, and *click fraud* is simply the practice of issuing fraudulent clicks. Because the intent is only in the mind of the person issuing the click or in the mind of the author of software that issues clicks, it is impossible to know with 100% certainty that any click is fraudulent. While the intent of a click is impossible to determine, signs or *signals* may indicate the intent of the click with varying certainty. Clicks that are believed to be fraudulent are marked as invalid, but it is not necessarily the case that all fraudulent clicks will be detected and marked in this way.

When suspected fraudulent clicks are marked as invalid, the user agent is still redirected to the advertiser's web site. Proceeding with the redirection offers two benefits. First, a fraudster does not receive any feedback as to whether he or she has been identified as an attacker. Second, if a suspected fraudulent click is, in reality, a legitimate click (a false positive), then the user's experience is not negatively affected and may provide the opportunity for increased ROI for the advertiser. That is, a user's click may be marked as invalid, and yet the user may go on to purchase a product on the advertiser's site! Of course, too many false positives may decrease a publisher's revenue, so an ad network must do its best to minimize false positives to balance the trade-off involved in providing high advertiser ROI while concurrently attracting and maintaining quality relationships with publishers.

In many cases, invalid clicks are not necessarily fraudulent, and they may have nothing to do with malicious intent. Clicks may be marked as invalid, for instance, based on an ad network's desire to improve advertiser ROI. Many such clicks that are marked invalid are attributable to double clicks (e.g., a user who clicks twice to open a link), crawlers that ignore `robots.txt` directives, and other technical reasons.

Two sources of invalid clicks that are the result of malicious intent are advertiser competitor clicking and publisher click inflation. In advertiser *competitor clicking*, a malicious advertiser may click on a competitor's ads. There are many reasons why a malicious advertiser might engage in competitor clicking. One possible, simplistic goal is to drain the competitor's advertising budget. Once the competitor's advertising budget has been exhausted, the malicious advertiser's ads may be exclusively shown to a user (assuming that no additional advertisers are bidding for the same keywords). More generally, an advertiser may want to decrease competition for a particular keyword. By fraudulently clicking on others' ads for that keyword, competitors derive less ROI and expend their budgets. In the short term, the auction becomes less competitive as competitors become ineligible to participate due to reaching their daily budget limits. In the long term, the decreased ROI for such keywords may mean that competitors may reduce or stop spending, and CPC rates for the fraudster will be lower.

When Google introduced AdSense, publisher *click inflation* emerged as a new type of click fraud that needed to be mitigated. In this scheme, a publisher clicks on ads on the publisher's own site in hopes of receiving a revenue share of the CPC that the advertiser pays for ad clicks. The incentive for fraud in publisher click inflation is a more financially direct one than is the case in advertiser competitor clicking.

Click fraud countermeasures are discussed in depth in Section 11.5.

### 11.3.3 Conversion Spam

A *conversion* takes place when an HTTP request is issued for an advertiser-defined URL. For example, the request of the URL could signify a page view, submission of a form, initiation of a file download, or the completion of an online sale.

In *conversion spam*, HTTP requests are issued with the intent of artificially producing conversions. Just as there is incentive for click spam in CPM-based advertising to make it appear that ads are relevant via inflated CTRs, so there exists an incentive for conversion spam in CPC-based advertising to make it appear that clicks are relevant. For instance, after clicking on an ad and being redirected to an advertiser's site, a click fraudster may download a file (such as a trial version of a software package) from an advertiser's site in an attempt to simulate the behavior of a legitimate user.

CPA-based advertising is also susceptible to conversion spam, as fraudulent publishers might like to derive a share of the revenues resulting from artificially produced actions. For example, if such a publisher gets paid a share of the revenues from a CPA-based advertising campaign based on downloads of a trial

software package, that publisher might initiate such downloads after fraudulently clicking on ads in an attempt to derive revenue from the self-initiated downloads.

## 11.4 Forms of Attack

Click fraud can take many different forms. Nevertheless, some key technology and resource limitations constrain which vectors an attacker may try. For example, someone with little time and low determination might attempt only simple attacks from a home computer. By contrast, a dedicated fraudster with more time may write malware, infect machines worldwide, and command the infected machines to click on ads. In this section, we describe some representative forms of attack; we do not attempt to comprehensively enumerate all known forms of attack, but merely seek to give the reader some familiarity with some attacks commonly seen in the wild.

Attacks against networks may generally be classified into two main categories: human, where people manually click on ads, and robotic, in which traffic is generated programmatically by software robots. We describe each of these categories of attack in more detail next.

### 11.4.1 Human Clickers

Humans are harder to manage than automated software robots, but they are also fundamentally limited by the speed at which they can think and act. Nevertheless, hiring humans to click on ads is a feasible vector by which to attack an ad network in geographies in which human labor is particularly cheap. Even in developed economies, humans can be coerced or leveraged to click on ads just as they can be coerced into solving CAPTCHAs in exchange for the privilege of viewing pornographic images [145]. From an economic point of view, using humans for click fraud purposes is viable as long as the cost of directly paying or coercing a human to click on an ad is lower than the return for clicking on the ad.

