# EXHIBIT 20

Case 1:22-cv-00585-RP Document 50-2 Filed 07/06/23 Page 1 of 26

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| NOBOTS LLC,<br><br>Plaintiff,<br>v.<br><br>GOOGLE, LLC,<br><br>Defendant. | Case No. 1:22-cv-00585-RP<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF DAVID MARTIN**

I, David Martin, hereby declare as follows:

1. I have been engaged by Nobots LLC ("Nobots") as a technical expert in this case. I am being paid my customary rate of $600 per hour. I am also being reimbursed for reasonable and customary expenses. My compensation is not dependent in any way on the results of the lawsuit or the substance of my testimony.

2. I have over 40 years of experience in the field of computer software, including specific experience as a software developer, designer, professor, and expert consultant. As a professor, I taught courses on a variety of topics in computer science, including computer security. As a software developer, I am experienced with various programming languages, including C, C++, Java, and JavaScript. My education, work history, and a summary of prior testimony are included in my resume, which is attached to this declaration as Exhibit 1.

3. I have reviewed U.S. Patent No. 9,595,008 (the "'008 Patent"), U.S. Patent No. 10,423,885 (the "'885 Patent") (collectively, the "Asserted Patents") and the file histories of the Asserted Patents. Because of my education and experience summarized above, I am readily familiar with the terms and concepts disclosed in the patents and recited in the claims.

4. I have also reviewed the parties' proposed claim constructions, the extrinsic evidence each party disclosed, as well as the declaration of Google's expert, Dr. Alan T. Sherman.

5. I understand that disputes have arisen between the parties regarding what one of ordinary skill in the art at the time of invention would understand certain words and phrases of the Asserted Patents to mean. I set forth below my understanding as to what one of ordinary skill would understand each of these words and phrases to mean.

6. I am not an attorney or a patent attorney and offer no opinions on the law. I have, however, been informed by counsel regarding various legal standards that may apply to this case, and I have applied those standards where necessary in arriving at my conclusions.

7. I have been informed that, to determine the meaning of claims, courts consider the intrinsic evidence, which includes the patent's claims, specification, prosecution history, material incorporated by reference in the patent, and prior art cited in the patent or its prosecution history. Courts give claim terms their ordinary and accustomed meaning as understood by a person of ordinary skill in the art at the time of the invention in the context of the entire patent. A patentee may also define his or her own terms or disclaim claim scope. The intrinsic record may also resolve ambiguous claim terms where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone. However, particular embodiments and examples appearing in the specification generally will not be read into the claims. A term's context in the asserted claims can also be helpful. Differences among claim terms can also assist in understanding a term's meaning. I further understand that extrinsic evidence can sometimes be useful in determining the meaning of claim terms.

8. I understand patents are to be interpreted from the perspective of a person of ordinary skill in the art as of the priority date of the patent, which I understand Nobots asserts is February 17, 2007.

9. I understand that Dr. Sherman has opined that a person of ordinary skill in the art would have had a bachelor's degree in computer science or a related field plus two years' academic and/or industry experience in computer security, though more education could substitute for experience and vice versa. Dkt. 46-1, at ¶ 34. For purposes of the claim construction opinions set forth, I have applied the same understanding of a person of ordinary skill in the art as Dr. Sherman has in his testimony.

**A. "Active Model Data"**

10. I understand that the parties dispute the meaning of "active model data" as used in Claims 2, 3, and 10 of the '008 Patent and Claim 14 of the '885 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "active model data" | Plain and ordinary meaning with the explanation that "active model data includes, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics." | "data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., |

| | | |
|---|---|---|
| | | and/or input response to sound), and similar metrics.” |

11. A person of ordinary skill in the art would understand that the term “active model data” has a plain and ordinary meaning—referring to model data corresponding directly to user actions. There is nothing in the specification or prosecution history that indicates any intent to redefine that term to mean something different than this plain and ordinary meaning. Rather, in the description of the specification, the patentee provided some examples of “active model data” that are consistent with this plain and ordinary meaning, including “without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics.” ’008 Patent at 2:60-3:5. These examples provide further clarity and guidance to a person of ordinary skill in the art.

12. A person of ordinary skill in the art would not understand the description of “active model data” provided in the specification to be limiting. The claims themselves do not contain any language indicating an intent to limit the definition of this term. To the contrary, Claim 3 of the ’008 Patent, for example, says that “active model data comprises pointing device vector movements and/or cadence; key stroke combinations and/or cadence; and/or time differentials between a display element and a response.” ’008 Patent at 5:55-58. A person of ordinary skill in the art would understand the word “comprises” to mean “including, but not limited to.” Use of “comprises” would therefore indicate to a person of ordinary skill in the art that “active model data” is not limited to those specified types of such data.