For publishers that are paid a share of ad click revenue on their web site, these costs can be quite low. For example, if it takes 10 seconds for a fraudster to view a page and click on an ad with a return of $0.10, a fraudster can realize returns of $0.60 per minute, or as much as $36 per hour, for clicking on ads. In many parts of the world, $36 is a reasonable daily salary at the time of writing of this text. By reducing the incentives and slowing fraudsters down to $0.01 every 20 seconds, a person can still make $1.80 per hour, or approximately $2500 per year, which is roughly the per capita GDP in some developing countries. Even accounting for connectivity costs (which can be $10 per month) and computer costs (cheap computers can run $300 to $400), a person can theoretically make a decent living

being paid to defraud advertisers, if countermeasures are not in place. (We discuss countermeasures in Section 11.5.) Of course, constantly loading pages and clicking on ads can be rather tedious.

Given that cheap sources of Internet-connected labor exist, fraudsters have generated several attacks that take advantage of humans. Such attacks all have similar goals, but have different costs and degrees of implementation difficulty. These human-intensive attacks can involve only one human or multiple humans whose efforts can be coordinated. Multiple numbers of machines and/or IP addresses can be taken advantage of. In addition, various means of acquiring the machines and IP addresses can be used.

Before discussing such targeted manual attacks, we first discuss how publishers might encourage or coerce legitimate users to unintentionally click on ads. Such ad clicks may or may not be fraudulent, but neither the advertisers' nor the users' interests are being respected. While much of the latter part in this chapter deals with the technology used to conduct and contain click fraud, the next subsection deals with the psychology of the user.

### Coercion

Good web site design is focused on helping a user accomplish a task and is often guided by interaction designers and usability engineers. For example, a web storefront may be designed and implemented so as to help a user find what he or she is looking for and purchase it in an efficient fashion. A social networking site may be designed to help users find and interact with others who have similar interests. Conversely, in an ad-centric web site design, a web publisher may attempt to design a site to "encourage" visitors to click on high-CPC ads.

To ensure that high-CPC ads will appear on her web site, a publisher can replace or supplement regular web page content with collections of keywords for which advertisers typically place high bids. This practice is sometimes called "keyword stuffing." The keywords can be hidden from the user by including them in HTML tags that are not visibly displayed or by rendering the keywords in the same color as the background of the web page. In both cases, the "stuffed" keywords will be seen by the ad network when its automated agents crawl the page to determine relevant ads to show, but not by a human user viewing the web page.

To encourage users to click on the high-CPC ads, the publisher might not include very many (if any) regular links to other web pages and might attempt to make any regular links look like ads as well. A user who then wants to click a link to go to another web page may inadvertently click on one of the high-CPC ads because it is not clear how to easily navigate to a more interesting web page. Similarly, a publisher might modify ad text to something more relevant to coerce users, while retaining the original advertiser URL (e.g., replacing "Click here for

Viagra" with "Free Ringtones"). Alternatively, a publisher may go so far as to make ads invisible to users and give them directions about actions to take (e.g., "Hit tab twice, then enter") to force users to unknowingly click on ads.

Other devious publishers may host games, often written in Macromedia Flash, on web pages such that the game is surrounded by ads. Part of the game play may involve clicking and dragging the mouse. By encircling the game with ads, the publisher increases the chance that users will unintentionally click on ads, providing a near-term benefit to the publisher.

At one extreme, a web publisher may explicitly ask users to click on ads—for example, by including "call to action" text on a web site stating "Please click on the ads on this page." At another extreme are web sites that are intentionally designed and engineered to coerce users to click on ads, even without an explicit call to action. Regardless of the technique used, all of these schemes aim to deceive users and provide a poor user experience. Moreover, users often end up at a site they had no intention of visiting. In such cases, deception leads to low advertiser ROI.

### Manual Clicking

A malicious user can generate a relatively large volume of traffic over a relatively short period of time. Even a person who is not very Internet savvy can generate thousands of page views and hundreds of ad clicks over the course of a day. For a web site that earns revenue based on CPM or CPC ads, such page views and ad clicks can translate into hundreds of dollars per day in revenue. Moreover, an advertiser that wants to drain a competing advertiser's budget can potentially rob the competitor's budget of hundreds of dollars per day if appropriate countermeasures are not in place.

At the same time, such behavior can be easily detected if the same user is returning to the same site again and again. Such a manual clicking attack can be simple to execute, but also relatively simple to detect. When such manual clicking attacks appear at high volumes, fraudulent intent can be obvious, as it is rare for a single user to generate large amounts of targeted page view and ad click traffic during normal browsing of the web.

To make such a manual clicking attack more difficult to trace and detect, some fraudsters use HTTP proxies to obscure the source of their clicks. HTTP proxies can anonymize traffic by acting as an intermediary between a user's machine and a web site. Proxies can hide the source IP address and strip identifying information, such as cookies, from HTTP requests. HTTP proxy services are often available for free or at nominal fees. Some attackers also set up a means to systematically reroute traffic through a series of proxy machines to further obscure the original source of HTTP requests. Anonymous routing systems and distributed networks of machines such

as Tor [89] sometimes provide a means for a fraudster to anonymize their traffic, although such systems can also be used legitimately for anonymous web browsing. In addition to stripping identifying information from HTTP requests, a given user's traffic may be challenging to uniquely identify because that user's traffic may be "mixed in" with many other users' requests arriving from an HTTP proxy.

HTTP requests for ad impression URLs (clicks) that emanate from such networks may be viewed as suspicious by ad networks. One might argue that a legitimate user might want to take advantage of such anonymization services. At the same time, if the value to advertisers of clicks emanating from such services is dubious or traffic from such a service is anomalous for other reasons, an ad network may decide to mark such clicks as invalid.