13. Likewise, the specification uses inclusive language. The specification's description of "active model data" is, in full:

> Active model data comprises data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, pointing device vector movements and/or cadence, key stroke combinations and/or cadence, time differentials between stimulus (e.g., display of dialog box, radio button, form field, etc., and/or generation of sound) and user response (e.g., input into dialog box, selection of radio button, completion of form field, new page display request rates, etc., and/or input response to sound), and similar metrics. Generally, such data must be monitored and stored 210, 220 by a program operative on the computing device, which makes the data available to another program, preferably on a server 320, or actively transmits such data to a server.

'008 Patent at 2:60-3:9. The use of "comprises" and "includes, without limitation" would indicate to a person of ordinary skill in the art that an exhaustive definition of "active model data" has not been provided. If that were the patentee's intent, close-ended language, like "is," "consists of," or "means," would have been used instead of "comprises."

14. I also understand that Google is arguing that "active model data" must be data "not normally stored (logged) or transmitted to a remote location." While this language appears in the description of "active model data" provided as guidance in the specification, I disagree that someone of ordinary skill in the art would understand the term "active model data" to include that limitation.

15. First, the full sentence in the specification, of which Google only quotes part, says: "Active model data *comprises* data acquired from a computing device user's interactions therewith and within the computing environment where such data is not normally stored (logged) or transmitted to a remote location." '008 Patent at 2:60-64 (emphasis added). Based on the use of "comprises" here, rather than "consists of" or other close-ended language, one of ordinary skill in

Case 1:21-cv-00585-RP Document 100-1 Filed 07/23/22 Page 6 of 26

the art would not understand "active model data" to be limited to solely data not normally stored or transmitted to a remote location.

16. Second, it appears other portions of the specification also conflict with Google's limitation. In describing "acquired data," the specification notes that such data, which "has/have been recorded and/or transmitted to a remote location, such as a server," is "a type of active data." '008 Patent at 3:25-32. If such data constitutes a type of active data, it would not make sense for "active model data" to be limited to data not normally stored or transmitted to a remote location, as Google suggests. Rather, this passage indicates that a system having acquired data may have active model data that is normally recorded and/or transmitted to a remote location.

17. Nor is the term "active model data" indefinite absent Google's limitation. As I mentioned previously, the specification provides ample examples of types of "active model data." These examples provide reference points and more than enough guidance for a person of ordinary skill in the art to understand the scope of the claims using the term, even without the limitation Google seeks to insert.

**B. "passive model data"**

18. I understand that the parties dispute the meaning of "passive model data" as used in Claims 4 and 5 of the '008 Patent and Claim 14 of the '885 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "passive model data" | Plain and ordinary meaning with the explanation that "passive model data includes, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding | "data available from a computing device user's interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, browser cookies, |

| | | |
|---|---|---|
| | abusers (including originating IP addresses and physical locations), etc.” | destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc.” |

19. A person of ordinary skill in the art would understand that the term “passive model data” has a plain and ordinary meaning—referring to model data that does not immediately describe user interface interactions but rather is data that is observable by remote computers due to user interactions or model data that is used to analyze such observable data. There is nothing in the specification or prosecution history that indicates any intent to redefine the term to mean something different than this plain and ordinary meaning. Rather, in the description of the specification, the patentee provided some examples of “passive model data,” such as “browser cookies, destination IP histories, originating IP address originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc.” ’008 Patent at 3:9-3:17. These examples provide further clarity and guidance to a person of ordinary skill in the art.

20. A person of ordinary skill in the art would not understand the description of “passive model data” provided in the specification to be limiting. The claims themselves do not contain any language indicating an intent to limit the definition of this term. To the contrary, Claim 5 of the ’008 Patent, for example, says that “passive model data comprises browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, and/or third party data regarding abusers comprising originating IP addresses and physical locations.” ’008 Patent at 6:1-6:6. As I explained above, a person of ordinary skill in the art would understand the word “comprises” to mean “including, but not limited

to.” Use of “comprises” would therefore indicate to a person of ordinary skill in the art that “passive model data” is not limited to only those specified types of such data.

21. Likewise, the specification uses inclusive language. The specification’s description of “passive model data” is, in full:

> Passive model data comprises data available from a computing device user’s interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location. Such model data includes, without limitation, browser cookies, destination IP histories, originating IP address, originating IP address traffic data, originating IP address physical location, third party data regarding abusers (including originating IP addresses and physical locations), etc.