An attacker can also explicitly coordinate groups of users to click on ads to drain advertiser budgets or attempt click inflation. In one scenario, a *click farm* firm might be hired to click on ads. Such a firm may be profitable in a developing nation. It may hire employees to click on ads in its offices or may coordinate contract workers who click on ads from cyber-cafes in different cities.

Naturally, distributing such fraudulent ad clicks across many malicious users and machines increases the burden on the detection systems of ad networks by forcing the networks to aggregate activity over a period of time and across many IPs to find significant sources of fraudulent activity. Interestingly, activity distributed as such can be difficult for a single advertiser to detect because the activity occurs "below the radar" for a given advertiser, though it can be detected using aggregated traffic across multiple advertisers. Such distributed attacks can take a significant amount of effort to coordinate and are indicative of fairly determined fraudsters.

An interesting case study of a manual, distributed, click fraud attack occurred on the Google search network in 2006 with clicks relating to the keyword *kiyashinku* (meaning "credit" or "credit cards" in Japanese). Google's Ad Traffic Quality Team noticed an increase in query and click traffic on the keyword that emanated from large numbers of seemingly legitimate users. An inflammatory blog post was later found that incited readers to issue a search query for the keyword on Google and then to click on the resulting ads in an effort to drain the advertising budgets of Japanese credit card vendors.

The resulting traffic looked very anomalous, as there was a sudden surge in interest in these high-value ads. Moreover, users clicked on the same ad dozens of times or clicked on large numbers of ads returned as a result of the query. In cases like this one, however, user interest quickly wanes and the attack tends to be short-lived.

Humans looking to supplement their income can also be recruited directly to click on ads by "pay to read" (PTR) and "pay to click" (PTC) web sites. Such sites

accept membership registrations from users (usually other than publishers). The "pay to" web site sends the user instructions on which sites to "read" or click on in return for an extremely small share of revenues derived from such activity. Such sites give explicit directions to users on web pages or in emails about how to act in an attempt to ensure that the ensuing activity appears legitimate from these sites. For example, instructions might specify to "stay on the web site for at least 30 seconds" or "click on links that are interesting to you."

Often, however, users are fundamentally uninterested in the content of these sites, and are more interested in the prospect of being paid for their browsing and clicking. One can find some differences between programs that pay users to surf and programs that pay users to click on ads, because surfing does not guarantee ad clicks. Nevertheless, many of these sites seek to indirectly generate revenue from CPM- and CPC-based advertising. PTR/PTC programs are also often part of a pyramid scheme in which some "users" pay into the program to receive better payouts. As with most pyramid schemes, most participants rarely, if ever, receive any significant payouts themselves.

An intriguing effect of many of these sites is that networks of "pay to" sites are often linked to one another via ads. In effect, users who visit "pay to" sites are likely to sign up on other "pay to" sites. One PTC web site may show advertisements on other PTC sites in an attempt to attract other like-minded users.

Despite the advantages of using humans to conduct click fraud and otherwise generate invalid clicks, people can be difficult to convince, can be hard to provide with adequate incentives, and can get bored or tired quickly. Moreover, a person who is paid to view pages or click on ads can act in ways distinctly different from a user who is truly interested in, say, purchasing a product. For instance, a real user tends to read, consider, think, and surf a web site because he or she wants to learn more about the product. A paid user has few such interests. In addition, PTR and PTC users might be less likely to conduct purchases or "convert," and the lack of conversions can be visible to advertisers in the form of ROI. There are significant gray areas in what an ad network needs to consider fraudulent—bad behavior on one network may be normal on another network. At the end of the day, fraud needs to be defined by what advertisers expect from services provided by an ad network and normal user behavior.

### 11.4.2 Robotic Clicking

Fraudsters often abandon any pretense of legitimacy in their click inflation efforts and resort to automated traffic generated by software robots, or "bots." Bots enjoy one major advantage over human users: They do what they are told, over and over

again, and they do it for free, without needing direct motivation. Running a bot can require less coordination and avoids the pesky requirement of finding and interacting with willing people.

Many software robots are written for legitimate purposes, such as scraping web sites or crawling web links. Sites may place robot exclusion files (i.e., `robots.txt`) in specific directory trees to direct automated crawlers to avoid scanning parts or all of a web site. Advertising networks often use `robots.txt` files to prevent robots from inadvertently crawling ads.

A malfunctioning or improperly configured bot may not abide by the `robots.txt` directives and unintentionally click on ads. These bots are not intended to be malicious and make little effort to "cloak" themselves. They often announce themselves as robots through their user-agent string or other fields in the headers of their HTTP requests, making it easy to detect and account for inadvertent bots.

In contrast, some bots are constructed for the sole purpose of clicking on ads. A *clickbot* [79] is a software robot that clicks on ads by issuing HTTP requests for advertiser web pages with the intent to commit click fraud. Clickbots can be custom-built or purchased, and they can be manually installed by fraudsters or disseminated in a manner similar to malware and worms.

If appropriate countermeasures are not in place, large clickbot networks could potentially conduct significant amounts of fraud, even if each bot executes just a few ad clicks per day. Moreover, the operational costs to run a botnet could decrease over time, entailing even lower risk for attackers [195].

Unfortunately for clickbots, their predictability is a significant weakness. Developing a bot that behaves like a human and cloaks its behavior is challenging. An ad network may use hundreds or thousands of signals to determine whether HTTP requests might have been generated by a machine instead of a human.