’008 Patent at 3:9-17. The use of “comprises” and “includes, without limitation” would clearly indicate to a person of ordinary skill in the art that an exhaustive definition of “passive model data” has not been provided. If that were the patentee’s intent, close-ended language, like “is,” “consists of,” or “means,” would have been used instead of “comprises.”

22. I also understand that Google is arguing that “passive model data” must be data “normally stored (logged) or transmitted to a remote location.” While this language appears in the description of “passive model data” provided as guidance in the specification, I disagree that someone of ordinary skill in the art would understand the term “passive model data” to include that limitation.

23. The full sentence, of which Google only quotes part, says: “Passive model data *comprises* data available from a computing device user’s interactions therewith and within the computing environment where such data is normally stored (logged) or transmitted to a remote location.” ’008 Patent at 3:9-12 (emphasis added). Based on the use of “comprises” here, one of ordinary skill in the art would not understand “passive model data” to be limited to solely data normally stored or transmitted to a remote location. As an example, while “originating IP address

physical location" may be stored/logged or transmitted to a remote location, the Internet and web protocols do not normally do so. Rather, one interested in estimating the physical location of an IP address must use separate "geolocation" techniques along with additional techniques to store, log, or transmit this information. Thus, the "originating IP address physical location" given as an example of "passive model data" demonstrates that the term is not limited soley to data normally stored (logged) or transmitted to a remote location. '008 Patent at 3:9-17.

24. Nor is the term "passive model data" indefinite absent Google's limitation. As I mentioned previously, the specification provides ample examples of types of "passive model data." These examples provide reference points and more than enough guidance for a person of ordinary skill in the art to understand the scope of the claims using the term, even without the limitation Google seeks to insert.

### C. "repeating a)-d) for a single user instance" and "repeating a)-d) for a single user instance until a predetermined value for d) is reached"

25. I understand that there is a dispute between the parties regarding the meaning of the phrase "repeating a)-d) for a single user instance" used in Claims 16 and 17 of the '008 Patent and "repeating a)-d) for a single user instance until a predetermined value for d) is reached" as used in Claim 17 of the '008 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "repeating a)-d) for a single user instance" | "repeating b)-e) for a single user instance" | Indefinite |
| "repeating a)-d) for a single user instance until a predetermined value for d) is reached" | "repeating b)-e) for a single user instance until a predetermined value for e) is reached" | Indefinite |

26. A person of ordinary skill in the art would readily understand from the face of the '008 Patent and a simple review of the file history that there is a typographical error in these claims. As is readily apparent, there is a mismatch between the letters for the steps in Claims 16 and 17, and the steps of Claim 1. For instance, "value for d)" clearly should refer to the value generated in step e) of Claim 1. This issue appears in a number of dependent claims in the '008 Patent, including Claims 6, 11, and 15-18.

27. As Google and Dr. Sherman explain, the prosecution history demonstrates that these errors result from an oversight while drafting. *See* Dkt. 46, at 7-8; Dkt. 46-1, at 21-24. As originally drafted, Claim 1 only had four steps. Step a) was "presenting issued data to the client computing device," b) was "monitoring at least some data generated at the client computing device in response to the issued data; c) was "comparing the monitored data to model data relating to human interaction with or in response to the issued data," and d) was "generating a value that represents a likelihood that the monitored data results from human interaction with or in response to the issued data." Dkt. 46-6, at NOBOTS_00000043-45. That claim was subsequently amended to insert a new step a), and each of the original steps was adjusted forward by one letter in Claim 1. Added step a) was "a single user of a client computing device requesting data from a server," former step a) became step "b) the server presenting data issued by the server to the client computing device," former step b) became step "c) monitoring at least some data generated by the user at the client computing device in response to the issued data," former step c) became step "d) comparing the monitored data to model data relating to human interaction with or in response to the issued data," and former step d) became step "e) generating a value that represents a confidence level that the monitored data is a result of human interaction on the client computing device rather than that of an autonomic user with or in response to the issued data." *Id.* at NOBOTS_00000090.

But "[w]hile original steps a)-d) in claim 1 were re-lettered as steps b)-e), [the patentee] did not make corresponding amendments to the dependent claims." Dkt. 46, at 8.

28. I understand that both parties agree that the only reasonable correction for "value for d)" in Claim 17 is to replace "d)" with "e)," making that phrase "value for e)." *See* Dkt. 46, at 8. I agree that this is the only reasonable correction for this term for two reasons. First, step e) of Claim 1 involves generating a value, rather than step d).