Despite this shortcoming, attackers often use robotic traffic sources to send invalid traffic to advertisers. Building a robot to click on ads does require some skill as a programmer. Likewise, it requires significant insight into how one might write a software bot to look and act like a human.

Costs involved in using bots include authoring or purchasing bot software, and obtaining a network of machines on which to run the bot software. Often, these machines have been illicitly compromised and are rented for hire. Current research indicates botnet rental fees run in the cents per bot per week range [195, 229].

### Custom-Built Bots

Many tools are available that may be used to develop custom-built bots. Open-source utilities such as `wget` [277] and `curl` can, for instance, be used to issue HTTP requests. Shell scripts can be written to invoke such programs in an

automated fashion as one form of attack. Libraries that help programmers execute HTTP requests exist for many common programming languages, such as Python, Java, C/C++, and Perl. Some bots can also be written as browser helper objects (BHOs) to leverage existing functionality in web browsers so as to help bot authors construct HTTP requests. These open-source utilities, application libraries, and BHO-based methods often support the use of HTTP proxies, which can help mask the original source of an HTTP request. Such tools can be used to build clients that conduct advertiser competitor clicking or publisher click inflation attacks.

### For-Sale Clickbots

After a bot is built, it can be sold on the open market. While some legitimate, testing-oriented applications of bots exist, bots can just as easily be used to conduct attempted click fraud. For-sale clickbots such as the Lote Clicking Agent, I-Faker, FakeZilla, and Clickmaster can be purchased online. They typically use anonymous proxies to generate traffic with IP diversity. Fortunately, IP diversity usually is not enough to hide click fraud attacks conducted by such software, and the traffic generated by them is typically readily evident.

### Malware-Type Clickbots

Malware-type clickbots infect machines in an attempt to achieve IP diversity. Their traffic may or may not be as easily identifiable as that generated by for-sale clickbots. Malware-type clickbots can receive instructions from a botmaster server as to which ads to click, and how often and when to click them. Clickbot.A, which is described in more depth in "The Anatomy of Clickbot.A" by Daswani et al. [79], provides a detailed case study of such a clickbot investigated by Google. This case study was published with the hope of helping the security community build better defenses against malware-type bots.

### Forced Browser Clicks

Forced browser clicks is a technique that some fraudsters use to turn a legitimate user's browser into a clickbot. This technique takes advantage of flaws in some implementations of AdSense-like programs that could be used by a malicious publisher to conduct click inflation. In AdSense-like programs, web publishers are provided with a "snippet" of HTML code that they place on their web pages in locations where they would like ads to appear. The HTML code often contains elements that render ads, and some implementations of the HTML code can be vulnerable to a forced browser click attack. For instance, if the HTML code simply contained an anchor element that makes up the ad (i.e., `<A HREF>`), a publisher could insert additional HTML code on its web page that would instruct the browser

to click on the anchor element without explicitly being requested to do so by the user.

To implement dynamic ad slots securely, the ad slot code can take advantage of the same-origin security feature [80] implemented in most browsers to prevent script from the publisher's parts of the web page from clicking on the ads. For instance, an HTML `IFRAME` tag accepts a SRC attribute whose value can be set to an URL owned by the ad network. Using the `IFRAME` construct, the browser will not allow script on other parts of the web page to access the contents of the `IFRAME` if that content was not downloaded from the same-origin as the `IFRAME`'s content. The origin is specified by the domain name, port, and protocol in the URL. Google's AdSense ad slots are implemented in this way to protect against fraudulent publishers, although not all ad networks are equally well protected.

Even when an ad network uses a construct such as the `IFRAME` to prevent other, untrusted parts of the web page from interacting with its ads, the ad network is still relying on the browser and its implementation of the same-origin security model to defend against publisher click inflation. If a widely deployed browser had an implementation vulnerability that allowed a publisher to circumvent the same-origin model, then the ad network may be vulnerable to publisher click inflation.

The forced browser clicks technique was first described publicly in a research paper on "Badvertisements" [140], and Chapter 6 of this book is based on that research paper. The interested reader is referred to that chapter for more details on forced browser clicks.

## 11.5 Countermeasures

This section describes representative countermeasures that an ad network might deploy to mitigate the click fraud risk to an online advertising business. State-of-the-art click fraud mitigation takes advantage of "defense in depth" [80]. In other words, many countermeasures and defenses are used simultaneously, so that the probability of a successful attack is reduced by each layer of countermeasures a fraudster must circumvent. We divide our discussion of click fraud countermeasures into methods that are targeted at prevention, at detection, and at containment.

Before proceeding with this discussion of click fraud countermeasures, we note that the goal of such countermeasures is to "raise the bar" for conducting a successful attack to the point where the expense and effort of an attack outweigh the potential reward (monetary or otherwise). As such, we do not claim that these

countermeasures are perfect or eliminate click fraud in any absolute sense. Rather, the goal is to greatly lower the risk of a successful attack for advertisers, publishers, and online advertising networks and to support a profitable system for all parties involved (except, of course, the fraudsters). It is also not sufficient to introduce only enough countermeasures to allow advertisers to profit from an online advertising ROI that is better than can be achieved offline; minimizing click fraud further allows an ad network to benefit from a significantly higher CPC and stronger profitability for itself, publishers, and advertisers.