29. Second, the prosecution history makes apparent that the patentee intended for the steps of the dependent claims to align with steps a)-d) of Claim 1 as originally filed. As mentioned above, these steps were all adjusted forward by one letter in Claim 1 following the addition of a new step a) to Claim 1 and became steps b)-e). The prosecution history further makes evident that the patentee inadvertently failed to update the lettering for the steps in the dependent claims after adding a new step a) to Claim 1 during prosecution. Thus, a person of ordinary skill in the art would clearly understand that steps a)-d) of the dependent claims should actually refer to steps b)-e) of Claim 1.

30. My understanding is that the parties also agree that the lettering in Claims 6, 11, and 15 should be corrected as follows: in Claim 6, "b)" should be "c)," and "c)" should be "d)"; in Claim 11 "b)" should be "c)"; in Claim 15, "value of d)" should be "value of e)." I agree that these corrections are the only reasonable ones. In addition to the prosecution history, the claim language reinforces that the patentee intended to refer to the succeeding letters. For example, Claim 6 reads "wherein b) comprises enabling the client computing device to record input and making such recorded input available to a computing device for comparison according to c)," but it is step c) in Claim 1 that involves monitoring data and step d) that involves comparing the data. '008 Patent at 5:43-48; 6:7-10. In addition, Claim 11 reads "at least one monitoring program is operatively

installed . . . to perform b)," but monitoring takes place in step c). *Id.* at 6:22-24. Furthermore, Claim 15 refers to a "value for d)," and it is step e) that involves generating a value. *Id.* at 6:33-35.

31. I understand that Google and Dr. Sherman contend that there are two equally reasonable corrections that could be made to "repeating a)-d)"—either replacing this phrase with "repeating b)-e)" or leaving it as "repeating a)-d)." *See* Dkt. 46, at 8-9; Dkt. 46-1 ¶ 68. I disagree with this conclusion. The prosecution history on its own leaves no doubt that this phrase should be "repeating b)-e)" for the reason I gave above.

32. Additionally, it does not make sense to, on the one hand, correct "value of d)" to be "value of e)" in Claim 17, as well as the other corrections discussed in paragraph 28, *supra*, in recognition of the clear nature of the mistake during prosecution, but, on the other hand, not make a corresponding amendment to "repeating a)-d)." Accordingly, a person of ordinary skill in the art would understand based on the prosecution history that the steps in all of the dependent claims need to be shifted forward one letter. This interpretation is (i) consistent with the clear nature of the applicant's oversight during prosecution and (ii) universally makes the reading of the dependent claims naturally align with the steps of independent Claim 1. The fact that these claims require correction—and the same correction—would further make clear to a person of ordinary skill in the art that the patentee had intended to refer to "repeating b)-e)," not "a)-d)."

33. Furthermore, repeating step a) in Claims 16 and 17 would be illogical in light of other claim language. Both Claims 16 and 17 discussing repeating steps "for a single user instance." '008 Patent at 6:35-38. A "single user instance" refers to a discrete attempt to gain access to a protected resource, such as, for example, one web page on a website. *See generally id.* at 1:7-2:8. Step a) of Claim 1 is "a single user of a client computing device requesting data from a

server." *Id.* at 5:39-40. This step may be satisfied, for example, by the user making a request to a server for a web page. In response to this initial request of data from a server, the subsequent steps of Claim 1 assess a confidence level that an operator of a client computing device interacting with a server is a human being rather than an autonomic computer application. In other words, step a) describes the beginning of a new user instance. A person of ordinary skill in the art would not understand step a) to be repeatable for a single user instance. Therefore, replacing "a)-d)" with "b)-e)" in Claims 16 and 17 is the only reasonable correction.

**D. "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)"**

34. I understand that there is a dispute between the parties regarding the meaning of the phrase "repeating a)-c)" and "the second instance of the value of d)" used in Claim 18 of the '008 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "repeating a)-c) and comparing the first instance of the value of d) to the second instance of the value of d)" | "repeating b)-d) and comparing the first instance of the value of e) to the second instance of the value of e)" | Indefinite |

35. A person of ordinary skill in the art would readily understand from the face of the '008 Patent and a simple review of the file history that there is a typographical error in this claim. As is readily apparent, there is a mismatch between the letters for the steps in this claim, and the steps of Claim 1. For instance, "value for d)" clearly should refer to the value generated in step e) of Claim 1.

36. I understand that Google and Dr. Sherman agree that "value for d)" should be corrected to "value for e)" in both places that term appears in Claim 18. *See* Dkt. 46, at 10; Dkt.

46-1 ¶ 74. I understand that Google nevertheless contends that “second instance of the value of e)” is indefinite for lack of an antecedent basis and that “repeating a)-c)” is indefinite because there are two equally reasonable corrections to that phrase. *See* Dkt. 46, at 10-11. I disagree with both conclusions.