Finally, note that all of the countermeasures described in the following subsections may not necessarily be directly targeted at identifying fraudulent clicks. Some, in fact, focus instead on identifying anomalous expected or aggregate user behavior, browser behavior, or other inconsistencies that may be indicative of click fraud. In some cases, clicks associated with such anomalies are marked as invalid whether or not they can be directly linked to fraud.

### 11.5.1 Prevention

An old adage says, "An ounce of prevention is worth a pound of cure." While it might, indeed, be impossible to prevent someone from manually clicking on a single ad, it is possible to take steps that can prevent larger-scale, more systematic click fraud from occurring.

In the case of click fraud resulting from publisher click inflation, such an attack can be prevented by exercising care with regard to which publishers might be allowed to participate in an AdSense-like syndicated ads program. In addition, publishers that are terminated for low-quality or fraudulent ad clicks sometimes try to re-apply to be included in such programs. As such, it is important for an ad network to uniquely identify publishers and to prevent those that have been previously terminated from rejoining. Many such publishers attempt to sign up for participation with different, invalid, or fraudulent names, addresses, and/or telephone numbers in an attempt to appear distinct from their previous, blacklisted identity.

Ad networks may look at many different characteristics of HTTP query, click, and conversion traffic that might potentially indicate fraudulent click activity. If fraudsters are aware of which characteristics ad networks look for, they may be able to artificially construct HTTP request patterns that do not exhibit any of these anomalous characteristics. While an ad network can be quite open about which types of countermeasures and processes it has in place (see [427] for an example), it is extremely important for ad networks to maintain the confidentiality of those characteristics, or signals, that are considered indicative of fraudulent click

behavior. Companies that run ad networks must employ the best enterprise security practices available to protect these signals, just as a company would protect trade secrets against both insider and external attacks. Not only are such signals useful in identifying potential click fraud attacks, but they can also be useful for marking low-value clicks as invalid, thereby providing advertisers with a better ROI and giving the ad network a competitive advantage.

A more concrete preventive technique involves setting up a trust boundary between a publisher's web page content and the ad slots on the publisher's page, as discussed in Section 11.4.2 using an HTML `IFRAME`. Another example of a concrete, preventive technique would be for an ad network to set a maximum CPC, which can prevent a fraudster from making significant amounts of money with just a few clicks. Fraudsters who then want to attempt to make significant amounts of money would be forced to produce enough clicks to result in statistically significant signals. Of course, such preventive techniques are not perfect, so it is important to complement them with detection and containment countermeasures.

### 11.5.2 Detection

The purpose of click fraud detection is to mark clicks as invalid after they have occurred, given that much of the time they cannot be effectively prevented altogether. Clicks may be marked as invalid both online and offline. When invalid clicks are detected *online*, advertisers are not billed for them; when they are detected *offline*, advertisers are credited for the clicks. Online detection is preferred, as an advertiser's daily budget is not charged for invalid clicks, and the advertiser does not lose the opportunity to have its ads continue to participate in ad auctions during that day.

Online detection is not always possible, however. When invalid clicks are detected offline, advertisers are credited for the clicks at a later time. Nevertheless, the advertiser may still incur the opportunity cost of not having its ads compete in the ad auction for that day if the advertiser is budget-limited with respect to the amount of click fraud. At the same time, some types of click fraud can be more easily detected offline, such as an attack consisting of just a few clicks per day that requires many days of traffic in aggregate to identify the attack. Such attacks are more difficult to identify in an online fashion when they first start occurring.

Click fraud detection methods usually seek to identify anomalies in streams of click data. Different types of anomalies can be caught at different times in the processing of clicks. Some anomalies may be apparent in a single click, and such a click can be marked invalid by an online filter. Other types of anomalies may become apparent only in looking at an aggregate set of clicks over some time

period. The decision as to whether a particular click fraud detection filter should be implemented as an online or offline measure is often guided by exactly which anomalies need to be identified and which time period needs to be analyzed to identify a particular anomaly.

After filters have been applied and invalid clicks have been identified, additional actions may be required. For instance, an AdSense publisher with a high percentage of invalid clicks, or even just one that received potentially anomalous traffic that may or may not be invalid, may be inspected by an ad traffic quality investigator. In certain cases, a relationship with a publisher may be automatically terminated if the publisher's web site attracts unusual numbers of invalid clicks. Ad traffic quality investigators also need to be mindful of the potential for sabotage, such as may occur when a malicious publisher attempts to generate a large number of invalid clicks on a competing publisher's web site to make it seem as if the competitor is attempting a click inflation attack.

Anomaly-based detection can sometimes suffer from data limitations. If too little data is available for clicks associated with a particular advertiser or publisher, it may be difficult or even impossible to make a determination as to whether some clicks should be marked as invalid. If there are too few clicks, the damage from a click fraud attack may be generally low, so long as the CPCs involved in the attack are not too high. Such an attack can still be identified by analyzing longer time periods or clustering clicks with similar properties. In the case in which the clicks are for high-CPC ads, the traffic can be scrutinized even more intensely.

In other cases, if too much click data is associated with an advertiser or publisher, it may be difficult to identify potentially fraudulent clicks, which could get "lost in the sea" of valid clicks. In such cases, the amount of monetary damage from click fraud may be relatively low compared to the aggregate number of clicks. Nevertheless, identifying chunks of click data associated with advertisers and publishers that are "just the right size" is an important aspect of the problem. In particular, click data can be cut into finer chunks based on various properties to reduce the possibility of fraudulent clicks getting lost in the sea.