37. Although Claim 18 does not explicitly repeat generating a value, a person of ordinary skill in the art would understand that a second value is generated following the repetition of steps b)-d). First, the specification makes clear that “the comparison,” which takes place in step d), “yields a probability value.” ’008 Patent at 2:21-22. Moreover, the specification discusses an embodiment in which “an exact match” to “sample points of a dataset for comparison” “could then invoke a more intensive comparison with the same stored datasets, where again access can be denied when an exact or statistically sufficient match is found.” ’008 Patent at 5:5-12. This embodiment makes even more clear that repeating steps b)-d) would yield a second value. For all of these reasons, I do not believe that a person of ordinary skill in the art could not reasonably ascertain the scope of Claim 18 simply because step e) is not explicitly repeated. It is very apparent from the specification that a value is generated from the comparison that takes place in step d), and thus a person of ordinary skill in the art would understand what is being referred to as “the second instance of the value of d)” (and corrected to “value for e)”).

38. Nor does “repeating a)-c)” have two equally reasonable corrections. As I discussed above, the prosecution history would leave no doubt to a person of ordinary skill in the art reviewing the patent that “repeating a)-c)” should be “repeating b)-d)” because of the addition of new step a) in Claim 1 and failure to make corresponding amendments to the dependent claims. Moreover, that “value for d)” can only mean “value for e)” reinforces that the patentee intended “repeating a)-c)” to mean “repeating b)-d).”

### E. "prior to delivery of issued data"

39. I understand that there is a dispute between the parties regarding the meaning of the phrase "prior to delivery of issued data" used in Claim 19 of the '008 Patent and Claim 13 of the '885 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "prior to delivery of issued data" | Plain and ordinary meaning | "prior to delivery of at least some issued data" |

40. A person of ordinary skill in the art would understand that the phrase "prior to delivery of issued data" has its plain and ordinary meaning. It does not appear from the specification that the patentee intended to use that term in a manner distinct from its plain and ordinary meaning.

41. "Prior to delivery of issued data" does not have a special or technical meaning in the art either. A person of ordinary skill in the art would have the same understanding of this term as a layperson. As a result, it appears that construction would be unnecessary, because a juror would have no difficulty in interpreting this language in the same manner a person of ordinary skill in the art would.

### F. "biometric data"

42. I understand that there is a dispute between the parties regarding the meaning of the term "biometric data" used in Claims 1-12 of the '885 Patent. I understand that the parties' proposed constructions are as follows:

| Term | Nobots's Proposed Construction | Google's Proposed Construction |
|---|---|---|
| "biometric data" | Plain and ordinary meaning | "data based on biological characteristics, including characteristics of physical |

| | | |
|---|---|---|
| | | movement such as mouse movement or keystrokes” |

43. A person of ordinary skill in the art would understand that the term “biometric data” has its plain and ordinary meaning. It does not appear from the specification that the patentee intended to use that term in a manner distinct from its plain and ordinary meaning. Dr. Sherman agrees that the term “biometric data” in the ’885 Patent is consistent with the term’s ordinary and customary meaning. *See* Dkt. 46-1 ¶ 88.

44. Google and Dr. Sherman recognize that the patent does not provide any definition for the term “biometric data” in the specification. *See* Dkt. 46, at 15; Dkt. 46-1 ¶ 91. However, the specification does describe aspects of biometric data, such as that it may have a “time domain” and may be “unique.” ’885 Patent at 4:44-5:7. Thus, the specification provides sufficient guidance for a person of ordinary skill in the art interpreting the term in the context of the ’885 Patent’s claims.

45. The term “biometric data” does not have a special or technical meaning in the art either. A person of ordinary skill in the art would have the same understanding of this term as a layperson. As a result, it appears that construction would be unnecessary, because a juror would have no difficulty in interpreting this language in the same manner a person of ordinary skill in the art would.

46. That there is no special or technical meaning of this term in the art is further made clear from the extrinsic evidence that both parties have disclosed as supporting their claim constructions. A comparison between the technical dictionaries’ definition of the term “biometrics” and the general dictionaries’ definition of the term “biometrics” indicates that the two terms are defined the same for both a technical and lay audience. For example, “biometrics”

is defined in *McGraw-Hill Dictionary of Scientific and Technical Terms* as "[t]he use of statistics to analyze observations of biological phenomena." Meanwhile "biometry" is defined in *The Penguin Complete English Dictionary* as "the statistical analysis of biological observations and phenomena." These virtually identical definitions demonstrate that a layperson would have the same understanding of the term "biometric data" as used in the '885 Patent as would a person of ordinary skill in the art.