In addition to "passive" detection by identifying anomalies in streams of click data, an ad network can conduct "active" detection by modifying the interaction with the web browser and/or the user to generate additional data that can be used to ascertain the validity of a click or a set of clicks. For example, an ad network may decide to add extra JavaScript variables in ad slot code that runs computations on clients. Upon receiving ad clicks, the results of such computations are sent back to the ad network, and the ad network can check whether the expected results fit an expected distribution. While it may be apparent to a fraudster that such computations are taking place, the expected result distribution may not

be quite as obvious. For example, the ad network might modify the interaction with the user agent by requiring it to send back some computation results, which then serve as a signal of the validity of a set of clicks by legitimate users who are using a web browser (as opposed to, say, a custom-programmed bot that does not support JavaScript). While we use JavaScript-based computations as an example of an active detection technique, we note that we have not adequately covered many technical details for using such a technique to serve as an effective click fraud detection signal.

### 11.5.3 Containment

Top-tier ad networks employ hundreds or even thousands of passive and active signals to help detect click fraud. Nevertheless, it is typically difficult to ascertain the validity of a click in any absolute sense, even with a plethora of such signals. Prudent ad networks, therefore, may take the stance that some attempted click fraud may not be directly detected. It is important to contain or manage the potential monetary impact of such clicks to advertisers. In this subsection, we briefly describe two representative click fraud containment measures: smart pricing and manual reviews.

Given the difficulty in ascertaining whether any given click is truly fraudulent, some ad networks charge an advertiser only a fraction of the CPC for certain ad clicks. Google's version of this feature is called *smart pricing*. Based on various factors that can be indicative of advertisers' ROI, such as CTR and average CPC, the overall quality of click traffic can be assessed and captured by a smart pricing multiplier.

A smart pricing multiplier can help an ad network contain undetected click fraud attacks. Even though it may be challenging to determine whether a specific click is fraudulent, aggregate characteristics of click traffic may reveal that "something is fishy"; this "fishiness" is captured by a smart pricing multiplier, also called a click cost multiplier (CCM).

The benefits of smart pricing go well beyond containing the effect of any undetected click fraud. For example, a smart pricing multiplier may take into account the effect of aggressive placement of ads on web pages in which the ads are the most prominent feature on the web page. Even though CTRs may be higher for such ads, conversions might be relatively lower, and a smart pricing multiplier can protect advertisers from being charged the full CPC for clicks that are less likely to convert. In addition, a smart pricing multiplier can be used to contain poor ad targeting or other forms of poor content quality. Finally, in contrast to techniques we have discussed thus far that attempt to make a binary decision about the quality of a click, smart pricing allows click quality to be scored on a continuum.

*Manual reviews* of click traffic can be an important part of an ad network's containment strategy as well. If some fraudulent clicks evade existing automated detection mechanisms, they may eventually be caught by highly trained engineers and operations personnel who, over time, gain a keen sense of "smell" and intuition. In some cases, manual review requests (generated either by internal processes or by advertisers) could potentially result in identification of a new type of click fraud attack. In such cases, engineering and operations personnel may be able to generalize the new pattern of attack and develop automated countermeasures to detect similar attacks in the future.

Feedback from advertisers can also be valuable, because such feedback can sometimes uncover undetected click fraud due to "holes" in detection systems. As such, feedback from particular advertisers can be used to provide better ROI for all advertisers and benefit the ad network. However, in practice, most inquiries by individual advertisers do not uncover undetected click fraud, but rather highlight issues relating to non-optimal ad campaign management or advertiser site design. In a few cases, advertisers correctly identify fraudulent clicks that have already been detected as invalid and for which the advertiser was not charged. In even fewer cases, advertisers actually help uncover undetected click fraud.

To provide some quantitative data, Google reports that less than 10% of all clicks consistently are detected as "invalid" [285]. These clicks include both fraudulent clicks and redundant or inadvertent clicks, and advertisers are not charged for these invalid clicks. All of these clicks are *proactively* detected as invalid by Google. In contrast, all advertiser inquiries to Google lead to less than 0.02% additional clicks being reactively classified as invalid and credited back to advertisers.

## 11.6 Click Fraud Auditing

Click fraud auditing is the process of examining the set of click-throughs delivered to the advertiser's site to determine which of the clicks, if any, may have been fraudulent and/or issued with malicious intent. While an ad network may examine such click-throughs as part of its click fraud detection process, a company that serves as a trusted third party (separate and distinct from the ad network and the advertiser) can do such an examination as well.

An analogy can be drawn between click fraud auditing and auditing of corporate finances. Once a company prepares its financial statements, including its cash flow statements, profit and loss statements, and balance sheet, an auditing firm can verify these statements by analyzing the data and receipts used to

construct the statements. The auditor can, in many cases, request to see additional data. Ultimately, the company and the auditor work together to resolve any discrepancies that are found to ensure that the company is correctly reporting its financial health to the market.

In the case of a click fraud audit, an advertiser is interested in determining whether an ad network is correctly reporting the number of valid clicks for which it is charging. The advertiser can hire a third-party organization to serve as an auditor. The ad network and the auditor could work together to resolve discrepancies between the number of valid and invalid clicks indicated by the ad network's click logs and the advertiser's web logs. Click fraud audit reports, when constructed correctly, have the potential to do the following:

- Provide value to advertisers by giving them confidence that they are "getting what they are paying for"
- Allow the click fraud auditor to serve as a trusted third party that can help arbitrate discrepancies
- Help ad networks identify and fix limitations in their click fraud detection and containment systems

When done incorrectly, click fraud audit reports may provide misleading information to advertisers. The erroneous report may negatively impact the advertiser's business by prompting it to alter an advertising campaign that would otherwise result in cost-effective conversions.