47. I also understand that Google is arguing that "biometric data" would not include cookie data. I disagree that someone of ordinary skill in the art would understand the term "biometric data" to exclude all "cookie data", particularly in light of the prosecution history.

48. Cookies are files of data that may be stored on a client computing device or browser. Cookies can contain many different types of data. For example, past browsing activity, including the amount of time a user spent browsing a particular site or webpage, can be stored in a cookie. Likewise, in the context of CAPTCHA, data regarding a user's past CAPTCHA challenges (such as, for instance, the user's results from solving the CAPTCHA challenge) can be stored in the form of a cookie.

49. Biometric data can be stored in the form of a cookie. For example, time differentials between stimulus and response within a user interface can easily be stored as simple numbers and labels within cookie data. The specification suggests storage of monitored data. One embodiment discusses using "a servlet/Java applet" to monitor and retain data. '008 Patent at 4:7-15. The data monitored by the servlet or Java applet may include biometric data, and such biometric data can be stored in the form of a cookie. In that case, a person of ordinary skill in the art would understand that the cookie containing biometric data also is biometric data.

50. The prosecution history further demonstrates that "biometric data," at least as intended by the patentee, can include cookie data. The provisional application discussed "a biometric logging function" into which a practitioner could input various data, including cookie data. Dkt. 46-5 at NOBOTS_00000010. The fact that this function was termed "a *biometric* logging function" makes very clear to a person of ordinary skill in the art that the data the function logged was, at least as considered by the patentee, biometric data. Therefore, the inclusion of cookie data as a source of input data for the biometric logging function would indicate to a person of ordinary skill in the art that cookie data can be a source of biometric data. Such a person would not understand the '008 Patent's disclosures to indicate that biometric data stops being biometric data merely when it is stored within a cookie.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: July 7, 2022

________________________
David Martin

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022, this document properly was served on counsel of record via electronic filing in accordance with the USDC, Western District of Texas Procedures for Electronic Filing.

/s/ *Komal S. Patel*

# EXHIBIT 1

**David Martin, Ph.D.**
3102 Hackberry St.
Bismarck, ND 58503

224 633 9802
dmartin@dmartin.us

May 3, 2022

# CURRICULUM VITAE

---

## A. Summary

I have been working in the computer software field for over 40 years, in the roles of developer, designer, professor, and expert consultant. I hold a Ph.D. in computer science and a B.S. in mathematics and computer science.

## B. Education and Academic Qualifications

### 1. Education

1999 Ph.D. Department of Computer Science, Boston University

1993 B.S. Iowa State University, *summa cum laude*
Major: Mathematics
Major: Computer Science
Minor: German

### 2. Faculty Experience

2002-2007 Assistant Professor, Department of Computer Science
University of Massachusetts Lowell
(On leave of absence during 2005-2006)

2001-2002 Research Assistant Professor, Department of Computer Science
Boston University

1998-2001 Assistant Professor, Department of Mathematics and Computer Science
University of Denver

### 3. Courses Taught

| | | |
|---|---|---|
| Computer Networking | Unix Software Tools | Advanced Unix Programming |
| Cryptography and Network Security | Introduction to Computer Science I (C++) | Introduction to Object Oriented Programming (C++) |
| Applied Computer Security | Introduction to Computer Science II (C++) | Foundations of Theoretical Computer Science |
| Special Topics in Systems: Computer Security | Introduction to Computer Science (C) | Formal Languages and Automata |

## C. OTHER PROFESSIONAL ACTIVITIES

### 1. Government Service

2018-2021 City Councilor, Ames, Iowa (population 66,191 as of 2016; home of Iowa State University of Science and Technology). The Council is the elected government of the City.

### 2. Other Work Experience

2005-2008 **Cofounder,** Boston Software Forensics. Developed software analysis and protective tools for software publishers and OEMs and provided software forensics consulting services.

1997 **E-mail survey programmer and administrator**, Boston University School of Management, Summer

1996 **Student researcher**, Bellcore Inc., Summer
Conducted research in firewall technology, Java security, and cryptography.

1995 **Contract programmer**, BitFlow Inc., Summer
Ported device drivers for a digital camera interface board to Windows NT and Windows 95.

1995 **Database and statistical consultant** for Boston University expert witness, Spring

1987-1993 **System programmer and administrator**, Iowa State University.
Wrote administration and support code for ISU's distributed network of hundreds of Unix systems. Provided programming and system administration support to Computer Science faculty.