The process of click fraud auditing involves several challenges, including maintaining the confidentiality of signals, overcoming data limitations, and maintaining user privacy.

### 11.6.1 Confidentiality of Signals

As part of a click fraud audit, an ad network cannot disclose information about exactly which clicks it is has charged for and which it has marked invalid—that would leak information about its signals.[2] After all, a malicious advertiser could experiment with issuing a single click or a small number of clicks on its own ads during each billing period to determine how many of those clicks are deemed valid. Each set of clicks that the malicious advertiser issues could be targeted at testing a hypothesis that the advertiser might have about a specific, surmised signal that the

2. For transparency, Google does report to advertisers the number of invalid clicks that it discards on a daily basis.

ad network might be employing. If an advertiser repeats such experiments many times, it may effectively reverse-engineer an ad network's signals. It could then use the information to conduct competitor click fraud, sell the information, or issue a click inflation attack on a site for which it is also the publisher. For all these reasons, an ad network cannot disclose exactly which clicks it marks as valid or invalid so that the information cannot be used to create a "playbook" for attackers about how to circumvent signals.

### 11.6.2 Data Limitations

While click fraud auditing companies are typically given information about the set of clicks that arrive at the advertiser's web site, they may be at a disadvantage compared to ad networks with regard to being able to assess which clicks should and should not be considered valid. Because ad networks cannot disclose information about exactly which clicks they do and do not charge for, a click fraud auditing company is left to take a guess about which clicks the ad network may or may not have considered valid.

A click fraud auditing company may attempt to make its own assessment about which clicks should and should not be considered valid by looking for anomalies. For instance, if a click is issued on the same ad by the same IP in an advertiser's web log multiple times, the click may look anomalous to a click fraud auditing company if the only information it has is the advertiser's web log. At the same time, an ad network has information on clicks from extremely large numbers of advertisers, and a click that may look anomalous in the small stream of data that a click fraud auditor has from the advertiser may look completely normal in the ocean of data that an ad network has from, say, hundreds of thousands of advertisers. For instance, the multiple clicks on the same ad from the same IP address in the previous example may be completely valid if that IP is an HTTP proxy for a large ISP such as America Online or a mobile carrier. A large ad network benefits from seeing click data from across the Internet, and it may be able to do more effective and accurate anomaly detection even compared to a click fraud auditor that has several thousand advertisers as clients.

In addition to being able to use a much larger amount of click stream data in which to look for anomalies, ad networks have web logs from search requests that, when coupled with web logs containing ad clicks, can effectively and accurately help identify signs of click fraud. All ad impression URLs are generated in response to a query; in some cases, cookies are served to users who receive these queries. However, neither the queries used to generate ad impression URLs nor the cookies will appear in the advertiser's web logs and, therefore, will not be available

to a click fraud auditor. Such query logs, which are approximately two orders of magnitude greater in size than click logs, contain a wealth of information that can be mined for the purpose of identifying fraudulent, anomalous clicks that can be marked as invalid by an ad network.

Furthermore, in analyzing the click stream data that a click fraud auditor might have from an advertiser's web log, the auditor may not be able to compensate for some effects on its own. For instance, after clicking on an ad impression URL, the user is redirected to the advertiser's site, and the HTTP request corresponding to the advertiser's "destination URL" will appear in the advertiser's web logs. If the user continues browsing the advertiser's web site by clicking links to other parts of the advertiser's site, and then hits the browser's back button one or more times, another HTTP request may be made for the advertiser's destination URL to reload the page. Such HTTP requests may look like repetitive ad clicks in the advertiser's web logs and may look anomalous to a click fraud auditor. An ad network charges only for clicks—not for subsequent page reloads. The advertiser will be charged only for the click preceding the first HTTP request for the advertiser's destination URL. In fact, the page reloads do not go through the ad network at all and involve only the user's computer and the advertiser's site. However, an auditor may not have any way of knowing which requests in the advertiser's web log correspond to actual ad clicks and which are due to page reload requests. The subsequent HTTP requests may be misinterpreted as a fraudulent click by a click fraud auditor, when in reality it was caused by the user navigating back to the destination URL after exploring other parts of the advertiser's site. Such clicks are called "fictitious clicks" in click fraud audit reports.

To help remedy the problem of fictitious clicks, Google provides advertisers with a feature called "auto-tagging." The auto-tagging feature appends a unique ID to the destination URL for each distinct click that has the potential of being charged (i.e., both valid and invalid clicks) to the advertiser's account. The unique ID allows click fraud auditing and analysis firms to distinguish unique ad clicks from page reloads. Without this feature, it would be impossible to distinguish page reloads from new, distinct clicks on ads. Given how commonly users take advantage of such navigation features of web browsers, auto-tagging is essential for proper click fraud auditing. At the time of writing for this chapter, Google was the only ad network providing this feature. More details about fictitious clicks and auto-tagging are provided in [415].