1989 **Student intern programmer**, Hewlett-Packard Germany, Spring
Designed and implemented a hypertext help system based on a precursor of Motif for the X Window System under HP Unix while participating in a foreign exchange program.

1986 **Contract programmer**, Lucasfilm Ltd., Fall
Designed and implemented a sound sequencer for a computer game in 6502 assembler; arranged music and sound effects for the soundtrack.

1985-1986 **Lead programmer**, Sensor Scan Inc.
Designed and implemented object-oriented system and application software for a custom microcomputer-based security control device in 6303 assembler.

1984-1985 **Programmer**, Waveform Corp.
Developed software infrastructure for home computer music products in 6502 assembler.

| | |
|---|---|
| 1979-1983 | **Part-time programmer**, Cyberia, Inc.<br>Contributed to development of microcomputer software products in BASIC and 6502 assembler, including peripheral-sharing technologies, farm management software, and games. |

**3. Representative Testifying Expert Engagements** (listed by date of initial engagement by underlined party)

| | |
|---|---|
| 2021 | e-Numerate Solutions, Inc., and e-Numerate, LLC v. The United States of America (submitted declarations in 2021-22), C.A. No. 19-859-RTH (C. F. C.) |
| 2018 | Corus Realty Holdings, Inc. v. Zillow Group, Inc., et al. (submitted expert report; testified at deposition in 2019; W.D. Washington Case No. 2:18-cv-00847-JLR) |
| 2015 | ContentGuard Holdings, Inc. v Amazon.com, Inc., et al. (submitted expert report, testified at deposition and trial in 2015; E.D. Tex. Case 2:13-cv-01112-JRG) |
| 2012 | Droplets, Inc. v. Overstock.com, Inc., et al. (submitted expert reports; testified at deposition in 2014; testified at trial in 2015; E.D. Tex. Case 2:11-cv-401) |
| 2010 | The Apple iPod iTunes Anti-trust Litigation (engaged by plaintiffs; submitted expert reports, testified at depositions in 2011 and 2013; testified at trial in 2014; N.D. Cal. Case 4:05cv00037) |
| 2009 | University of California and Eolas Technologies Inc. v. Adobe Systems Inc. et al. (submitted expert reports, testified at depositions in 2011 and 2012, testified at trial in 2012; E.D. Tex. Case 6:2009cv00446) |
| 2008 | Northeastern University and Jarg Corporation v. Google, Inc. (submitted expert report, testified at deposition in 2011; E.D. Tex. 2:2007cv00486) |
| 2007 | i4i Limited Partnership v. Microsoft Corporation (submitted expert report, testified at deposition in 2009, testified in trial in 2009; E.D. Tex. Case 6:07cv00113) |
| 2004 | Lingo et al. (California Consumer Class) v. Microsoft Corporation (submitted expert report, testified at deposition in 2003) |

**4. Representative Consulting Expert Engagements** (listed by date of initial engagement by underlined party)

| | |
|---|---|
| 2020 | Match Group, LLC v. Bumble Trading, Inc., Case No. 6: 18-cv-00080-ADA (W.D. Tex.) |
| 2016 | Rovi Guides Inc., et al. v. Comcast Corp., et al., No. 2:16-cv-321 (EDTX); Rovi Guides Inc. v. Comcast Corp., et al., No. 2:16-cv-322 (EDTX); Certain Digital Video Receivers and Hardware and Software Components Thereof, |

| | |
|---|---|
| | Inv. No. 337-TA-1001 (ITC); Comcast Corp., et al. v. Rovi Corp., et al., No. 1:16-cv-03852 (S.D. New York) |
| 2015 | Zix Corp. v. Echoworx Corp. v. Microsoft Corp., Case No. 2:15-cv-01272-JRG (E.D. Tex.); Case No. 3:2016cv01886 (N.D. Tex.) |
| 2012 | VirnetX Inc. and Science Applications International Corporation v. Microsoft Corporation, Civil Action No. 6:13-cv-351 (E.D. Tex.) |
| 2010 | TiVo, Inc. v. EchoStar et al. |
| 2009 | Prism Technologies LLC v. Research in Motion, Ltd. and Microsoft Corporation |
| 2008 | Peer Communications, LLC v. Skype Technologies SA et al. |
| 2008 | Sun Microsystems v. Versata Enterprises |

**5. Memberships**

Association for Computing Machinery
National League of Cities Information Technology and Communications Committee