The various limitations discussed here increase the chances of inaccurate analysis and make it more challenging to do click fraud detection based on advertiser-side data. For this reason, advertisers should use care in adjusting their ad campaigns based on such analysis. Decisions made based on inaccurate

analysis can adversely affect sales and can cause advertisers to manage campaigns in a suboptimal manner.

As an example, consider an advertiser of leather goods that manages ad campaigns for shoes and handbags in which the advertiser uses two ad creatives, one for shoes and one for handbags, each with a separate destination URL. The advertiser's web logs may indicate several page views for the shoes destination URL, which could be due to reloads caused by users who may have done quite a bit of navigation through the advertiser's site after clicking on the shoes ad. The web logs may not indicate as many page views for the handbags destination URL. An inaccurate analysis of these web logs might tell the advertiser that there is a high level of click fraud occurring for the shoes ads. In reality, the page views corresponding to the advertiser's destination URL may be indicative of *more* user interest in shoes due to users conducting more research about shoes on the advertiser's web site. As a result, it may be worthwhile for the advertiser to invest more in its shoes campaign instead of its handbags campaign in the future. However, if the advertiser invests less in the shoes campaign based on inaccurate analysis, it is unclear what the opportunity cost might be: The advertiser might end up losing potential shoe sales if it makes a decision based on inaccurate analysis. Furthermore, the missed opportunity on shoe sales could be far larger than any money lost on potentially undetected click fraud. In this scenario, the advertiser is far better served by studying its dollars per conversion rate for both the shoes and the handbags campaigns.

It is important for advertisers to closely monitor ROI, and adjust ad campaigns appropriately based on this data. Undetected click fraud can manifest itself as lower ROI than expected (based, say, on past performance). At the same time, many other factors, such as non-optimal keyword or bidding choices, or a competitor having better sale prices, might also negatively affect ROI. Hence, while undetected click fraud will lower ROI, lower ROI does not necessarily imply that undetected click fraud is occurring.

### 11.6.3 Privacy

One might suggest that if ad networks have more data than click fraud auditors, then perhaps ad networks should share the data with auditors to help them verify the validity of clicks. Unfortunately, to protect the privacy of its users, an ad network cannot share the large amount of data that would be required to allow for such verification.

In addition to considering the number of valid and invalid clicks, it may be useful for click fraud auditing companies to consider auditing metrics such as the

| Name and Cite | Application/Definition | Causes of Action | Penalties |
|---|---|---|---|
| **State Laws** | | | |
| | | detection or prevention of unauthorized or fraudulent use or other illegal activities in connection with a network, service, or computer software, including scanning for and removing software prescribed by law. See, e.g., Arizona Revised Statutes §44-7302(C).<br><br>Some states include additional provisions. For example, Arkansas has specifically provided in its spyware law that "[n]o person shall engage in phishing," and also declared that "[a]ny provision of a consumer contract that permits an intentionally deceptive practice prohibited under this section is not enforceable." Arkansas Statutes Annotated §§4-111-103(d), (f). | |
| **Anti-Spyware Laws II** (Alaska Statutes §45.45.792; Utah Code Annotated §§13-40-101 to 201) | | Alaska and Utah prohibit "deceptive acts or practices ... using spyware," but define those narrowly to include only:<br><br>Causing a pop-up advertisement to be shown on the computer screen of a user by means of a spyware program, knowing that the pop-up advertisement is triggered by a user accessing a specific trademark or web site, and the advertisement is purchased or acquired by someone other than the mark owner, a licensee, an authorized agent or user, or a person advertising the lawful sale, lease, or transfer of products bearing the mark through a secondary marketplace for the sale of goods or services.<br><br>Purchasing advertising that violates the restriction on pop-up advertising if the purchaser of the advertising receives notice of the violation from the mark owner and fails to stop the violation. See, e.g., Alaska Statutes §45.45.792(a). | |

**Table 14.1:** Overview of laws relating to surreptitious code. (*Continued*)

publishers will receive a smaller share of ad revenues for their valid clicks. These publishers will choose the ad network that offers the best value for their legitimate clicks. Often, ad networks are also one of the largest publishers on the network themselves. For instance, an ad network may run a keyword search engine and display ads next to search results. Click inflation in other parts of the network will reduce the bid price that it would receive for clicks on their own properties.

In a competitive environment, ad networks face pressure to reduce both competitor clicks and click inflation. By reducing click fraud, ad networks will improve the returns of advertisers and publishers, as well as their own returns. More efficiently delivering relevant ads to legitimate users will benefit all parties in the system–except the fraudsters.

## Conclusion

This chapter has provided a summary of the current state of online advertising fraud, including representative forms of attack and representative countermeasures. We discussed some of the challenges involved in click fraud auditing, which, when done correctly, can even provide advertisers that receive high ROI further confidence in online advertising. In addition, we explored the economics of click fraud and the incentives that search engines have to catch as many fraudulent clicks as possible to maximize advertiser ROI.

There is much art and science still being developed surrounding various aspects of mitigating online advertising fraud, because the online advertising market is in a state of expansion while working to support the needs of advertisers and online commerce providers. Successful fraud management will provide competitive advantage to ad networks, and help enable them to provide the highest ROI possible to advertisers.

## Acknowledgments

We thank the editors, Markus Jakobsson and Zulfikar Ramzan, for the opportunity to contribute this chapter. The authors are grateful to Tom Dillon, Thomas Duebendorfer, Carl Evankovich, Daniel Fogaras, Tri Le, and Razvan Surdulescu for providing feedback that helped improve the quality of this chapter.