**6. Honors and Awards**

| | |
|---|---|
| 2007, 2004 | Teaching Excellence Award for U. Mass Lowell Computer Science Department |
| 1996 | Outstanding Teaching Fellow, Department of Computer Science, Boston University |
| 1993-1994 | University Graduate Fellowship, Boston University |
| 1993 | Top Graduating Senior in Mathematics, Iowa State University, Spring |
| 1993 | Top Graduating Senior in Computer Science, Iowa State University, Spring |
| 1990 | Phi Beta Kappa membership (liberal arts honor society) |
| 1990 | Phi Kappa Phi membership (engineering honor society) |
| 1990 | Pi Mu Epsilon (mathematics honor society) |
| 1990 | Upsilon Pi Epsilon (computer science honor society) |
| 1989-1990 | Barry M. Goldwater Scholarship (first recipient at Iowa State University) |
| 1988-1989 | Participated in Congress-Bundestag Youth Exchange to Germany |

## 7. Academic and Professional Publications

### Refereed Publications

| | |
|---|---|
| 2008 | Stanley J. Barr, Samuel J. Cardman, and David M. Martin Jr., *A Boosting Ensemble for the Recognition of Code Sharing in Malware*. Journal of Virology 4:4, 2008. |
| 2005 | Jesse M. Heines and David M. Martin Jr., *Development and Deployment of a Web-based Course Evaluation System*. In Proceedings of the 2005 International Conference on Web Information Systems and Technologies. |
| 2003 | D. Martin, H. Wu, A. Alsaid, *Hidden Surveillance by Web Sites: Web Bugs in Contemporary Use*, Communications of the ACM 46:12ve, December 2003. |
| 2002 | D. Martin and A. Schulman, *Deanonymizing Users of the SafeWeb Anonymizing Service*. In Proceedings of the 11th USENIX Security Symposium, August 2002. |
| 2002 | A. Alsaid and D. Martin, *Detecting Web Bugs With Bugnosis: Privacy Advocacy Through Education*. In Privacy Enhancing Technologies, Springer Lecture Notes in Computer Science volume 2482, 2002. |
| 2001 | J. Burns, P. Gurung, D. Martin, S. Rajagopalan, P. Rao, D. Rosenbluth, and A.V. Surendran, *Automatic Management of Network Security Policy by Self-securing Networks*, Proceedings of DISCEX II, 2001. |
| 2000 | D. Martin, R. Smith, M. Brittain, I. Fetch, and H. Wu, *The Privacy Practices of Web Browser Extensions*, Communications of the ACM, February 2001. Extended version available from Privacy Foundation, December 2000. |
| 1998 | A. Bestavros, M. Crovella, J. Liu, and D. Martin, *Distributed Packet Rewriting and its Application to Scalable Server Architectures*, Proceedings of the 1998 International Conference on Network Protocols, October 1998. |
| 1997 | D. Martin, S. Rajagopalan, and A. Rubin, *Blocking Java Applets at the Firewall*, Proceedings of the Internet Society Symposium on Network and Distributed System Security, January 1997. |
| 1995 | R. Book, J. Lutz, and D. Martin, *The Global Power of Additional Queries to Random Oracles*, Information and Computation 120:1, July 1995. |

### Book Chapters

| | |
|---|---|
| 2004 | D. Martin, "Privacy Analysis for the Casual User with Bugnosis", in *Designing Security Systems That People Can Use*, O'Reilly and Associates, 2005. |

### Book Editor

| | |
|---|---|
| 2005 | Privacy Enhancing Technologies, 4th International Workshop, David Martin and Andrei Serjantov (eds.), Lecture Notes in Computer Science 3424, Springer-Verlag 2005. |
| 2006 | Privacy Enhancing Technologies, 5th International Workshop, George Danezis and David Martin (eds.), Lecture Notes in Computer Science 3856, Springer-Verlag 2006. |

**Software Distributions**

| | |
|---|---|
| 2001 | A. Alsaid, J. Boak, and D. Martin, The Bugnosis Web Bug Detector (Web site and downloadable software), *www.bugnosis.org*, June 2001. |

**Magazine and Web site articles**

| | |
|---|---|
| 2001 | D. Martin, "TiVo's Data Collection and Privacy Practices", *Privacy Foundation*, March 2001. |
| 2001 | R. Smith and D. Martin, "E-Mail Wiretapping", *Privacy Foundation*, February 2001. |
| 1998 | D. Martin, "Internet Anonymizing Techniques", *;login:* Magazine, May 1998. |

**Technical Reports**

| | |
|---|---|
| 2007 | S. Barr, S. Cardman, and D. Martin, Matching Global Data References in Related Executables. Computer Science Department Technical Report No. 2007-003. |
| 1999 | D. Martin, *Local Anonymity in the Internet*, Ph.D. thesis, May 1999. |